U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
<u>SOUTHERN DIVISION</u>

CORY J. MANN, in his
individual capacity,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
U.S. DEPARTMENT OF JUSTICE
TAX DIVISION ATTORNEY
MARK MCDONALD, in his
individual capacity, and JOHN DOE
NOS. I-X,

     Defendants.

Hon. _____
Case No.2:26-cv-10930

## **<u>COMPLAINT</u>**

Now comes Plaintiff Cory J. Mann ("Mr. Mann"), by and through his attorneys Varnum LLP, and for his Complaint against the United States of America, U.S. Department of Justice Tax Division Attorney Mark McDonald, and John Does Nos. I-X, states as follows:

<u>INTRODUCTION</u>

1. "If any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately

1

fabricating evidence and framing individuals for crimes they did not commit."
*Limone v. Condon,* 372 F.3d 39, 45 (1st Cir.2004).

2.      This case is about the intimidation of witnesses, misconduct of a prosecutor and agents of the Federal Bureau of Investigations ("FBI"), subornation of perjured testimony, and fabrication of evidence, all in a calculated effort to frame an innocent person – Mr. Mann. As is described below, because of the Government's outrageous conduct, both Mr. Mann and his family have suffered significantly and continue to suffer under the stain of a wrongful prosecution.

PARTIES

3.      Mr. Mann is a United States citizen who resides within the Eastern District of Michigan. Mr. Mann was a criminal defendant in the cases styled *United States v. John Angelo, et al.*, Case No. 20-20599 ("Case No. 20-20599") and *United States v. Michael Angelo, et al.*, Case No. 22-20188 ("Case No. 22-20188"), both in the U.S. District Court for the Eastern District of Michigan.

4.      Defendant Mark McDonald ("Defendant McDonald"), was at all relevant times an attorney with the U.S. Department of Justice ("DOJ"), Tax Division and was the primary prosecutor involved in Case Nos. 20-20599 and 22-20188.

2

5.     John and/or Jane Doe Nos. I-X (hereinafter "Doe-1", "Doe-2", etc., as needed) are federal agents, prosecutors, and/or employees of the FBI and DOJ who violated Mr. Mann's constitutional rights.

6.     Agent Doe-1 was at all times relevant to this Complaint an employee of the FBI, engaged in investigative or law enforcement activities, stationed within the Eastern District of Michigan.

7.     The United States of America ("United States" or "Government"), by extension of the acts carried out by employees of the FBI and DOJ, is a properly named Defendant in this lawsuit.

<u>JURISDICTION & VENUE</u>

8.     The preceding allegations are fully incorporated herein by reference.

9.     Plaintiff brings this action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, which provides a limited waiver of sovereign immunity for tort claims arising from the negligent or wrongful acts or omissions of federal employees acting within the scope of their employment.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1346(b), which confers exclusive jurisdiction on the district courts for civil actions on claims against the United States for money damages for personal

injury or loss of property caused by the negligent or wrongful act or omission of a federal employee acting within the scope of their office or employment.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1402(b) because the acts or omissions giving rise to this claim occurred in this district, and/or because the plaintiff resides in this district.

FACTS COMMON TO ALL ALLEGATIONS

12.     The preceding allegations are fully incorporated herein by reference.

## A.     FACTS REGARDING PLAINTIFF

13.     Mr. Mann grew up in Illinois, and his family moved to Michigan when he was nine years old. Since that time, Mr. Mann has been a resident of the State of Michigan.

14.     After obtaining a bachelors in business administration from Eastern Michigan University in 2000, Mr. Mann would come to initially find success as a pharmaceutical sales representative. After working in this field for a number of years, Mr. Mann leveraged his relationships with doctors and other medical professionals and transitioned to become a minority owner and operator of an MRI center called HealthFirst Imaging. While he ran this clinic with a number of other partners, it would ultimately fail. This was a major setback for Mr. Mann, but would prove to be the 'learning opportunity' that would launch him into the next phase of his career.

4

15.    In subsequent years, Mr. Mann and his business partners, including private equity firms, would go on to launch numerous other healthcare related businesses. Unlike his first venture into this area, this proved to be a success. This led to Mr. Mann, along with various other business partners, to open surgery centers, MRI centers, a medical billing company, and a toxicology testing lab (amongst other businesses outside the medical field). In some of these ventures, Mr. Mann maintained operational oversight and control over the company, whereas in others, he was simply a passive investor.

16.    Mr. Mann is a natural entrepreneur, and in the year immediately preceding his indictment in Case No. 20-20599, Mr. Mann was involved in 33 different business ventures, and also maintained various high-level employment agreements to run some of these ventures and other non-affiliated companies.

17.    As Mr. Mann's business interest grew, so too did the complexity of his financial affairs. Mr. Mann is an individual with no formal tax training or acumen, so to address the finances of his business ventures and his tax returns, he relied on multiple certified public accountants, both internal and external to his organizations.

18.    The first line of Mr. Mann's accounting team was an individual named Kyle Davis ("Mr. Davis"). Mr. Davis is a CPA with multiple years of experience, both working for Mr. Mann and other accounting firms. While employed by Mr. Mann, Mr. Davis served as the controller for several of Mr. Mann's companies, but

5

he was also tasked with communicating directly with Mr. Mann's external CPAs regarding broader tax and financial matters.

19. While Mr. Mann has used several CPA firms over the years, at years germane to Case Nos. 20-20599 and 22-20188, Mr. Mann relied on the prominent Michigan accounting firm, Rehmann LLC ("Rehmann"). The individuals who worked on Mr. Mann's financial matters at Rehmann were primarily, certified public accountants Bryan Kearis and Rachel Locricchio ("Mrs. Locricchio"), both senior members of Rehmann.

20. Mr. Davis would frequently work directly with Rehmann regarding issues related to Mr. Mann's personal and business tax returns. Rehmann also had direct access to the QuickBooks software for many of Mr. Mann's business ventures, meaning that they had the ability to review and analyze Mr. Mann's financial transactions and business endeavors in real time and in raw form.

21. Mr. Mann relied on both Mr. Davis and Rehmann, both having combined decades of experience, to ensure that his taxes were prepared and filed correctly - which ultimately occurred the vast majority of the time.

22. Notwithstanding Case Nos. 20-20599 and 22-20188, Mr. Mann had no prior record of criminal history, and specifically, he had no history of tax violations.

**B.     CASE NO. 20-20599 BACKGROUND AND PROCEDURAL HISTORY**

23.     On December 16, 2020, a federal grand jury in the Eastern District of Michigan returned an indictment captioned *United States v. Angelo et al.*, Case No. 4:20-cr-20599 (Case No. 20-20599), charging six defendants—John Angelo ("Angelo"), Cory J. Mann, Rosina Angelo, Michael Daneshvar, Glenn Phillip Franklin III, and Brent Farouk Sitto with an alleged multipart scheme involving a conspiracy to engage in the theft of Michigan traffic crash reports and related tax offenses.

24.     The original Indictment alleges that, beginning as early as January 9, 2014, and continuing through at least October 21, 2019, the defendants secured unauthorized access to 'stolen crash reports' from Detroit police officers, before those reports were released to the public, and used the personal information therein to steer crash victims to their own law firms, chiropractic clinics, MRI facilities, and related medical businesses.

25.     Count 1 (18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud) was charged against Angelo, Mr. Mann, Michael Daneshvar, Glenn Phillip Franklin III, and Brent Farouk Sitto; it alleged that these defendants knowingly used interstate wire communications to obtain crash reports by false pretenses and to solicit crash victims for personal financial gain.

26.     Count 2 (18 U.S.C. § 371 – Conspiracy to Defraud the United States) was charged solely against Angelo and Rosina Angelo, brother and sister, for

7

impeding IRS efforts to assess and collect taxes through nominee entities and false tax filings.

27.     Counts 3–5 (26 U.S.C. § 7206(2) – Aiding or Assisting in the Preparation of False Tax Returns) were charged against Angelo and Rosina Angelo for causing the filing of materially false individual income-tax returns for tax years 2015, 2016, and 2017.

28.     Counts 6–7 (26 U.S.C. § 7206(2) – Aiding or Assisting in the Preparation of False Tax Returns) were charged against defendant Cory Justin Mann and allegedly related to (i) his own 2018 Form 1040 misreporting adjusted gross income, and (ii) the 2018 partnership return for Gravity Imaging, LLC ("Gravity Imaging"), which falsely reported ordinary business income and underreported distributions.

29.     The Government further alleged that Mr. Mann, Angelo, and Anthony Sereno ("Sereno") held ownership in a common entity, Gravity Imaging, through their various business interests, and conspired to commit wire fraud by obtaining stolen crash reports in exchange for payments exceeding $300,000 per year during 2015–2017.

30.     On December 1, 2021, the Government filed a Superseding Indictment. The Superseding Indictment did not alter the allegations against Mr. Mann or bring

any other charges against him. *See* Case No. 20-20599, ECF No. 81. The Superseding Indictment only added a new defendant, Thomas Quartz. *Id.*

31.    On May 17, 2023, after the original Indictment was issued, the Government filed a Second Superseding Indictment. *See* Case No. 20-20599, ECF No. 340. The Second Superseding Indictment expands upon the original Indictment by adding a new defendant, Mrs. Locricchio.

32.    Mrs. Locricchio was a certified public accountant ("CPA") and tax preparer with the prominent Michigan firm, Rehmann. She had been part of the long-time accounting team for Mr. Mann and his businesses.

33.    For many years prior to her indictment, Mrs. Locricchio had been a cooperating government witness, whereby, she had met with the Government during numerous interviews and had provided significant documents and information regarding Mr. Mann's companies, and both his personal and corporate tax returns.

34.    The Second Superseding Indictment charged Mrs. Locricchio as a defendant for her role in aiding or assisting in the preparation and presentation of false and fraudulent tax returns to the Internal Revenue Service ("IRS"), in relation to returns for Mr. Mann and entities associated with him.

35.    Specifically, Mrs. Locricchio was charged in Counts Six and Seven of the Second Superseding Indictment, alongside Mr. Mann, with violations of 26

U.S.C. § 7206(2) (Aiding or Assisting in the Preparation of a False Return) and 18 U.S.C. § 2 (Aiding and Abetting).

36.     The Second Superseding Indictment alleges that on or about October 14, 2019, Mrs. Locricchio and Mr. Mann willfully aided and assisted in the preparation and presentation to the IRS of a false and fraudulent Form 1040 for Mr. Mann for the 2018 tax year. The indictment alleges that the figures reported on Mr. Mann's tax returns were materially false, and that Mrs. Locricchio knew that Mr. Mann received a substantially different amount of adjusted gross income, taxable income, and tax liability than was reported.

37.     The Second Superseding Indictment further alleged that on or about February 15, 2019, Mrs. Locricchio and Mr. Mann willfully aided and assisted in the preparation and presentation to the IRS of a false and fraudulent Schedule K-1 (Form 1065) for Gravity Imaging for the 2018 tax year.

38.     The allegations common to both Mr. Mann and Mrs. Locricchio center on their joint preparation and submission of tax returns and related forms that – according to the Government – materially misrepresented the true financial condition and income of Mr. Mann and his associated entities and business partners.

39.     The Second Superseding Indictment provides that Mrs. Locricchio, as Mr. Mann's tax preparer, was directly involved in the preparation and filing of these

false returns, and that her actions were not isolated but part of a broader scheme to conceal income and evade tax obligations, in concert with Mr. Mann and others.

40.     The Second Superseding Indictment alleged that Gravity Imaging "was a limited liability company operating in Berkley, Michigan" and that "Defendants John Angelo and Cory Justin Mann, and Anthony Sereno *held an ownership interest in Gravity Imaging.*" (emphasis added). The pleading therefore treated Gravity as a multi-member partnership whose income would, by definition, be allocable among the purported owners.

41.     Only a few months after issuing the Second Superseding Indictment, on August 16, 2023, the Government filed a Third Superseding Indictment. *See* Case No. 20-20599, ECF No. 441.

42.     The Third Superseding Indictment abandons all allegations from prior indictments that Gravity Imaging was operated by Mr. Mann, Angelo, and Sereno and replaces it with the assertion that Gravity Imaging "was [exclusively] owned by Mann Global, L.L.C."—a holding company wholly owned by Cory Mann—and that "at times, Defendant Cory Justin Mann falsely represented that other individuals or entities were partners in Gravity Imaging or otherwise held an ownership interest." As a result, the Government claimed that Mr. Mann was the sole economic owner, and that any suggestion of shared ownership was a "false representation."

11

43.     This pivot in the Government's theory directly reshaped the tax charges. It introduced four new counts (Counts 6–9) and alleged that Mann: (i) filed a fraudulent 2017 Form 1065 for Gravity that improperly reported Robin Street Consultants as a partner and disguised payments to that entity as "distributions"; (ii) filed a fraudulent 2017 Form 1040 that understated his income by treating Gravity as a partnership instead of a sole proprietorship; (iii) filed a fraudulent 2018 Form 1065 that again reported nonexistent partnership distributions—this time to Robin Street and J&A Consultants—and falsely deducted $563,206 in "professional expenses" that were in fact payments to those entities; and (iv) filed a fraudulent 2018 Form 1040 that under-reported his adjusted gross income, taxable income, and tax due by misclassifying Gravity Imaging's income and claiming partnership treatment that the Government now says never existed.

44.     In support of the new charges, the Third Superseding Indictment injected an entirely new factual storyline absent from the Government's prior pleadings: that Mr. Mann alone "solely operated and solely owned" Gravity Imaging. As a result, the Government's new theory was the inverse of the position it took in the original Indictment (filed December 16, 2020), First Superseding Indictment (filed December 1, 2021), and the Second Superseding Indictment (filed May 17, 2023). It also contradicted the factual narrative that had been set forth by

the Government, the prosecution, and the FBI in the Indictment and superseding indictments filed in Case No. 22-20188.

45.    Due to this, and in combination with other factors, the Government's prosecution of Mr. Mann – *and all other co-defendants* – collapsed on itself.

46.    In September of 2023, after holding an *Enright* hearing and the Court concluding that the Government failed to sustain an initial evidentiary showing that a criminal conspiracy to commit wire fraud existed by and amongst the defendants, the charges against Mr. Mann and other co-defendants were dismissed by the Government. *See* Case No. 20-20599, ECF No. 488.

47.    On March 26, 2024, Mr. Mann and Mrs. Locricchio filed under seal their Joint Motion for Production of Grand Jury Materials alleging, *inter alia*, that the Government, Defendant McDonald, and FBI agents had engaged in misconduct before the grand jury that issued the Third Superseding Indictment. On April 8, 2024, Judge Leitman held a hearing on the Joint Motion for Production of Grand Jury Materials and granted the Motion, finding that there was a sufficient showing of concern regarding the way evidence was presented to the grand jury. Immediately following this ruling, while still in the courtroom, Defendant McDonald handed over the grand jury information to Mr. Mann's defense counsel.

48.    On April 22, 2024, Mr. Mann and Mrs. Locricchio filed under seal a Joint Motion to Dismiss counts Six through Nine of the Third Superseding

13

Indictment. As the basis of the Motion to Dismiss, Mr. Mann and Mrs. Locricchio cited widespread misconduct on behalf of the Government, to include its prosecutors and the FBI. After the Motion to Dismiss was fully briefed by the parties, Judge Leitman held a hearing on May 15, 2024, where he made detailed findings on the record, concluding that the Government's conduct before the grand jury constituted serious prosecutorial and law enforcement misconduct.

49.     The Court found that the Government, through its prosecutors and FBI agents, presented false and misleading evidence to the grand jury in order to secure the Third Superseding Indictment against Mr. Mann and Mrs. Locricchio. Accordingly, the remaining Counts in the Third Superseding Indictment were dismissed against Mr. Mann and Mrs. Locricchio. *See* Case No. 20-20599, ECF No. 607.

50.     This major event led to a cascading series of motions and findings, whereby, charges were dismissed or vacated against *all defendants* in Case Nos. 20-20599 and 22-20188. During these follow-on proceedings, many additional instances of Government misconduct were brought to light.

C.     CASE NO. 22-20188 BACKGROUND AND PROCEDURAL HISTORY

51.     On April 6, 2022, in the Eastern District of Michigan, the Government filed a second case against individual defendants: (i) Michael Angelo; (ii) Hassan Kamal Fayad; (iii) Mirna Kamal Fayad, (iv) Mr. Mann; (v) Thomas Reed Quartz;

14

and (vi) Rosina Angelo alleging a sweeping fraud and tax-evasion scheme that allegedly operated from approximately 2011 through 2022. *See* Case No. 22-20188, ECF No. 1.

52.     Mr. Mann was specifically charged with: (i) three Counts of wire fraud in violation of 18 U.S.C. § 1343; and (ii) one Count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371. *See* Case No. 22-20188, ECF No. 1.

53.     Mr. Mann, Thomas Quartz, and Rosina Angelo were overlapping defendants in Case Nos. 20-20599 and 22-20188. Defendant Michael Angelo is the brother of defendant John Angelo (Angelo) from Case No. 20-20599. Defendants Hassan Fayad and Mirna Fayad are brother and sister.

54.     The allegations from the Indictment filed in Case No. 22-20188 largely mirrored the allegations of the original Indictment filed in Case No. 20-20599, in that, the Government alleged Michael Angelo and other co-conspirators retained solicitors who unlawfully obtained Michigan traffic-crash reports and cold-called victims to steer them toward the defendants' clinics, therapy centers, transportation companies, pharmacies, magnetic-resonance-imaging ("MRI") facilities, and personal-injury law firms.

55.     The original Indictment identified Gravity Imaging as a limited liability company operating in Berkley, Michigan, that provided MRI services to patients. Mr. Mann was specifically named as one of the individuals who, at various times,

held ownership interests in Gravity Imaging and controlled its bank accounts. The

relevant excerpt states:

> Gravity Imaging, L.L.C. ('Gravity Imaging') was a limited liability company operating in Berkley, Michigan. Gravity Imaging provided MRI services to patients. Defendants HASSAN KAMAL FAYAD, MIRNA KAMAL FAYAD, and CORY JUSTIN MANN and others held ownership interests in Gravity Imaging and controlled Gravity Imaging bank accounts at various times.

*See* Case No. 22-20188, ECF No. 1, PageID 7.

56.     A distinct portion of the charged conduct involved the sale of accounts-receivable portfolios to third-party factoring companies, described therein as Buyer A and Buyer B. Michael Angelo, Hassan Fayad, and Mr. Mann were alleged to have packaged receivables—including invoices that had already been settled, paid, or otherwise rendered uncollectable—and sold or assigned to those portfolios for cash. According to the Government, each Purchase Agreement certified, under penalty of perjury, that the receivables were valid, unpaid, and free of encumbrances. The Indictment claims these representations were false because the defendants knowingly included stale, settled, or previously assigned claims, thereby defrauding the factoring companies.

57.     Critically, as of November 15, 2021, Gravity Imaging, LLC was placed under the exclusive control of a court-appointed Chief Restructuring Officer ("Receiver") by order of the Wayne County Circuit Court in the matter of *Velocity MRS - Fund IV, LLC v. 411 Help, LLC, et al.*, Case No. 21-013338-CB. Pursuant to

16

the Stipulated Order Appointing Chief Restructuring Officer, Charles Hoebeke of Rehmann, LLC was vested with "ultimate executive authority for all actions and decisions" of Gravity Imaging, including exclusive control over "all cash and cash equivalents," "all Deposit Accounts," and "all bank accounts maintained by the Stipulating Defendants." The Order further provided that the CRO maintained "sole responsibility and control over the disposition and uses of cash, credit facilities, checking accounts, deposit accounts and other financial assets," and held "exclusive authority to open and close deposit accounts." Furthermore, the CRO was ordered to "revoke the authority of any person over any account owned by any Stipulating Defendant at the direction of the CRO." Thus, from November 15, 2021 forward, Mr. Mann could not have controlled Gravity Imaging's operations or its bank accounts as alleged by the Government, because the entity and all of its assets were under the exclusive control of a court-appointed fiduciary. The Government's repeated allegations throughout its indictments and during criminal proceedings that Mr. Mann exercised post-2021 control over Gravity Imaging were demonstrably false, as any such control would have been impossible under the receivership order.

58.   A Superseding Indictment was filed on December 6, 2023. The superseding pleading was seventy-nine pages and contained several substantive changes to the original Indictment filed in Case No. 22-20188. First, it narrowed the wire-fraud allegations: the number of wire-fraud counts was reduced from twenty-

17

one to five (Counts 1–5), and Mr. Mann was no longer charged with wire fraud.

Second, the Government alleged that Mr. Mann operated Gravity Imaging as a sole

proprietor "[f]rom in or about September 2015 to at least in or about May 30, 2018."

*See* Case No. 22-21088, ECF No. 201, PageID 2035. The Government asserted

further that during this time span:

> Gravity Imaging was solely owned and operated by Defendant Cory
> Justin Mann. During that time period Gravity Imaging income,
> expenses, deductions, and other financial information should have been
> reported by Defendant Cory Justin Mann on a Schedule C attached to
> his individual income tax return. Instead of reporting Gravity Imaging
> as a solely owned business, Defendant Cory Justin Mann falsely treated
> it as a partnership. This allowed him to falsely reduce his reported
> income by claiming that the income of Gravity Imaging was split with
> other partners in the company. It also allowed him to disguise payments
> he was making for the solicitation of accident victims as distributions
> from the partnership to his supposed partner or partners.

See Case No. 22-20188, ECF No. 201, PageID 2036.

59.     Through the Superseding Indictment filed in Case No. 22-20188, the

Government essentially aligned its new and novel 'theory' that was first put forth in

the Third Superseding Indictment filed in Case No. 20-20599, which alleged that

Mr. Mann went from having multiple business partners in Gravity Imaging, to now

being operated by him as a sole proprietor, which further served as the underlying

basis for the tax claims against him.

60.     Both cases being in front of Judge Leitman, the issue of the

Government's characterizing Mr. Mann's interest in Gravity Imaging going from a

partnership to a sole proprietorship was addressed through motion practice in Case No. 20-20599 (addressed in the proceeding section). Once Judge Leitman issued his ruling on Mr. Mann and Mrs. Locricchio's Joint Motion to Dismiss in Case No. 20-20599, finding widespread Government misconduct, the Government stipulated to the dismissal of the remaining charges against Mr. Mann in Case No. 22-20188. *See* ECF No. 271.

61.     Following this, the pending charges in Case No. 22-20188 were dismissed against all of the remaining defendants. The Government also stipulated to the jury verdict against Hassan Fayad being vacated, on information and belief, largely because the Government had presented false evidence against him at trial and also subverted the grand jury process to obtain his indictment.

62.     Following the disposition of Case No. 20-20599 and 22-20188, representations were made by the Government (*but never confirmed*) that Defendant McDonald was referred by the Department of Justice to the Office of Professional Responsibility. Also based on representations made by the Government, Defendant McDonald self-reported his misconduct to the Virginia State Bar for disciplinary consideration. At the time of filing this Complaint, Defendant McDonald is still a prosecutor for the DOJ and is actively working on cases.

63.     Based on representations made by the Government, the FBI agents who were involved in submitting false evidence and suborned testimony (i.e., Agent Doe-

1 and others) were internally reprimanded yet faced no serious consequences. Despite this, these FBI agents are still actively working on cases within the Eastern District of Michigan.

64.     The supposed punitive measures taken by the Government towards the FBI and DOJ – *if they even occurred* – do nothing to redress the individuals and their families who were harmed by the Government's malevolent prosecution in Case Nos. 20-20599 and 22-20188.

## D.     IDENTIFIABLE INSTANCES OF GOVERNMENT MISCONDUCT

65.     For more than four years, the Government felt at liberty to misrepresent the true facts of Case Nos. 20-20599 and 22-20188; engaging in conduct that breached ethical as well as constitutional duties and bordered on the verge of criminality. In a sense, the Government proceeded to prosecute as a "pathological liar," with almost no adherence to the standards that govern the legal profession.

66.     Collectively, this conduct led to the wrongful prosecution of numerous individuals, including chiefly, Mr. Mann. This conduct included, but was not limited to, the facts set forth below:

> i.     *The Original Red Flag – Defendant McDonald Blatantly Misrepresenting the So-Called 'Policies' of the U.S. Attorney's Office for the Eastern District of Michigan*

67. Very early in Case No. 20-20599, there was a unique, but telling, dispute between defense counsel and the Government regarding the proper venue for the proceedings to continue.

68. Judge Leitman's Court Room was originally based in Flint, Michigan, where the original Indictment was filed. As the case progressed, Judge Leitman received notice that his chambers were scheduled to move to the Detroit federal courthouse.

69. Given this, the defendants in Case No. 20-20599 took the position that the case should move with Judge Leitman to his chambers in Detroit, for amongst other reasons, continuity and because Local Criminal Rule 18.1 requires the place of holding court to be the county in which the offense was alleged to have been committed, whereby, crimes that were alleged to have occurred in Wayne County, Macomb County, and Oakland County shall proceed in Detroit.

70. Predominantly, nearly all the facts of the original Indictment filed in Case No. 20-20599 took place in Wayne, Macomb, and Oakland Counties; thus, the federal courthouse in Detroit was *always* the proper venue.

71. Despite the clear authority otherwise, Defendant McDonald represented to the Court that it was the "policy of the U.S. Attorney's Office for the Eastern District of Michigan for cases indicted in Flint to stay in Flint." This turned out to be a blatant lie.

72.     This position of the Government was proven by Judge Leitman to be wildly false, after his chambers personally contacted the U.S. Attorney's Office for the Eastern District of Michigan to confirm that no such policy existed or ever existed. During this interaction, Defendant McDonald received a stern warning from the Court, but no further disciplinary action was taken.

73.     This gross misrepresentation on behalf of the Government, for something that was innocuous, was the original signal to defense counsel that Defendant McDonald had no ethical inhibitions about misrepresenting facts and lying to achieve an outcome that the Government so desired. This theme permeated the Government's actions throughout Case Nos. 20-20599 and 22-20188, and became increasingly more egregious as the years progressed.

   ii.     *The Purposeful Weaponization of the Discovery Process by the Government*

74.     In a criminal case, acting pursuant to Fed. R. Crim. P. 16, *Brady v. Maryland,* 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and 18 U.S.C. § 3500, the Government has well defined discovery production obligations.

75.     In the underlying criminal cases, while representing to defense counsel during numerous proffers that the Government's case in chief consisted of "41 documents," the Government proceeded to produce nearly four terabytes of electronic discovery to the defendants, over the course of 104 different unindexed, and often duplicative, productions. The only practical way to review this volume of

information was to use sophisticated e-discovery tools that heavily rely on original metadata and text to search and cull unnecessary information.

76.   Defense counsel for Mr. Mann hired an e-discovery expert to help review this mountain of information, where the expert ultimately determined that the volume of electronic information produced was roughly equivalent to nearly 17 semi-trucks worth of material, had it been printed.

77.   A significant amount of the Government's discovery, consisting of material obtained from individuals' personal computers, had absolutely no relevance to the criminal proceedings whatsoever. Some examples of this were a significant amount of pornography, Walt Disney Videos, other media, personal photos, and any number of personal files and other irrelevant information.

78.   The volume of this discovery, combined with the sheer amount of irrelevant material and disorganization, made it possible for the Government to 'hide' relevant discovery material buried within a mountain of completely irrelevant information.

79.   The task in reviewing this material was largely driven by automated processes and the use of "metadata." On a large scale, however, this was nearly impossible to do because many of the Government's files were corrupted or missing significant amounts of metadata, thus rendering the files "unsearchable."

80.     In more discrete instances, defense counsel identified occasions where files appeared to be purposefully augmented by the Government to ensure that they would not be found by using necessary e-discovery tools. The primary example of this is where the Government would take screenshots of text messages or emails from key witnesses and would then paste those into a word document which the Government would convert to a PDF. Through this process, the Government essentially rendered those materials "unsearchable," because there was no background metadata or text that e-discovery tools would pick up on.

81.     By doing this, in combination with producing massive amounts of data, the Government essentially ensured that Mr. Mann and his defense counsel were unlikely to find certain key pieces of evidence, or would spend valuable resources and time culling through mountains of information to determine what was relevant to the criminal proceedings.

82.     The Government's many productions fell woefully short of the DOJ's own guidelines.

83.     The chaotic manner of discovery carried through to the Government's supposed expert as well, IRS Revenue Agent Kelley Williams ("Ms. Williams"). The Government attempted to misuse Ms. Williams in several ways.

84.     First, she was not qualified to opine on matters relevant to the case; specifically, the intricacies of partnership taxation. This showed in her multiple –

unsigned – so-called "expert reports" where her opinions often contradicted one another or were conclusory.

85.     Second, on multiple occasions the Government opposed further discovery into Ms. Williams' substantive opinions and the material used to support those opinions; information that Mr. Mann was entitled to pursuant to Fed. R. Crim. P. 16.

86.     As Case Nos. 20-20599 and 22-20188 progressed, numerous evidentiary hearings were held and defense counsel attempted to subpoena various FBI agents to testify at these hearings, including Agent Doe-1. Despite having properly served the subpoenas requiring these witnesses' attendance, and these witnesses appearing on the Government's witness list, the Government would not produce these witnesses for testimony – even though these individuals had relevant and key exculpatory testimony to offer.

87.     As the basis for not producing these witnesses, the Government and Defendant McDonald hid behind *Touhy* regulations as providing the Government with authority not to produce these witnesses.

88.     *Touhy* regulations, named after the Supreme Court case *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) govern how agencies handle request for the testimony of government employees, primarily in legal proceedings where the U.S. Government is <u>not a party</u>.  However, when *Touhy* regulations are invoked to

prevent a criminal defendant from calling a government agent as a witness, this raises significant constitutional concerns. *Touhy* regulations cannot be used to prevent a criminal defendant from calling a government agent as a witness or to impose procedural hurdles that infringe on the defendant's constitutional rights.

89. In Case Nos. 20-20599 and 22-20188, the Government falsely relied upon *Touhy* regulations as its basis for failing to produce Government agents that could have testified regarding exculpatory information about Mr. Mann. This further obstructed Mr. Mann's substantive constitutional rights and contributed to his false prosecution.

90. On whole, the Government's handling of discovery related matters in Case Nos. 20-20599 and 22-20188 was malicious and purposefully aimed at preventing Mr. Mann and the other defendants from being able to adequately defend themselves.

### iii. *Improper Attempts to Oppose and Revoke Mr. Mann's Bond*

91. Since the first Indictment was issued in Case No. 20-20599, Mr. Mann was released on a personal bond and was only required to conduct regularly scheduled check-ins with pretrial services. During his entire time under indictment, Mr. Mann received no bond violations and was otherwise a model citizen.

92. Many months after the original indictment, and after having a chance to digest some of the Government's voluminous discovery, defense counsel had

raised a significant number of evidentiary and ethical concerns with both the Court and the Government. These efforts peaked on May 16, 2022, where defense counsel sent a Letter addressed to the head of the Northern Tax Division for the DOJ, Jason Poole, asking that a proffer be conducted in Washington, D.C. to address significant evidentiary concerns in the criminal cases and the unethical behavior of Defendant McDonald.

93.     The very next day, on May 17, 2022, Defendant McDonald filed the Government's Motion and Memorandum in Support to Revoke Defendant's Bond (the "Bond Motion"), which sought to incarcerate Mr. Mann until his trial. *See* Case No. 20-20599, ECF No. 131.

94.     As the basis for revoking Mr. Mann's bond, the Government alleged there was probable cause to believe that Mr. Mann continued to engage in criminal acts because he continued to use a "secret" bank account to make deposits from Gravity Imaging, during a time where he no longer owned the company.

95.     As alleged, this was a completely false and malicious narrative put forth by the Government, and there was no reason to believe a bond violation had occurred.

96.     The Government's Motion to Revoke Bond, filed on May 17, 2022, was predicated upon a fundamentally false factual narrative regarding Mr. Mann's purported control over Gravity Imaging and its bank accounts. Specifically,

27

Defendant McDonald and the Government alleged that "[f]rom June 2018 through at least 2021," Mr. Mann "received Gravity Imaging checks and deposited the checks into a Gravity Imaging LLC account" that the Government labeled a "Secret Gravity Imaging Account," and that Mr. Mann "disbursed, and attempted to disburse, at least approximately $700,000 of funds from Gravity Imaging's bank accounts to bank accounts he controlled for his own personal use." The Government presented purported evidence of specific overt acts occurring in January through May 2021, including deposits and disbursements from the so-called "Secret Gravity Imaging Account," as the basis for probable cause to revoke Mr. Mann's bond. What the Government failed to disclose to the Court, and what it apparently failed to discover despite its 'supposed' extensive investigation, was that Gravity Imaging, LLC had been placed into a court-supervised receivership on November 15, 2021, more than six months before the Government filed its Motion to Revoke Bond.

97.     The implications of the receivership order are devastating to the Government's bond revocation theory. Pursuant to the Stipulated Order Appointing Chief Restructuring Officer entered in *Velocity MRS - Fund IV, LLC v. 411 Help, LLC, et al.*, the CRO was granted "ultimate executive authority for all actions and decisions" of Gravity Imaging, including "sole responsibility and control over the disposition and uses of cash, credit facilities, checking accounts, deposit accounts and other financial assets." The Order explicitly directed "all financial institutions

28

and banks receiving actual or constructive notice of this Order to add the CRO or his designee as the sole signatory on any account owned in whole or in part by any of the Stipulating Defendants, and, further, to revoke the authority of any person over any account owned by any Stipulating Defendant at the direction of the CRO." Thus, at the time the Government filed its Motion to Revoke Bond in May 2022, and during the period of alleged post-indictment misconduct cited therein, the actual Gravity Imaging, LLC, and all accounts properly belonging to it, were under the exclusive control of a court-appointed fiduciary, not Mr. Mann. The Government's characterization of Mr. Mann as exercising continuing illicit control over Gravity Imaging's financial operations was therefore a legal and factual impossibility with respect to the entity itself.

98.    The Government's failure to discover, disclose, or account for Gravity Imaging's receivership status reveals either gross negligence or willful blindness in its investigation, or worse, a calculated decision to proceed with false allegations to punish Mr. Mann for his defense counsel's advocacy. The receivership was a matter of public record in the Wayne County Circuit Court. A competent investigation into Gravity Imaging's corporate status and financial affairs, which the Government purported to have undertaken, would have revealed that the entity was under court supervision and that any allegation of Mr. Mann controlling Gravity Imaging's operations or accounts after November 15, 2021, was false.

99.   Moreover, had the Government properly investigated the account activity it labeled as "secret," it would have discovered that the account Mr. Mann retained was explicitly authorized under the May 2018 sale agreement, which entitled him to keep the pre-sale bank account and collect pre-sale receivables, which were entirely legitimate transactions having nothing to do with the post-sale operations of Gravity Imaging. The Government's presentation of these facts to the Court in support of bond revocation was, at best, recklessly misleading and, at worst, knowingly false.

100.   The timing of the Government's Motion to Revoke Bond, filed the very day after defense counsel sent formal correspondence to the head of the Northern Tax Division regarding Defendant McDonald's unethical conduct, combined with its reliance on demonstrably false factual premises, further evidences the retaliatory and malicious nature of the Government's actions. By seeking to incarcerate Mr. Mann based on allegations that were contradicted by the public record of Gravity Imaging's receivership status, Defendant McDonald demonstrated a willingness to misrepresent material facts to the Court in order to inflict extrajudicial punishment on Mr. Mann and chill his defense counsel's legitimate efforts to expose prosecutorial misconduct.

101.   After the sale of Gravity Imaging on May 30, 2018, Mr. Mann had *no* ongoing business relationship with the new owners of the company *vis-a-vis* the

operations of Gravity Imaging. However, pursuant to the relevant sale transaction and documented agreement, and along with other mutual consideration that was exchanged, Mr. Mann was entitled to keep the cash assets of Gravity Imaging, to include the cash in Gravity's bank account along with all of its pre-sale account receivables.

102.    Taking the foregoing into account, the Government's sole theory regarding illicit conduct was that Mr. Mann somehow maintained a concealed post-sale interest in Gravity Imaging. This was a completely false narrative. The truth of the matter is that Mr. Mann sold his interest in Gravity Imaging on May 30, 2018, and had nothing to do with Gravity Imaging's operations since that time.

103.    The fact that Mr. Mann retained collection rights to the pre-sale account receivables (*that were generated while he owned the business*), did not constitute a continuing criminal act as so described by the Government.

104.    Furthermore, the so-called bank account that the Government alleged was "secret," was the original account that Mr. Mann himself opened when he started Gravity Imaging, using his own name and other individual information to open such account. When Gravity Imaging was sold in 2018, the sale agreement explicitly entitled Mr. Mann to keep this account. Nothing was done by Mr. Mann to conceal or otherwise disguise this account, and as his accountants were willing to attest to,

31

the income derived from that account was fully incorporated into his personal tax returns.

105.   The Government further described the nominal transfers to and from this account as "fraudulent," where any degree of investigation would have proved otherwise. These were legitimate transactions, which largely consisted of a monthly $40 QuickBooks subscription (*going out*) and aged receivable patient co-pays (*going in*). There was also other legitimate activity on the account that was clearly tied to business litigation expenses for collecting pre-sale receivables.

106.   The timing of these events clearly demonstrates Defendant McDonald's intentions. The Government's attempt to revoke Mr. Mann's bond on false pretenses was retribution for defense counsel sending a formal Letter (*the day before*) to the head of the Northern Tax Division that both described Defendant McDonald's unethical misconduct and raised serious evidentiary concerns about the case. This was nothing more than the Government's attempt to impose a form of unfounded extrajudicial punishment on Mr. Mann.

107.   The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Pretrial release on bond is considered a significant liberty interest. When the government seeks to revoke that liberty, it must provide fair procedures to ensure the deprivation is not arbitrary or unjustified.

108. While the Court ultimately declined to revoke Mr. Mann's bond, the Government's false and malicious conduct in filing the Motion caused Mr. Mann significant anxiety, reputational harm, and additional legal expense, and is emblematic of the broader pattern of misconduct that permeated the Government's prosecution throughout Case Nos. 20-20599 and 22-20188.

        *v.*      *Lack of Probable Cause for Charges In the Original Indictment in Case No. 20-20599*

109. The original Indictment against Mr. Mann in Case No. 20-20599 asserted charges for one Count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and two Counts of aiding and assisting in the preparation of a false return in violation of 26 U.S.C. § 7206(2).

110. At the time of alleging these charges against Mr. Mann, the Government objectively lacked probable cause to believe these crimes had occurred.

111. This factor would later be tested on count one, conspiracy to commit wire fraud, during an *Enright* hearing, where the Government was required to prove by an initial threshold that a conspiracy existed, so that co-conspirator statements could be introduced at trial.

112. At the conclusion of the *Enright* hearing, Judge Leitman found that "the Government did not prove, by a preponderance of the evidence, that the wire fraud conspiracy alleged in the indictment existed or that these defendants before me now, were members of it." In reaching this conclusion, the Court recounted evidence

submitted by the Government on the wire fraud count and stated the following: "[W]hen pressed on details," one of the Government's primary witnesses was unable to "identify any specifics that would suggest that Mr. Mann was aware that reports were being obtained by fraud."

113. Shortly after the *Enright* hearing, the Government dismissed count one of the indictments against Mr. Mann and other of his alleged co-conspirators. *See* Case No. 20-20599, ECF No. 485.

114. With respect to the other charges against Mr. Mann in the original indictment; two Counts of aiding and assisting in the preparation of a false return in violation of 26 U.S.C. § 7206(2), there was never a technical basis for the Government to assert that there was probable cause to sustain those charges.

115. According to the Government, the conduct underpinning the tax counts in Case No. 20-20599 related to Mr. Mann manipulating his membership basis in Gravity Imaging. Purely, through its own ignorance and misapplication of tax law, the Government never understood that the accounting of Mr. Mann's basis in Gravity Imaging did not lend itself to a taxable offense.

116. In connection with the redemption of Robin Street's membership interest in Gravity Imaging, Mr. Mann's accountants increased Mann Global's capital account in Gravity Imaging by the amount of Robin Street's remaining capital account balance after the redemption of Robin Street's membership interest.

34

Such increase to Mann Global's capital account did not create a corresponding increase to Mann Global's outside basis in the partnership.

117. This was reflected in the capital account analysis of each of Robin Street and Mann Global, shown in item L of each of their respective Schedule K-1. The accompanying statement to each such Schedule K-1 described the adjustment as "transferred capital," with a footnote on the statement accompanying Mann Global's Schedule K-1 that the transfer of member capital in the amount $244,429 is not considered an increase in partnership basis. Thus, there was no resulting taxable capital shift to Mr. Mann.

118. The Government's narrative in this regard was wildly illogical and failed to comport with the U.S. Tax Code.

119. When pressed on the intellectual honesty of these tax charges during court proceedings Defendant McDonald eventually conceded that he, as a U.S. Department of Justice Tax Division trial attorney, did not understand the underlying tax law, and commented: "I am not a tax lawyer. My understanding is that accountants will say, if a -- I mean, I'm not a tax lawyer at all." *See* **Exhibit 1**, *Hearing Transcript dated 4/8/2024,* at 35:3-8.

120. There was no basis in fact for the charges in the original indictment. As it relates to Mr. Mann, from the Government's perspective, the charges spun from a

very salacious, but fictional conspiracy to commit wire fraud, combined with a massive misapplication of the U.S. Tax Code and general accounting principles.

### vii.   *Use of Suborned Testimony and Improper Grand Jury Influence*

121.   The United States Department of Justice and its individual prosecutors are bound by a constellation of constitutional, statutory, ethical, and internal-policy mandates that categorically forbid the subornation of perjury or any other effort to procure false testimony. The Due Process Clause of the U.S. Constitution requires the Government to refrain from knowingly permitting or encouraging the presentation of false evidence, and the Supreme Court has long held that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside." *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972).

122.   These constitutional imperatives are reinforced by the bedrock principle that a federal prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty … whose interest … is not that it shall win a case, but that justice shall be done." *See Berger v. United States*, 295 U.S. 78, 88 (1935).

123.   Federal statutes codify these constitutional commands. Title 18 U.S.C. § 1622 makes it a crime to "procure another to commit any perjury," while 18 U.S.C. § 1512(b) prohibits the use of intimidation, threats, corrupt persuasion, or misleading conduct to influence the testimony of any person in an official proceeding. These

provisions apply with full force to Government attorneys, who are additionally subject to 28 U.S.C. § 530B; a statute that imports the rules of professional conduct of the jurisdiction in which the attorney performs his or her duties.

124.   Under those rules, including American Bar Association Model Rule 3.4(b) and its state analogues, an attorney may not "counsel or assist a witness to testify falsely." Engaging in any conduct calculated to induce a witness to depart from the truth therefore exposes the responsible prosecutor to criminal liability, professional discipline, and potential civil sanctions.

125.   The DOJ's own rules echo and amplify these prohibitions. The United States Attorneys' Manual (now the Justice Manual) instructs that "[p]rosecutors must not knowingly make any offer of an inducement to a witness that is likely to influence the content of that witness's testimony" (JM 9-5.001 B.4), and that "[p]rosecutors may not sponsor testimony they know to be false" (JM 9-5.100). Likewise, 28 C.F.R. Part 77, which implements the Federal Prosecution of Government Officers and Employees statute, reminds all DOJ personnel that misconduct involving witness tampering can itself trigger prosecution under §§ 1622 and 1512. These internal directives are not aspirational; they constitute binding guidance, and a departure from them "may form the basis for such remedial action as is deemed appropriate." *See* JM 1-1.200.

126. Against this rigorous legal backdrop, any attempt by DOJ officials to exploit a witness's vulnerabilities, threaten adverse consequences, or dangle leniency for family members in order to secure fabricated testimony offends settled constitutional doctrine, violates federal criminal law, breaches professional-responsibility rules, and contravenes the Department's own published standards. Such conduct, if proven, exposes the culpable actors to criminal and disciplinary proceedings, and provides aggrieved parties with a basis for declaratory, injunctive, and monetary relief under authorities including 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

127. As it relates to this Complaint, on August 16, 2023, the Government filed a Third Superseding Indictment in Case No. 20-20599 that completely reversed its theory of the tax charges against Mr. Mann. In Counts Six through Nine of the Third Superseding Indictment, the Government – for the first time ever – alleged that Mr. Mann and Sereno *were not* partners or owners of Gravity Imaging. The Government then relied on this premise to charge Mr. Mann for filing false tax returns solely on the basis that he claimed to be *in a partnership* with Sereno and Angelo, a factor that Mr. Mann never disputed and was consistent with every prior statement made by Sereno himself.

38

128. At the time of filing the Third Superseding Indictment, there was no 'record' so-to-speak-of for Sereno providing any statements claiming he *was not* a partner with Mr. Mann in Gravity Imaging.

129. Defendant McDonald willfully induced and/or procured witnesses to give perjured testimony. Defendant McDonald prepared Agent Doe-1 to provide false grand jury testimony in a "scripted" or predetermined format. By doing this, Defendant McDonald incited, instigated, or persuaded Agent Doe-1 to commit a crime and offer perjured testimony. Agent Doe-1's false testimony was then supported by Defendant McDonald's own false comments he made to the Grand Jury to bolster the perjured testimony of Agent Doe-1.

130. Agent Doe-1 was not an ordinary witness. He was an extraordinarily ill-equipped junior FBI agent who, given his limited background and training, was given an unreasonable degree of credibility before the grand jury. As would come to light post-dismissal, Agent Doe-1 never fully understood the nature of the tax charges against Mr. Mann.

131. In order to secure a Third Superseding Indictment, Defendant McDonald had clearly prepared Agent Doe-1 for his grand jury testimony in a "scripted" format, whereby, Agent Doe-1 was coached to describe Defendant McDonald's illegitimate theories of the case, which were not consistent with the

Government's investigation or Agent Doe-1's own prior testimony and FBI memoranda.

132. During the grand jury session that led to the Third Superseding Indictment, Defendant McDonald asked Agent Doe-1 two-hundred-twenty-two (222) questions. Three questions were about Agent Doe-1's history with the FBI and 219 questions concerned what he supposedly 'learned' during his investigation. Each of the 219 questions were either conclusory, compound, leading, or based on hearsay. Significantly, the 219 questions mirrored the allegations in the Third Superseding Indictment (drafted by Defendant McDonald), and Agent Doe-1 simply answered each question with one-word, affirmative responses of "yes," "yeah," or "correct."

133. Following a preplanned script where Agent Doe-1 would only answer in the affirmative, Agent Doe-1 did not have a single original thought or introduce his own observations of the evidence relative to Case No. 20-20599. In one instance, for example, Agent Doe-1 was asked a question by Defendant McDonald containing glaring factual errors, and rather than correct Defendant McDonald, Agent Doe-1 simply responded "yes," as if on autopilot.

134. Agent Doe-1's direct testimony to the grand jury was scripted and did not constitute "independent evidence"; it was, at best, a verbatim affirmation of the allegations in the Third Superseding Indictment.

40

135.   To secure the Third Superseding Indictment, on August 16, 2023, Agent Doe-1 testified before the grand jury that Sereno said he was never an owner or partner in Gravity Imaging: "Q. And have you heard Anthony Sereno tell you and others that he understood he was not an owner of gravity imaging ever? A. Yes. Yes."

136.   As Judge Leitman ultimately concluded, it was impossible to reconcile Agent Doe-1's testimony on August 16, 2023, with his testimony on May 17, 2023, and Sereno's prior statements and sworn testimony.

137.   Agent Doe-1's testimony was demonstrably false and nonsensical – which Agent Doe-1 and Defendant McDonald knew because: (i) Agent Doe-1 and/or Defendant McDonald participated in each of Sereno's prior proffers; (ii) Agent Doe-1 previously testified before the grand jury about Sereno's ownership in Gravity Imaging in the presence of Defendant McDonald; (iii) Sereno testified about the existence of the partnership and his ownership in Gravity Imaging both before the grand jury in 2020 and during the Angelo trial in 2023; (iv) on September 1, 2022, Agent Doe-1 authored an FBI 302 Report summarizing Sereno's statement that "Sereno became a partner in Gravity as a way to get 'bonused out.'"; (v) fellow FBI agents generated at least four 302 reports from proffers in which Sereno explicitly said he was an owner and partner in Gravity Imaging; and (vi) on March 2, 2022, Agent Doe-1 offered sworn testimony to a different grand jury in Case No. 22-20188, in which he explicitly affirmed that Gravity Imaging "was owned at different

41

points by Hassan Fayad, Mirna Fayad, Cory Mann … and others to include Anthony Sereno and John Angelo," and later during that same grand jury proceeding, Agent Doe-1 similarly affirmed that on December 21, 2017, Mann bought out his business partners (i.e., Angelo and Sereno) and obtained 100% ownership of Gravity Imaging.

138. Thus, the testimony offered by Agent Doe-1 on August 16, 2023 to secure the Third Superseding Indictment was completely at odds with the testimony Agent Doe-1 provided to the grand jury on many prior occasions, Agent Doe-1's own written memoranda describing the ownership of Gravity Imaging, and other FBI Agents' written memoranda describing the ownership of Gravity Imaging.

139. Defendant McDonald also used his own comments and influence to misrepresent facts to the grand jury. Indeed, after dismissing Agent Doe-1, Defendant McDonald engaged in direct dialogue with the grand jurors, where he summarized evidence for why Mr. Mann should be treated as a sole proprietor by stating the following: "[T]here are no documents that [Gravity Imaging] ever became a partnership and the person who's supposed to be the partner Anthony Sereno says he was never a partner." These comments by Defendant McDonald were demonstratively false when they were made, and Defendant McDonald knew they were false.

140. At the time, the Government was in possession of numerous documents that evidenced a partnership between Mann, Angelo, and Sereno, including: (i) tax

returns; (ii) numerous partnership distribution checks that Sereno authenticated under oath and testified he accepted; (iii) the written agreement between these individuals to terminate their partnership; (iv) Title III recorded calls between Angelo and Mann discussing their partnership, which the Government knew included Sereno; and (v) email correspondence between Angelo and Mann discussing the partnership in Gravity Imaging. Moreover, the Government had pled the first three indictments in Case No. 20-20599 as if Mr. Mann, Sereno, and Angelo were all partners in Gravity Imaging.

141.  Ultimately dismissing the tax charges against Mr. Mann, Judge Leitman went on to make numerous findings regarding the Government's conduct before the grand jury, including:

    a.  "Indeed, as I indicated, I believe that, on the record before me, given the government's answers today, that the reasonable conclusion -- the most reasonable conclusion is that the testimony attributing these specific words to Mr. Sereno was false. On top of that, aside from my view that this is false, in my view, the way this matter was presented to the Grand Jury was grossly misleading. The -- heading into this testimony in August of 2023, the government had sworn testimony from Mr. Sereno that directly and unambiguously, on its face,

43

contradicted what was reported to the Grand Jury." *See* **Exhibit 2**, *Hearing Transcript dated 5/15/2024*, at 105:17-25 to 106:1-2.

b. "While there is no general obligation to share exculpatory information with the Grand Jury, the fact that this was so grossly misleading, the omission of this evidence, on top of the fact that the testimony was false, to me, is something that weighs in favor of a dismissal here." *Id.* at 106:7-11.

c. "I found that aspect of the government's presentation [to the grand jury] to be misleading and not consistent with DOJ policy." *Id.* at 107:19-21.

d. "Is there a strong reason to believe that the testimony that I found both to be false and grossly misleading led to this indictment. And I think the answer there is, to me, yes -- an unequivocal yes." *Id.* at 108:17-21.

e. "I want to indicate that not only do I believe that the testimony elicited from Special Agent [Doe-1] brought out what I believe to be a false point that Sereno told somebody, I think it's additionally significant that [Defendant] McDonald emphasized or highlighted that evidence again, on page 26 of the Grand Jury testimony, when he said that, among other things, the person who is supposed to be the partner, Anthony Sereno, says he was never a partner." *Id.* at 109:6-13.

44

142. Judge Leitman expressly found that the government's conduct caused actual prejudice to the defendants, as the false and misleading evidence presented to the grand jury was material to the return of the Third Superseding Indictment.

143. This pattern of suborned testimony was no mistake. As described below, it was perpetrated by Defendant McDonald and Agent Doe-1 against multiple defendants in Case Nos. 20-20599 and 22-20188.

144. Judge Leitman further found that the Government's questioning and argument to the grand jury regarding the alleged withholding of handwritten notes by Ms. Locricchio was materially misleading, as the evidence showed that Ms. Locricchio had provided the notes to her attorneys, and any delay in production was attributable to her counsel, not to any willful act by Ms. Locricchio. This false presentation of facts was again perpetrated by Defendant McDonald and Agent Doe-1.

145. The Court determined that the government's misleading presentation of the facts regarding Mrs. Locricchio's notes was designed to cast aspersions on Mrs. Locricchio and Mr. Mann, and to create a false impression of obstruction or non-cooperation.

146. The Court found that the Government's conduct in these respects was not isolated, but rather reflected a pattern of misrepresentation and omission that fundamentally undermined the integrity of the judicial process.

147. Judge Leitman's on-the-record findings of Government misconduct were limited to Case No. 20-20599, however, there were significant instances of misconduct that permeated Case No. 22-20188 as well. Upon these instances of misconduct being brought to light through defendants' motion practice and other informal discussions, the Government (*then being primarily represented by the local U.S. Attorneys Office for the Eastern District of Michigan*) moved to dismiss all charges against the defendants and vacated the jury verdict against Defendant Hassan Fayad ("Fayad") in Case No. 22-20188.

148. Specifically as it relates to Fayad, Defendant McDonald and FBI agents pushed a false narrative through the testimony of Government witnesses, that Fayad stole another, completely unrelated, Hasan Fayad's identity because he was a customer at a bank where Fayad's mother worked. The allegation on behalf of the Government was that Fayad used the stolen information from the bank and used that to avoid his creditors vis-a-vis various factoring agreements. The Government pushed this false narrative both to the grand jury and during the trial of Fayad. However, the Government knew the purported individual whose identity Fayad was alleged to have stolen was not a customer at the bank at the time Fayad entered into the factoring agreements; thus, his information could not have been obtained in the manner so presented by the Government at trial and during grand jury proceedings.

46

149. Defendant McDonald manipulated witnesses in a manner that both violated his ethical obligations and resulted in false and grossly misleading testimony being offered to the grand jury. Indeed, in his role as prosecutor, McDonald had an obligation to refrain from manipulating evidence before the grand jury. *See Com. v. Seminara*, 20 Mass. App. Ct. 789, 793 (1985). The Government is also prohibited from selectively presenting evidence in a manner which distorts and taints the integrity of the grand jury process. *Id*.

150. The American Bar Association Standards Relating to the Prosecutorial Function require the Government not to "mislead the grand jury, or abuse the processes of the grand jury." *See* ABA Rule 3-4.5(a). Moreover, ABA Rule 3-4.6(e) states that "[a] prosecutor with personal knowledge of evidence that directly negates the guilt of a subject of the investigation should present or otherwise disclose that evidence to the grand jury." *Id*.

151. The U.S. Department of Justice, United States Attorneys' Manual, Section 9-11.233 similarly provides that: It is the policy of the Department of Justice, however, that when a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.

47

152.    Taking the foregoing into account, the Government's conduct in Case Nos. 20-20599 and 22-20188 showed a repeated pattern of egregious behavior using suborned testimony. Thus, the Government's conduct was not isolated or 'by accident.' Instead, the Government's conduct was calculated to lead to the continued wrongful prosecution of Mr. Mann and others.

### viii.    _Witness Manipulation and Intimidation_

153.    Throughout the pendency of Case Nos. 20-20599 and 22-20188, the Government used strong arm tactics and showed a repeated pattern of manipulating and intimidating witnesses to craft false narratives or solicit perjured testimony.

154.    Including by reference the legal authority from the preceding section, no government actor has "discretion" to violate the Constitution, statutes, regulations or rules that bind them. _See Muniz–Rivera v. United States,_ 326 F.3d 8, 15 (1st Cir.2003). The fabrication of evidence is categorically outside the bounds of lawful prosecutorial discretion or authority.

155.    Anthony Sereno: Sereno was the Government's star malleable witness, whose testimony was easily altered by external factors.

156.    Since the original Indictment was filed in December of 2020, and for almost three years thereafter, the Government maintained that Mr. Mann, Angelo, and Sereno were owners and partners in an MRI center called Gravity Imaging.

157.   This allegation was, *inter alia*, supported by Sereno's repeated, explicit representations – during multiple proffer sessions with the Government and his sworn testimony before a grand jury and at the trial of co-defendants John and Rosina Angelo in July of 2023 – that Sereno, Angelo, and Mann were owners and partners in Gravity Imaging.

158.   On August 16, 2023, however, the Government filed a Third Superseding Indictment in Case No. 20-20599 that completely reversed this narrative. This time, in Counts Six through Nine of the Third Superseding Indictment, the Government – for the first time ever – alleged that Mr. Mann and Sereno were not partners or owners of Gravity Imaging.

159.   This polar change in narrative in the Government's Third Superseding Indictment was directly contrary to the many prior statements of Sereno, which were memorialized in numerous FBI 302 reports, and were contradicted by Sereno's own testimony under oath.

160.   On at least seven (7) occasions, as early as July 6, 2018, and as recently as July 2023, Sereno, during proffer sessions with the Government and in sworn testimony, represented that he and Angelo, through their limited liability company, Robin Street, were an owner and partner in Gravity Imaging. Defendant McDonald was present for every proffer session and was the DOJ employee who elicited testimony from Sereno.

49

161. In defiance of its ethical and Constitutional obligations, the Government intended to offer Sereno's perjured testimony as the basis to obtain convictions against Mr. Mann and Mrs. Locricchio.

162. When the inconsistencies in Sereno's statements regarding the ownership of Gravity Imaging became apparent, the Government engaged in a thinly-veiled effort to have Sereno recant his testimony. Defense counsel for Mr. Mann originally raised the inconsistencies in Sereno's testimony to the Government when seeking concurrence pursuant to Local Rule 7.1 prior to filing a Motion for Production of Grand Jury Materials. In seeking concurrence, defense counsel was required to explain to the Government – in detail – the alleged abuses that had occurred and evidentiary deficiencies. In doing so, one of the issues raised with the Government was that there was not a shred of evidence that supported Sereno's newest allegations in the Third Superseding Indictment, and that this newest 'narrative' was contradicted by every statement Sereno had made.

163. Lo-and-behold, attached to the Government's Response to Defendants' Joint Motion for Production of Grand Jury Materials as Exhibit D, was a *newly-minted* FBI 302 Report authored just days after defendants' filed their Motion alleging grand jury abuse.

164. Defendant McDonald and his co-conspirators retroactively attempted to 'cover-up' any allegations of wrongdoing by creating a new paper trail of FBI 302

50

reports, that all-too-conveniently would have remedied Agent Doe-1's false testimony. This, in and-of-itself, shows that the Government in this matter was not just operating on pure gross negligence, but actually elevated its actions to where it engaged in criminal conduct in order to sustain an illegitimate prosecution.

165.   This mirrored the Government's conduct after defense counsel met with Defendant McDonald's superiors in Washington D.C.; whereby, after submitting exculpatory evidence at that meeting, Defendant McDonald spurred a wave of 'new' 302 reports and witness testimony to contradict what was presented.

166.   According to the Government's own statements made on the record, Sereno was a malleable, unsophisticated witness who could not be depended upon to articulate the simplest of concepts, however, when it came to the core of the Government's case Sereno was always at the center, and his testimony continually changed based on the whims of the Government.

167.   In 2020 Sereno pled guilty to: (i) one count of attempting to evade the assessment of federal income tax; and (ii) one count of conspiracy to commit theft from an organization receiving federal funds. See **Exhibit 3**, *Rule 11 Plea Agreement*. Sereno's sentencing in the matter styled *U.S. v. Anthony Sereno, et al.*, Case Nos. 18-20286 and 20-20055 was adjourned by the Government six times, so that he would be incentivized to provide favorable testimony in the cases against Mr. Mann.

168. In addition, Sereno was under a Cooperation Agreement with the Government. See **Exhibit 4**, *Sereno's Cooperation Agreement*. What is even more shocking is that the Government explicitly made Sereno's cooperation contingent on whether the Government would decide if Sereno's domestic partner, Tracy Varjabedian ("Varjabedian"), would be charged with any crimes.

169. Indeed, Sereno's Cooperation Agreement explicitly stated: "Defendant's cooperation will be considered by the government in the resolution of any criminal liability on the part of Tracy Varjabedian within the scope of this investigation." *Id.* (emphasis added). Sereno was pressed on this issue during one of the severed trials of a co-defendant, and he explicitly acknowledged through his testimony that he needed to make the Government "happy" so that it did not charge his girlfriend with any felonies. This exchange was captured as follows:

> Q.        You have an agreement with the government; is that right?
>
> Sereno.   Yes.
>
> Q.        And I just -- this agreement has multiple components with it. One is that you're supposed to assist them in the prosecution of other people, right?
>
> Sereno.   Yes.
>
> Q.        And that includes testifying today?
>
> Sereno.   Yes.

52

Q.  And you're hoping that if you do that to their satisfaction, they are going to ask this Judge to take it easy on you at sentencing?

Sereno.  Yes, I hope.

Q.  That's not the only part of your testimony, right, your cooperation agreement? It also hinges on Tracey Varjabedian, right?

Sereno.  Yes.

Q.  So you have to make them happy, not only to tell this Judge to be lenient on you, but you have to make them happy so they don't charge your girlfriend with something, right?

A.  Yes.

*See* **Exhibit 5**, *Trial Transcript dated 7/14/2023,* at 60:5-25.

170.  Separately, Sereno had his own angst against Mr. Mann. In the many Title III recordings that were provided by the Government, Sereno can be heard exchanging antisemitic slurs about Mr. Mann and discussing how to actively undermine him, for Sereno's own financial gain.

171.  Sereno was the Government's malleable and incentivized witness. Sereno had incentive to lie about Mr. Mann in order to receive a reduced sentence, save his spouse from criminal prosecution. He also had personal disdain for Mr. Mann. Fully aware of these factors, Defendant McDonald colluded with Sereno to develop false narratives which were then used by the Government to prosecute Mr. Mann.

172.   Based on other evidence, the Government knew, or should have reasonably known, that the facts put forth by Sereno were materially false.

173.   Defendant McDonald personally cultivated, briefed, and prepared Sereno to provide perjured testimony. Indeed, Defendant McDonald, after issuing the Third Superseding Indictment, returned to Sereno to have him recant his prior statements in order to align with the Government's new theory of criminal culpability. During this interaction, McDonald told Judge Leitman how he met with Sereno and his Attorney to discuss and memorialize the false factual narrative; clearly an action that strayed outside the bounds of prosecutorial discretion.

174.   After extensive scrutiny of Sereno and the meandering series of facts associated with him, it seemingly appeared to Judge Leitman that Sereno was being manipulated by the Government. In one exchange, as captured below, Judge Leitman directly questioned (*read:* accused) Defendant McDonald regarding his improper use of Sereno and the possible ethical concerns it raised:

> The Court:   [Defendant] McDonald, this is a question for you. Do you recall our good friend, Mr. Hammoud, who has joined us here today, one of his common refrains during the prior trial that we had in this courtroom, was that when the defense was uncovering things that were problematic for the government's case, there was a pattern of the witness who had the problem being called in for a new interview, and the new interview somehow solving the problem? I may not have Mr. Hammoud's exact words right, but Mr. Hammoud was clearly pointing out what he characterized as an evolution in 302s. Do you recall, at least, him doing that?

54

McDonald:   Yes, Your Honor.

The Court:   My recollection is that, at least as a factual matter -- at least sometimes, and it may be more than I'm just saying there, it might have been a lot of times, he had a point, and this arguably looks like what he was accusing you of -- and I'm using a lot of hesitation here -- arguably and accusing. But what do you say to the notion that if some sort of independent inspector general did a deep dive into what happened here, I'm talking about a DOJ inspector general, independent of you guys, independent of this prosecution team, that there's cause to be extremely troubled about what's going on here. . .

See **Exhibit 1**, *Hearing Transcript dated 4/8/2024*, at 53:21-25 to 54:1-19.

175.   It was clear to all litigants and Judge Leitman that Defendant McDonald and the Government relied upon Sereno as its malleable witness, who was used to shore up weaknesses in the Government's case whenever it became necessary.

176.   Rachel Locricchio: As described in the preceding sections, Mrs. Locricchio was a CPA with the Rehmann firm, that worked on Mr. Mann's personal and business tax returns.

177.   At all points in the Government's investigation up until February 2023, Mrs. Locricchio was a cooperating government witness and was not under criminal investigation. However, in February of 2023, Mrs. Locricchio met twice with Defendant McDonald to engage in "trial prep" sessions. During these sessions, Mrs. Locricchio was presented with FBI 302 reports covering her prior interviews. In reviewing these FBI 302 reports she observed wide-sweeping errors and omissions

55

regarding her prior statements made to the FBI. Mrs. Locricchio was then asked by Defendant McDonald to indicate what was incorrect with these FBI 302 reports and how it inaccurately reflected her statements.

178.   Key in these interactions was Mrs. Locricchio's acknowledgement that the Government improperly memorialized the core of its tax charges against Mr. Mann, in that, "LOCRICCHIO clarified that MANN did not 'tell' her to transfer $244,000 from the ROBIN STREET capital account to the MANN GLOBAL capital account, but instead, LOCRICCHIO did this on her own and MANN saw this reflected on his tax return." With this key acknowledgment, in combination with other factors, the Government's tax case against Mr. Mann essentially fell apart.

179.   As Mrs. Locricchio would testify to, Defendant McDonald was irate during these interactions. On information and belief, Defendant McDonald (*and not any FBI agents*) personally threatened Mrs. Locricchio with criminal charges if she refused to change her narrative.

180.   Shortly afterwards, in a measure of pure vindictiveness and without probable cause, the Government indicted Mrs. Locricchio upon allegations that she aided Mr. Mann in the preparation of false returns. The Government then used the fact that it indicted Mrs. Locricchio as leverage to try and solicit testimony that further inculpated Mr. Mann.

181. This ill-fated tactic on behalf of the Government never worked, however, because Mrs. Locricchio and her defense counsel sought to prove her innocence.

182. Kyle Davis: Mr. Davis was another witness the Government attempted to improperly intimidate into providing false testimony.

183. As described in the preceding sections, Mr. Davis was the corporate controller for many of the companies Mr. Mann owned or controlled. Mr. Davis, was thus likely to have significant information related to the tax and accounting practices related to Mr. Mann's companies.

184. When it was clear that Mr. Davis was not going to offer the Government any inculpatory statements on Mr. Mann, the sentiment of which was memorialized in numerous FBI 302 reports, the Government, through its FBI agents, approached Mr. Davis and presented him with a check he received from one of Mr. Mann's companies. In displaying the check, the agents use blackmail tactics and asserted that it had been a "kickback" that Mr. Davis had received from Mr. Mann in order to provide false and/or inaccurate statements to investigators. The agents raised this allegation with Mr. Davis and in the same token, solicited negative statements against Mr. Mann.  This was blatant coercion.

185. During this exchange, Mr. Davis acknowledged the check and simply indicated it was his yearly bonus, which was historically provided around the holiday

season. There was nothing improper about the payment, but the Government, without any justification whatsoever, attempted to intimidate a witness based on false pretenses.

186.   On information and belief, Mr. Davis would testify that, through his numerous meetings with the Government, including Defendant McDonald, it was always implied – or even explicitly suggested – that he should offer untruthful statements to inculpate Mr. Mann.

187.   David Lynch: David Lynch ("Lynch") was a Government witness that was called during the July 2023 trial of Mr. Mann's co-defendants, John and Rosina Angelo. Generally, Lynch testified that he had worked with Angelo from 2015 to 2017 by driving car accident victims to different doctors' appointments. His comments did not appear to seriously implicate any of the defendants.

188.   On cross examination, however, Lynch described, in detail, how Defendant McDonald and other government agents intimidated him and attempted to obtain false testimony.

189.   According to Lynch, the Government harassed both him and his fiancé. *See* **Exhibit 6**, *Trial Transcript dated 7/12/2023*, at 90 – 91. The Government, apparently, told Lynch's fiancé that he had engaged in nefarious illegal prior acts, and that inevitably caused a breakdown in the couple's relationship. *Id.* 90:21-23.

58

All of this was done, according to Lynch, in order to have him testify in a particular manner against the defendants. *Id.*

190. According to Lynch, the Government "attempted to put words in his mouth" and when the Government wasn't happy with a particular answer he had provided, the Government would "prod him" until he gave the answer it wanted. *Id.* at 91. This oppressive conduct continued up until trial, where Defendant McDonald confronted Lynch prior to his testimony and threatened him and said "don't make me look like a jerk when you answer." *Id.*

191. This action exceeded Defendant McDonald's prosecutorial discretion. Moreover, the Government's actions towards Lynch, through its agents or Defendant McDonald, were unjustified and improper.

192. Ericka Peterman: Ericka Peterman ("Mrs. Peterman") is the sister of Mr. Mann. Over the years, Mrs. Peterman had been employed by Mr. Mann's companies, filling various administrative roles.

193. The Government understood the sibling relationship between Mrs. Peterman and Mr. Mann and tried to improperly leverage that relationship to its benefit.

194. On numerous instances the Government would demand to meet with Mrs. Peterman, where it would use the same tactics it did with other witnesses:

accuse her of some illegal act under the implication that she should testify in a particular manner.

195. Defendant McDonald directly made many veiled threats towards Mrs. Peterman and harassed her through the use of numerous subpoenas, to the point where she obtained her own separate counsel to serve as a buffer.

196. Defendant McDonald issued numerous subpoenas to Mrs. Peterman that called for her to attend hearings or trials that never occurred. Mrs. Peterman would comply with these subpoenas and would appear on the date and time of her expected testimony, only to be told by court staff that the matter had been canceled. In a calculated measure of vindictiveness, Defendant McDonald would routinely fail to notify this witness that her court appearances were canceled, thus abusing the Government's subpoena power.

197. On whole, the fabrication of evidence, subornation of perjury, and witness intimidation involve no element of legitimate judgment or choice, because they violate mandatory legal commands.

**E.    ADMINISTRATIVE EXHAUSTION UNDER THE FEDERAL TORT CLAIMS ACT**

198. On August 19, 2025, Mr. Mann submitted a completed and signed form SF-95, along with other contents, to the United State Department of Justice Torts Branch, Civil Division (the "FTCA Claim") seeking damages in the approximate amount of $81,901,544.76. *See* **Exhibit 7**, *FTCA Claim.*

199. Mr. Mann's FTCA Claim was filed within two years of when his claim accrued.

200. The Government confirmed delivery of the FTCA Claim Submission, but engaged in no other substantive correspondence. *See* **Exhibit 8**, *Proofs of Service*; **Exhibit 9**, *DOJ Letter dated 1/12/2026.*

201. February 19, 2026, is approximately six months after Mr. Mann submitted his FTCA Claim.

202. More than six months has passed without a final disposition of Mr. Mann's FTCA Claim.

203. Prior to filing this lawsuit, Mr. Mann exhausted his administrative remedies under the Federal Tort Claim Act.

COUNT I

(*Bivens Claim for Compensatory Damages For
Violation of Plaintiff's Constitutional Rights – Defendant McDonald*)

204. The preceding allegations are fully incorporated herein by reference.

205. At all relevant times, Defendant McDonald ("Defendant McDonald") was employed as a federal prosecutor with the United States Department of Justice, Tax Division, and was acting under color of federal law.

206. The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of liberty without due process of law, including the right

to a fair and impartial grand jury process before being charged with a serious federal crime.

207. DOJ prosecutors are only entitled to qualified immunity – not absolute immunity. *See Buckley v. Fitzsimmons,* 509 U.S. 259 (1993). When prosecutors act outside of their role as advocates, for example, by fabricating evidence and participating in investigative misconduct, they may be subject to civil liability.

208. Defendant McDonald, acting individually and under color of federal law, intentionally, recklessly, or with deliberate indifference to Plaintiff's constitutional rights, subverted the grand jury process and deprived Plaintiff of his right to a fair and impartial grand jury proceeding.

209. Specifically, as found by the United States District Court for the Eastern District of Michigan, Defendant McDonald:

    a. Presented false and misleading evidence to the grand jury, including eliciting and highlighting testimony from a government agent that was not supported by the record and was contrary to sworn testimony and prior statements of key witnesses;

    b. Failed to disclose to the grand jury substantial exculpatory evidence, including prior sworn testimony and interview statements of a key witness, Anthony Sereno, that directly contradicted the Government's theory of the case and the evidence presented to the grand jury;

c. Knowingly or recklessly mischaracterized the evidence and the role of other witnesses, including Plaintiff, in a manner that created a false and prejudicial impression before the grand jury;

d. Made statements to the grand jury that were materially misleading and omitted critical context, including the existence of prior indictments and evidence that undermined the Government's theory in the Third Superseding Indictment; and

e. Failed to comply with Department of Justice policy requiring disclosure of substantial evidence that directly negates the guilt of the subject of the investigation.

210. This was not an isolated incident for Defendant McDonald because he weaponized the grand jury process against multiple defendants in Case Nos. 20-20599 and 22-20188; whereby, he followed a repeated pattern of eliciting false evidence and testimony, and failing to introduce exculpatory evidence to the grand jury.

211. Throughout the pendency of the prosecution, Defendant McDonald routinely overstepped his role as a prosecutor and took on the role of an investigatory agent of the Government, where Defendant McDonald himself would: (i) interview witnesses; (ii) cultivate suborned testimony from witnesses; (iii) threaten witnesses;

63

(iv) manipulate documentary and testimonial evidence; and (v) manipulate witnesses through various *quid pro quo* incentives.

212.  Defendant McDonald's conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's constitutional rights.

213.  As a direct and proximate result of Defendant McDonald's actions, Plaintiff was deprived of his constitutional right to a fair grand jury process, was indicted based on false and misleading evidence, and suffered deprivation of liberty, immeasurable reputational harm, emotional distress, legal expenses, and other damages.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant McDonald, in his individual capacity, for compensatory damages, punitive damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## COUNT II
(*Malicious Prosecution – United States of America*)

214.  The preceding allegations are fully incorporated herein by reference.

215.  Under the FTCA, the United States may be sued for torts arising out of the negligent or wrongful acts or omissions of its employees or agents. *See* 28 U.S.C. § 1346(b); 28 U.S.C. § 2671 *et seq.*

216.  The FTCA operates as a waiver of the United States' sovereign immunity for such claims, but with some limitations. In order to be attributed to the

64

United States, the act or omission must be one for which a private person could be sued under "the law of the place where the act or omission occurred," and must have been committed within the scope of the actor's employment. 28 U.S.C. § 1346(b)(1).

217.   To prove a claim for malicious prosecution, Plaintiff must prove the following: (1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Matthews v. Blue Cross & Blue Shield of Michigan*, 456 Mich. 365, 378 (1998).

218.   In *Manning v. United States,* 2006 WL 3240112 (N.D.Ill. Sept.28, 2006), for example, the court held that where FBI agents had "assisted in the creating of false evidence upon which prosecutors relied in causing or continuing the prosecution," such conduct plainly satisfied the malicious prosecution initiation prong. *Manning,* 2006 WL 3240112 at *31.

219.   Both Case Nos. 20-20599 and Nos. 22-20188 ended in Plaintiff's favor, with both matters being dismissed with prejudice. See **Exhibit 10**, *Order of Dismissal Case No. 20-20599*; and **Exhibit 11**, *Order for Dismissal Case No. 22-20188*. The dismissals were indicative of Mr. Mann's innocence and were not merely procedural.

65

220.    At all times relevant to this Complaint, Defendant McDonald, Agent Doe-1, and other actors of the U.S. Department of Justice and FBI, were acting within the scope of their employment with the United States Government.

221.    As described in the preceding sections, the Government never had probable cause to prosecute Mr. Mann nor did it have facts that would lead a person of ordinary caution and prudence to believe or entertain an honest and strong suspicion of Mr. Mann's guilt.

222.    The Government's lack of probable cause is further demonstrated by its conduct during the May 2023 *Enright* hearing. After the Court required the Government to make a threshold showing that a wire fraud conspiracy existed, the Government offered only a handful of witnesses, none of whom could place Mr. Mann in a conspiracy to obtain Stolen Crash Reports. One purported coconspirator candidly conceded he could not "identify any specifics" indicating Mann was aware of the alleged scheme.

223.    Another witness, an FBI confidential informant, was deemed by the Court to be "not credible in any respect," as he "seemed to be operating on some pre-ordained plan or script," that was clearly orchestrated by Defendant McDonald.

224.    At the close of the *Enright* hearing, Judge Leitman found the Government had failed to prove by an initial threshold that the charged conspiracy existed or that Mann was a member of it. The Court's ruling, made before any

66

defense case was presented, confirms that the Government never possessed facts that would lead "a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion," that Mann was guilty of the crimes charged.

225.   In a similar vein, the Government's own admissions underscore its want of probable cause on the tax counts. When pressed by the Court to explain how a basis shift among partners could amount to a violation of 26 U.S.C. § 7206(2), lead prosecutor Defendant McDonald conceded with no justifiable explanation of the charges: "I am not a tax lawyer at all."

226.   Furthermore, IRS Revenue Agent Kelley Williams – designated as the Government's tax expert – was forced to abandon three separate written 'expert' reports after defense counsel revealed that each relied on a misunderstanding of fundamental partnership-tax concepts. The Government's inability to articulate a coherent tax theory, even after three superseding indictments, is compelling evidence that probable cause was lacking from the outset.

227.   Malice is not only apparent by the Government's lack of probable cause; malice is also apparent from the Government's extraordinary efforts to manufacture evidence and to silence or intimidate witnesses whose testimony undermined its theory.

228.   For example, FBI Agents confronted Kyle Davis (Mr. Mann's corporate controller) with an innocuous year-end bonus check and baselessly labeled it a

"kickback," expressly suggesting he could avoid scrutiny by providing inculpatory statements against Mann. Likewise, Defendant McDonald repeatedly threatened Mrs. Locricchio, Mann's longtime CPA at Rehmann, with indictment, then followed through on that threat only after she refused to change her statements. Likewise, witness David Lynch testified under oath that Defendant McDonald warned him "don't make me look like a jerk" immediately before Lynch took the stand. Such conduct, designed to coerce favorable testimony and punish non-compliant witnesses, evidences the improper purpose required to satisfy the malice element of malicious prosecution.

229.   Furthermore, Defendant McDonald and Agent Doe-1 engaged in a calculated scheme to provide perjured testimony to the grand jury in order to sustain charges against Mr. Mann and other defendants. This was not an isolated incident but occurred before multiple grand juries on separate cases.

230.   Judge Leitman recognized the absurdity of the Government's continued prosecution of Mr. Mann and commented towards Defendant McDonald as follows: "Do you have any concern that given the history of this case and the different competing positions and the testimony that you've elicited and the evidence that you've had, that there's not that good-faith basis to say that these allegations can be proved beyond a reasonable doubt?" *See* **Exhibit 1**, *Hearing Transcript dated 4/8/2024*, at 43:4-9.

68

231. The termination of the prosecution in Mr. Mann's favor was unequivocal and dispositive; all of the charges in Case Nos. 20-20599 and 22-20188 were dismissed with prejudice. Furthermore, given the egregious conduct that was brought to light by Mr. Mann and Mrs. Locricchio's motion practice, charges against all defendants were dismissed or vacated.

232. The tortious conduct underlying this Count, including, but not limited to, the fabrication of evidence, the subornation of perjured testimony before the grand jury, and the intimidation and coercion of witnesses, was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

233. No federal employee possesses discretion to violate the United States Constitution, federal criminal statutes, or binding rules of professional conduct. The Due Process Clause of the Fifth Amendment prohibits the Government from knowingly presenting or permitting false testimony (*Napue v. Illinois*, 360 U.S. 264, 269 (1959)), and federal criminal law makes it a felony to procure perjured testimony, 18 U.S.C. § 1622, or to use intimidation, threats, or corrupt persuasion to influence testimony in an official proceeding, 18 U.S.C. § 1512(b).

234. These mandatory commands prescribed specific courses of action for the Government's prosecutors and agents, leaving no room for the exercise of policy judgment. The decision to fabricate evidence and suborn perjury in order to initiate

and sustain criminal proceedings against Mr. Mann was not a permissible exercise of prosecutorial discretion; it was a deliberate violation of mandatory legal obligations that no reasonable official could have believed was authorized by law. Accordingly, the discretionary function exception does not bar this claim.

235. Mr. Mann and his family have suffered actual damages as a direct and proximate result of the Government's malicious prosecution, including but not limited to: legal expenses, loss of reputation, loss of businesses and income, mental and emotional damages, as well as other quantifiable harm.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages, exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## COUNT III
### (*Negligent Supervision – United States Government*)

236. The preceding allegations are fully incorporated herein by reference.

237. Under Michigan's common law, employers can be found liable for "their negligence in hiring, training, and supervising their employees." *Zsigo v Hurley Med. Ctr.*, 475 Mich. 215, 227 (2006). Negligent supervision has been defined as the failure of the employer "to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to other employees *or third persons*."

70

238. On March 22, 2025, President Donald J. Trump issued a Presidential Memorandum for the Attorney General and the Secretary of Homeland Security with the Subject: "Preventing Abuses of the Legal System and the Federal Court" (the "Presidential Memorandum"). *See Memorandum on Preventing Abuses of the Legal System and the Federal Court*, Presidential Memorandum (Mar. 22, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/preventing-abuses-of-the-legal-system-and-the-federal-court/. A copy of the Presidential Memorandum is attached hereto as **Exhibit 12**.

239. The outset of the Presidential Memorandum states that "[l]awyers and law firms that engage in actions that violate the *laws of the United States or rules governing attorney conduct* must be efficiently and effectively held accountable." *Id.* (emphasis added). In the Presidential Memorandum, the Attorney General is directed "to take all appropriate action to refer for disciplinary action any attorney whose conduct in Federal court or before any component of the Federal Government appears to violate professional conduct rules . . ." *Id.* "In complying with this directive, the Attorney General shall consider the ethical duties that law partners have when supervising junior attorneys, *including imputing the ethical misconduct of junior attorneys to partners or the law firm when appropriate*." *Id.* (emphasis added).

240. As officers of the United States Department of Justice, the senior attorneys within the Tax Division – specifically the Section Chief, Deputy Section Chief, and the management to whom Defendant McDonald reported – owed Mr. Mann a non-delegable duty to ensure that line prosecutors and FBI agents under their command adhered to the Constitution, federal statutes, the Justice Manual, and the Rules of Professional Conduct. That duty was not abstract.

241. The DOJ has established comprehensive internal rules and policies requiring all employees to receive initial and periodic training on ethics laws, regulations, and standards of conduct, including, but not limited to: (18 U.S.C. §§ 202–209); the Standards of Ethical Conduct for Employees of the Executive Branch (5 C.F.R. pt. 2635); DOJ supplemental regulations (5 C.F.R. pt. 3801, 28 C.F.R. Part 45); Ethics Handbook for On and Off-Duty Conduct (U.S. Department of Justice); Justice Manual § 1-4.000 (U.S. Dep't of Justice).

242. The Justice Manual requires supervising attorneys to carefully monitor all subordinates to ensure compliance with constitutional discovery obligations, and to take prompt corrective action when credible allegations of misconduct arise.

243. Similarly, the Presidential Memorandum on Preventing Abuses of the Legal System (Mar. 22, 2025) directs the Attorney General and, by delegation, component heads, to "efficiently and effectively hold accountable" any lawyer who

violates those rules, emphasizing that supervisors must police "the ethical misconduct of junior attorneys."

244. At all times relevant to this Count, the Government's negligence in supervising Defendant McDonald and various FBI agents, was independent of Defendant McDonald and the FBI agents as individual tortfeasors; the Government, and specifically the management to whom Defendant McDonald and various FBI agents reported, negligently allowed Mr. Mann to be harmed.

245. From the outset of Case Nos. 20-20599, the Government was repeatedly placed on clear notice that handling of the prosecution and investigation was improper and, if left unchecked, would violate the constitutional rights of the accused.

246. For instance, on May 16, 2022, defense counsel delivered written correspondence to Tax Division leadership outlining various ethical concerns about Defendant McDonald's conduct. Less than a month later, on June 10, 2022, those same supervisors met in-person with defense counsel in Washington D.C. At that meeting defense counsel detailed Defendant McDonald's misconduct and supplied hundreds of pages of documentation and transcripts, detailing the inconsistencies in the Government's case and exculpatory evidence. Defense counsel also presented the polygraph results of Mr. Mann, showing that he had "no deception detected" as to all material aspects of the Indictment.

73

247. Rather than intervene, his supervisors permitted Defendant McDonald to continue overseeing the matters without any meaningful oversight, discipline, or remedial training, and in fact, Defendant McDonald's conduct worsened. Immediately following that meeting, Defendant McDonald pressured numerous witnesses into changing their stories, which he ultimately used as the basis to reindict Mr. Mann.

248. Likewise, there were numerous junctures throughout Case Nos. 20-20599 and 22-20188 where Judge Leitman attempted to 'warn' Defendant McDonald's superiors in Washington D.C. that something untoward was happening. These judicial warnings further underscored the need for supervisory action. On multiple occasions Judge Leitman expressly implored the Tax Division hierarchy to review McDonald's charging decisions and grand-jury practices. For example, during an October 23, 2023 hearing, the Court advised that the transcripts of recent proceedings should be 'taken up the chain of command' because the prosecutions appeared to lack a lawful foundation. Notwithstanding these warnings, Defendant McDonald's supervisors neither reassigned the case nor imposed heightened managerial scrutiny; instead, they ratified his conduct, approved the filing of the Third Superseding Indictment, and authorized Defendant McDonald's continued appearance before the grand jury even after credible allegations of improper conduct had surfaced.

74

249. The foreseeable consequence of this dereliction was precisely what occurred. Unchecked by any effective supervisory controls, Defendant McDonald proceeded to submit suborned testimony to the grand jury on multiple occasions. Had McDonald's supervisors exercised ordinary care, by reviewing the disputed FBI 302s reports, reviewing the prior testimony of FBI agents, comparing Sereno's sworn statements across proceedings, or simply heeding the Court's caution – Mr. Mann would not have been subjected to the deprivation of liberty, emotional distress, financial ruin, and reputational injury that flowed directly from the baseless indictments.

250. The supervisory breach was compounded by the Department's own written policies and the professional rules of ethics governing the supervision of attorneys. Justice Manual § 9-5.100 mandates that when "substantial evidence directly negates the guilt of a subject," prosecutors must disclose that information to the grand jury; supervisors are charged with enforcing that rule. Likewise, Justice Manual § 1-4.200 requires component heads to investigate allegations that an attorney "engaged in professional misconduct or exercised poor judgment."

251. Moreover, the Government's knowledge of Defendant McDonald's reckless conduct is not limited to this case. Plaintiff is aware of one other specific instance within the Eastern District of Michigan in which Defendant McDonald was reprimanded by a judge for reckless conduct in another case, whether formally or

informally. And on information and belief, Defendant McDonald and associated FBI agents have received numerous complaints, formal as well as informal reprimands, and other forms of sanctions regarding their professional conduct, such that, their superiors were on notice of their reckless, unethical, unprofessional and/or illegal conduct.

252. By ignoring repeated red flags, failing to institute any remedial training, and rubber-stamping successive indictments notwithstanding the mounting evidence of misconduct, the Government breached these obligatory safeguards and thereby proximately caused the harms for which Mr. Mann now seeks redress.

253. As the criminal case collapsed on the Government, Defendant McDonald made it clear that everyone in his chain of command at the DOJ knew of the unethical behavior that permeated the Government's case against Mr. Mann. This sentiment was captured by Judge Leitman in one exchange, as follows:

| | |
|---|---|
| The Court: | Do you mind if I ask another question? Who among the chain of command at the Tax Division has seen the motion to dismiss? |
| McDonald: | As far as I know, from my direct supervisor up to ethics personnel - - everybody, everybody. |
| The Court: | Your supervisor's supervisor? |
| McDonald: | The chief, my supervisor, my chief, up to the ethics person, and then I don't know what happens after that. |

See **Exhibit 2**, *Hearing Transcript dated 5/15/2024,* at 89:1-10.

76

254. Defendant McDonald's superiors in Washington D.C. had actual knowledge – borne of prior instances of misconduct, direct meetings with management, written submissions, and judicial incitements – that Defendant McDonald was violating core prosecutorial standards. Likewise, on information and belief, the junior FBI agent's superiors also had knowledge of significant mishandling of the case and ethical breaches.

255. The Government's deliberate indifference to this knowledge, and its failure either to retrain, reassign, or meaningfully supervise Defendant McDonald and various FBI agents, constituted a breach of the duty of care owed to Mr. Mann. That breach was a substantial factor in the wrongful continuation of the criminal proceedings, the years-long restraint on Mr. Mann's liberty, the collapse of his businesses, and the severe emotional and financial injuries enumerated in this Complaint.

256. The tortious conduct underlying this Count was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a). The DOJ's own internal rules, including the Justice Manual and 28 C.F.R. Part 77, impose mandatory supervisory obligations on senior attorneys to ensure that line prosecutors adhere to the Constitution, federal statutes, and established standards of professional conduct. These are not discretionary guidelines; they

constitute binding directives, and a departure from them "may form the basis for such remedial action as is deemed appropriate." See JM 1-1.200.

257. The failure of Government supervisors to intervene after receiving actual notice – through formal complaints by defense counsel and repeated judicial warnings from Judge Leitman – that a line prosecutor under their command was fabricating evidence, suborning perjury, and intimidating witnesses was not a permissible exercise of supervisory judgment grounded in policy considerations. It was the dereliction of mandatory duties imposed by Department regulations, constitutional law, and federal statutes.

258. No federal supervisor possesses discretion to ratify, ignore, or fail to correct known violations of the Constitution and federal criminal law by subordinate employees. Accordingly, the discretionary function exception does not bar this claim.

259. Mr. Mann and his family have suffered actual damages as a direct and proximate result of the Government's negligent supervision of Defendant McDonald, including but not limited to: legal expenses, loss of reputation, loss of businesses and income, mental and emotional damages, as well as other quantifiable harm.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages,

exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

COUNT IV
(*Civil Conspiracy – United States of America*)

260. The preceding allegations are fully incorporated herein by reference.

261. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Swain v. Morse*, 332 Mich. App. 510, 530 (2020). A plaintiff alleging a civil conspiracy must prove a separate, actionable tort as the basis of the conspiracy.

262. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003).

263. At all times relevant to this Complaint, Defendant McDonald, Agent Doe-1, and other actors of the U.S. Department of Justice and FBI, were acting within the scope of their employment with the United States Government.

264. The facts in support of this Complaint demonstrate multiple, often overlapping, civil conspiracies, with Defendant McDonald at the intersection of the wrongful conduct, however, Defendant McDonald never acted in a vacuum. From inception, Defendant McDonald operated in lock-step with select FBI personnel, principally Agent Doe-1, and with the Government's purported cooperating witness, Anthony Sereno, and the Government's paid informant, Aaron Korson, in a concerted effort to manufacture inculpatory evidence that did not otherwise exist.

265. The following specific allegations establish the existence of a distinct conspiracy to deprive Mr. Mann of his constitutional rights through the knowing use of fabricated testimony and the deliberate suppression of contradictory proof.

266. Defendant McDonald colluded with multiple FBI Agents (John Does), Agent Doe-1, as well as Sereno to shape false testimony that led to Plaintiff being in a never-ending cycle of indictments and false allegations. In doing this, the Government recognized that Sereno was willing to be a malleable witness, and returned to Sereno on numerous occasions to shore-up weaknesses in the Governments case or have Sereno recant prior testimony to fit a particular narrative.

267. Defense counsel sent Sereno numerous letters requesting that he submit to an informal interview, which he denied based on his participation as a government witness. *See* **Exhibit 13**, *Subpoena to Sereno*. In reality, Sereno was unwilling to

speak to anyone other than his Government handlers, Defendant McDonald and Agent Doe-1.

268. In a similar fashion, the Government shielded Sereno from going on the record and offering testimony under oath, when he would be subject to heightened scrutiny. For example, during the parties' *Enright* proceedings, where the Government cited Sereno as its supposed "key witness" during its briefings, but then backtracked and would not call him as a witness during the *Enright* evidentiary hearing because (to quote Defendant McDonald): Sereno had a credibility problem and was not the best witness to "discuss intricate details."

269. The Government used the looming threat of sentencing as an incentive for Sereno to participate in the Government's false information campaign against Mr. Mann in Case Nos. 20-20599 and 22-20188. Defendant McDonald used his prosecutorial powers to delay Sereno's sentencing on at least six different occasions, in order to ensure that he would testify favorably against Plaintiff. Not coincidentally, nearly every time Sereno's sentencing was delayed it aligned with a time where he was expected to provide testimony as a Government witness.

270. The Government also implied that it would 'take care of' any exposure Sereno's domestic partner, Tracy Varjabedian, faced if Sereno 'stayed on message.' These quid-pro-quo inducements, memorialized in the DOJ's own Cooperation Agreement with Sereno, constitute overt acts in furtherance of the conspiracy.

81

271. If Defendant McDonald, Agent Doe-1, other FBI agents, and individuals had not prompted Sereno's fictitious narratives and not coached him to concoct remedial evidence, then the prosecution of Mr. Mann and his co-defendants would have been brought to an expedient end. Defendant McDonald, the FBI, and other co-conspirators attempted to create a complete monopoly on the truth.

272. For instance, after defense counsel sought concurrence with Defendant McDonald regarding its preliminary motion for the disclosure of grand jury materials, which required defense counsel to disclose the inconsistencies in the Third Superseding Indictment, Defendant McDonald rushed out to arrange an emergency proffer with Sereno, where Agent Doe-1 was also present. In the FBI 302 Report to follow, Sereno purports to recant all his prior testimony about him being an owner or partner in Gravity Imaging, thus attempting to solve the Government's evidentiary problem.

273. During follow on proceedings, Defendant McDonald then used this newly-minted FBI 302 report as evidence to support that the Government had a valid basis for the Third Superseding Indictment. Inherent in this, Sereno had the motivation to lie on behalf of the Government. Likewise, Defendant McDonald needed Sereno to lie in order to support Agent Doe-1's suborned testimony, that Defendant McDonald orchestrated.

274.    In a similar fashion, the Government conspired with its paid informant, Aaron Korson ("Korson"), to offer suborned testimony. At all times relevant to the government's investigation, Korson was a paid informant who was allegedly operating with many of the defendants and their supposed co-conspirators. In periods leading up to 2019, Korson was paid at least $172,000 by the Government. For periods after 2019, the Government owed Korson an undisclosed sum of money, which is believed to be in the six-figure range.

275.    Korson first testified during the John Angelo trial which occurred in July of 2023. During such trial, defense counsel moved to preemptively limit portions of Korson's testimony as a government witness on the basis that Korson had never made any inculpatory statements against Angelo regarding first-hand knowledge of his "tax problems." Lo-and-behold, however, on the night before Korson was set to testify he met with Defendant McDonald, and adopted new statements that were inculpatory against Angelo.

276.    Sensing what had happened in this instance – likely due to the fact that the Government had already established a pattern of interactions with witnesses who drastically changed their testimony, Judge Leitman initially remarked: "Let me guess, [the Government] met with [Korson] in the last three days and he's now remembered Mr. Angelo confessed." It was clear from what was happening that the

Government leaned on Korson and had him come up with 'new' inculpatory statements that addressed defense counsel's objection.

277.   Korson was again called by the Government to testify during the parties *Enright* hearing on September 18, 2023. At such hearing, Korson offered strained and outlandish testimony on behalf of the Government (solicited by Defendant McDonald), whereby, Judge Leitman went on to remark in his findings:

> The next witness I want to talk about is Mr. Korson. And as I'm going to go through in detail, shortly, his testimony, even if believed, in my view, does not show that any defendant was aware that the reports were being obtained by fraud. But I find that *he was not a credible witness in any respect*, in my view. I found him, both in his demeanor and in his answers to questions, to appear overly eager to provide inculpatory information against these defendants. *He seemed to be operating on some preordained plan or script*. At one point he was asked a question, he got ahead of the government and he said, "I'm sure we'll talk about this." And in my view, when I observed him, he seemed, in my view, pleased to be able to point the finger at the defendants. In addition, he was paid a substantial amount of money for his work as an informant, and, in my view, that colored his testimony.

*See* **Exhibit 14**, *Hearing Transcript dated 9/20/2023,* at 15:19-25 to 16:1-10 (emphasis added).

278.   Like Sereno, Korson maintained a quid pro quo relationship with the Government; he'd say whatever the Government needed for a paycheck. Defendant McDonald was aware of this factor and colluded with Korson to develop "scripted" false testimony that was inculpatory of the criminal defendants, including Mr. Mann.

279.   The conspirators possessed actual knowledge that their conduct violated clearly established constitutional and statutory limits.

280. Defendant McDonald was supposedly a seasoned DOJ Tax Division prosecutor who would have extensive familiarity with the Justice Manual and *Brady/Giglio* obligations.

281. Paid informant, Korson, was a licensed attorney and was bound by the professional rules of conduct that required him to have candor towards a tribunal, testify truthfully, maintain his duty of honesty and integrity.

282. Agent Doe-1 and the other FBI agents were graduates of the FBI Academy, where they received mandatory instruction on the prohibition against presenting perjured testimony and the duty to preserve exculpatory information. Despite such knowledge, each conspirator willfully joined the plan to fabricate evidence, intimidate witnesses, and mislead the grand jury.

283. The unlawful civil conspiracy proximately caused harm to Mr. Mann. Specifically, the co-conspirators committed numerous constitutional deprivations, and engaged in malicious prosecution, and intentional infliction of emotional distress.

284. Absent the conspirators' agreement and overt acts – including the falsification of 302s, suppression of exculpatory materials, manipulation of witness testimony, and misleading of the grand jury – Mr. Mann would not have been indicted, would not have faced the ongoing threat of imprisonment, would not have

incurred millions of dollars in legal fees, and would not have lost lucrative business opportunities and professional relationships.

285.   The tortious conduct underlying this Count, including, but not limited to, the concerted fabrication of FBI 302 reports, the coordinated subornation of perjured testimony from Anthony Sereno and Aaron Korson, and the deliberate suppression of exculpatory evidence, was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), all which culminate in the torts underlying this complaint: (i) malicious prosecution; (ii) negligent supervision; (iii) negligent infliction of emotional distress; and (iv) abuse of process.

286.   No federal employee possesses discretion to enter into an agreement with co-conspirators to violate the United States Constitution, federal criminal statutes, or binding rules of professional conduct. The overt acts committed in furtherance of the conspiracy, including the falsification of investigative reports, the coaching and scripting of false grand jury testimony, and the exploitation of cooperating witnesses through threats and inducements to produce fabricated statements, each independently violated mandatory commands of the Due Process Clause, 18 U.S.C. §§ 1512(b) and 1622, ABA Model Rule 3.4(b) as incorporated by 28 U.S.C. § 530B, and the Justice Manual's binding directives at JM 9-5.001 B.4 and JM 9-5.100.

287. These mandatory legal obligations prescribed specific courses of action and left no room for the exercise of policy judgment. The agreement among Defendant McDonald, Agent Doe-1, and other co-conspirators to manufacture inculpatory evidence was not the product of any legitimate discretionary function; it was a concerted violation of binding legal mandates. Accordingly, the discretionary function exception does not bar this claim.

288. Mr. Mann and his family have suffered actual damages as a direct and proximate result of the Government's civil conspiracy against him, including but not limited to: legal expenses, loss of reputation, loss of businesses and income, mental and emotional damages, as well as other quantifiable harm.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages, exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

### COUNT V
*(Intentional Infliction of Emotional Distress – United States of America)*

289. The preceding allegations are fully incorporated herein by reference.

290. "To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4)

87

the severe emotional distress of the plaintiff." *Dalley v. Dykema Gossett PLLC*, 287 Mich.App. 296, 321 (2010); *Limone v. United States*, 579 F.3d 79, 91 (1st Cir. 2009).

291.    At all times relevant to this Complaint, Defendant McDonald, Agent Doe-1, and other actors of the U.S. Department of Justice and FBI, were acting within the scope of their employment with the United States Government.

292.    The conduct of the United States, through its agents and employees – including but not limited to DOJ Tax Division Attorney Mark McDonald, Agent Doe-1, and various other FBI agents – was extreme, outrageous, and beyond the bounds of decency tolerated in a civilized society. The Government's actions included, but were not limited to:

    a.  Deliberately misrepresenting facts to the Court and to the grand jury, including fabricating and suborning perjured testimony, and presenting false and misleading evidence to secure indictments against Mr. Mann;

    b.  Suppressing exculpatory evidence and failing to disclose substantial evidence that directly negated Mr. Mann's guilt, in violation of both constitutional and Department of Justice obligations;

    c.  Engaging in a pattern of witness intimidation, manipulation, and harassment, including threatening and coercing witnesses to provide false testimony against Mr. Mann, and retaliating against those who refused to do so;

d. Attempting to revoke Mr. Mann's bond on false pretenses, including mischaracterizing legitimate business transactions as criminal conduct, in a transparent effort to punish Mr. Mann and his counsel for raising concerns about prosecutorial misconduct;

e. Orchestrating a campaign of harassment against Mr. Mann's family members, including his sister, through repeated, unnecessary subpoenas and threats and government intrusion causing them significant distress and requiring them to retain separate counsel for protection;

f.  Engaging in a calculated scheme to manufacture evidence, manipulate witnesses, and mislead the grand jury, all with the intent to secure wrongful indictments and prosecutions against Mr. Mann and others.

293. The Government's conduct was intentional, willful, wanton, malicious, and in reckless disregard of Mr. Mann's rights. The actions described above were not isolated incidents, but rather part of a sustained and deliberate campaign to inflict harm upon Mr. Mann and his family.

294. As a direct and proximate result of the Government's extreme and outrageous conduct, Mr. Mann suffered severe emotional distress, including but not limited to: anxiety, depression, humiliation, loss of reputation, loss of business and income, disruption of family relationships, and other mental and emotional injuries

– along with the manifestation of physical injuries. The distress suffered by Mr. Mann was so severe that no reasonable person could be expected to endure it.

295. The tortious conduct underlying this Count, including, but not limited to, the deliberate fabrication of evidence, subornation of perjured testimony, intimidation and harassment of witnesses, and the retaliatory attempt to revoke Mr. Mann's bond on false pretenses, and attempts to cover up the falsification of evidence. This was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

296. No federal employee possesses discretion to engage in extreme and outrageous conduct that violates the United States Constitution, federal criminal law, and binding professional conduct rules. The Government's sustained campaign of misconduct, fabricating evidence to secure baseless indictments, threatening and coercing witnesses who refused to provide false testimony, harassing Mr. Mann's family members through abusive subpoena practices, and attempting to revoke his bond as retaliation for defense counsel's complaints, violated the Due Process Clause of the Fifth Amendment, 18 U.S.C. §§ 1512(b) and 1622, and the Department of Justice's own binding standards of conduct.

297. Each of these mandatory legal commands prescribed specific courses of action and left no room for the exercise of policy-laden judgment. The Government's conduct was not the product of any permissible discretionary

90

function; it was the deliberate violation of non-discretionary obligations imposed by law. Accordingly, the discretionary function exception does not bar this claim.

298. As a direct and proximate result of the Government's negligent conduct, Mr. Mann suffered severe emotional distress, including but not limited to: anxiety, depression, humiliation, loss of reputation, loss of business and income, disruption of family relationships, and other mental and emotional injuries – along with the manifestation of actual physical injuries, to include: (i) diagnosed post-traumatic stress disorder; (ii) panic attacks; (iii) chronic nervousness and paranoia; and (iv) stress induced shingles. The distress suffered by Mr. Mann was so severe that no reasonable person could be expected to endure it.

299. Mr. Mann and his family have suffered actual damages as a direct and proximate result of the Government's intentional infliction of emotional distress, including but not limited to: legal expenses, loss of reputation, loss of businesses and income, mental and emotional damages, as well as other quantifiable harm.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages, exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## COUNT VI
*(Abuse of Process – United States of America)*

300. The preceding allegations are fully incorporated herein by reference.

301.   Under Michigan law, to recover on a theory of abuse of process, a plaintiff must plead and prove two elements: (1) the existence of an ulterior purpose, and (2) an act in the use of process that is improper in the regular prosecution of the proceeding. *Friedman v. Dozorc,* 412 Mich. 1, 30 (1981).

302.   The gravamen of the misconduct is not the wrongful procurement of legal process or the wrongful initiation of civil proceedings; it is the misuse of process, no matter whether properly obtained, for any purpose other than that which it was designed to accomplish.

303.   The FTCA operates as a limited waiver of sovereign immunity for torts committed by federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b). Although 28 U.S.C. § 2680(h) generally excludes claims arising out of abuse of process, the law enforcement proviso to § 2680(h) restores the United States' liability for claims of abuse of process when such claims arise from the acts or omissions of "investigative or law enforcement officers of the United States Government," defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).

304.   At all times relevant to this Complaint, Agent Doe-1 and other FBI agents involved in the investigation and prosecution of Mr. Mann in Case Nos. 20-20599 and 22-20188 were "investigative or law enforcement officers" within the

meaning of 28 U.S.C. § 2680(h), as they were empowered by law to execute searches, seize evidence, and make arrests for violations of federal law.

305. These officers were acting within the scope of their employment with the United States Government at all times relevant to the acts described herein.

306. Throughout the pendency of Case Nos. 20-20599 and 22-20188, federal investigative and law enforcement officers, acting in concert with Defendant McDonald, engaged in a sustained pattern of misusing validly issued legal process for purposes wholly collateral to the legitimate objectives of the criminal proceedings against Mr. Mann. The Government's ulterior purposes included, but were not limited to: (a) retaliating against Mr. Mann and his defense counsel for raising concerns about prosecutorial and law enforcement misconduct; (b) coercing witnesses into providing false testimony to shore up the Government's lack of probable cause; (c) punishing witnesses who refused to change their statements to conform to the Government's desired narrative; and (d) dismantling Mr. Mann's business relationships and economic livelihood as a means of extrajudicial punishment and leverage. None of these purposes bore any legitimate relationship to the proper objectives of the criminal proceedings.

307. The Government's ulterior purposes were corroborated by numerous improper acts in the use of process, including, but not limited to, the following:

a. Weaponization of the Discovery Process. Agent Doe-1 and other federal law enforcement officers, acting in concert with Defendant McDonald, produced nearly four terabytes of electronic discovery over the course of 104 separate, unindexed, and often duplicative productions, while simultaneously representing that the Government's case-in-chief consisted of only "41 documents." A substantial portion of this discovery consisted of material with absolutely no relevance to the criminal proceedings. More critically, the Government's productions contained files that appeared to have been purposefully augmented, for example, by taking screenshots of key text messages and emails and converting them into unsearchable PDF documents, thereby ensuring that Mr. Mann's defense counsel would be unable to locate critical evidence through standard e-discovery tools. The practical effect of this weaponized discovery was to bury exculpatory and relevant material within a mountain of irrelevant data, impose extraordinary and unjustified financial burdens on the defense, and obstruct Mr. Mann's ability to prepare his defense. This conduct was not a legitimate exercise of the Government's discovery obligations but was instead a calculated abuse of the discovery process undertaken for

the collateral purpose of overwhelming the defense and concealing evidence favorable to Mr. Mann.

b. Abuse of the Subpoena Power Against Ericka Peterman. Federal law enforcement officers personally delivered numerous subpoenas to Mr. Mann's sister, Ericka Peterman, compelling her to appear at hearings and trials that never occurred. Mrs. Peterman dutifully complied with each subpoena and appeared on the designated date and time, only to be informed by court staff that the matter had been canceled. In a calculated measure of vindictiveness, Defendant McDonald and the Government routinely failed to notify Mrs. Peterman that her court appearances had been canceled. These subpoenas were not issued for the legitimate purpose of securing relevant testimony; they were issued for the collateral purpose of harassing, intimidating, and punishing Mrs. Peterman for refusing to provide the false testimony the Government demanded, and of exerting psychological pressure on Mr. Mann through the mistreatment of his family member. The harassment was so severe that Mrs. Peterman was forced to retain her own separate counsel to serve as a buffer against the Government's abusive conduct.

c. Retaliatory Motion to Revoke Bond. On May 16, 2022, defense counsel sent formal correspondence to the head of the Northern Tax Division

95

for the DOJ, Jason Poole, requesting a proffer in Washington, D.C. to address significant evidentiary concerns and the unethical behavior of Defendant McDonald. The very next day, on May 17, 2022, Defendant McDonald filed the Government's Motion to Revoke Defendant's Bond, seeking to incarcerate Mr. Mann until trial. The factual basis for the bond motion was demonstrably false, as the Government characterized Mr. Mann as exercising continuing illicit control over Gravity Imaging's financial operations at a time when Gravity Imaging had been under the exclusive control of a court-appointed Receiver — a fact that was a matter of public record. The bond motion was not filed for the legitimate purpose of protecting the integrity of the proceedings or addressing a genuine threat of flight or danger; it was filed for the collateral purpose of retaliating against Mr. Mann and his defense counsel for exposing prosecutorial misconduct, and of punishing Mr. Mann by threatening his liberty in order to chill further advocacy.

d.  Abuse of Grand Jury Process to Obtain Baseless Indictments. Agent Doe-1, acting in concert with Defendant McDonald, presented scripted, false testimony to the grand jury in order to secure the Third Superseding Indictment against Mr. Mann. As Judge Leitman found, Agent Doe-1's testimony on August 16, 2023, was irreconcilable with

96

his prior testimony on May 17, 2023, and with every prior statement made by the Government's own witness, Anthony Sereno. The grand jury process was not used for the legitimate purpose of presenting truthful evidence to secure a valid indictment; it was used for the collateral purpose of manufacturing charges based on fabricated evidence to sustain a prosecution the Government knew could not be supported by truthful testimony, and to maintain leverage over Mr. Mann and other defendants.

e. Abuse of *Touhy* Regulations to Obstruct the Defense. Throughout Case Nos. 20-20599 and 22-20188, defense counsel attempted to subpoena various FBI agents, including Agent Doe-1, to testify at evidentiary hearings. Despite having properly served the subpoenas and despite these individuals appearing on the Government's own witness list, the Government refused to produce these witnesses for testimony, falsely invoking *Touhy* regulations as its basis for non-production. *Touhy* regulations are designed to govern requests for testimony of government employees in proceedings where the United States is not a party, and cannot be used to prevent a criminal defendant from calling a government agent as a witness or to impose procedural hurdles that infringe on the defendant's constitutional rights. The Government's

97

invocation of *Touhy* was not a legitimate procedural objection; it was an abuse of administrative process for the collateral purpose of shielding FBI agents from having to provide exculpatory testimony under oath and preventing Mr. Mann from exposing the Government's misconduct.

308. These acts were not isolated or incidental. They formed a sustained and deliberate pattern of process abuse spanning more than four years of criminal proceedings, all directed toward the common collateral objectives of sustaining a prosecution the Government knew was unfounded.

309. The collateral purposes alleged herein are "genuinely extrinsic" to the criminal proceedings. Retaliating against defense counsel for raising ethical complaints, coercing fabricated testimony, punishing non-compliant witnesses, and deliberately destroying a defendant's businesses are not legitimate objectives of any criminal prosecution. These purposes had nothing to do with the relief or outcome available in the underlying proceedings; they were directed at achieving ends entirely outside the scope of the criminal cases.

310. The conduct underlying this Count was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

311. As a direct and proximate result of the Government's abuse of process, Mr. Mann suffered actual damages, including but not limited to: legal expenses, loss

of reputation, loss of businesses and income, the deterioration and failure of multiple business ventures, severe emotional distress, and other quantifiable harm. These damages were the foreseeable and intended consequence of the Government's sustained misuse of legal process for purposes entirely collateral to the criminal proceedings.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages, exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

### COUNT VII
(*Tortious Interference with Business Relationships – United States of America*)

312. The preceding allegations are fully incorporated herein by reference.

313. To prove tortious interference with a business relationship or expectancy, a plaintiff must show (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) damages. *Zerafa v. Hesse*, No. 339409, 2018 WL 4927104, at *4 (Mich. Ct. App. Oct. 9, 2018).

314. Tortious interference with business relationships has never been on the roster of excluded torts listed in Section 2680(h), tortious interference claims are not

per se barred by that provision. *See Limone v. United States*, 579 F.3d 79, 92 (1st Cir. 2009).

315. At all relevant times, Mr. Mann maintained numerous valid business relationships and expectancies, including but not limited to his ownership interests, operational roles, and contractual relationships with various healthcare-related businesses, such as surgery centers, MRI centers, a medical billing company, and a toxicology testing lab, as well as other ventures outside the medical field. Mr. Mann also maintained high-level employment agreements and partnerships with private equity firms and other business partners.

316. At all times relevant to this Complaint, Defendant McDonald, Agent Doe-1, and other actors of the U.S. Department of Justice and FBI, were acting within the scope of their employment with the United States Government.

317. The United States, through its agents and employees, including but not limited to Defendant McDonald and federal agents, had actual knowledge of Mr. Mann's business relationships and expectancies. This knowledge was obtained through the Government's investigation, review of Mr. Mann's business records, and direct communications with Mr. Mann's business partners, accountants, and employees.

318. The United States, acting through Defendant McDonald and other agents, intentionally and maliciously interfered with Mr. Mann's business relationships and expectancies by, among other things:

a. Initiating and maintaining baseless criminal prosecutions against Mr. Mann, which were unsupported by probable cause and premised on fabricated evidence, suborned perjury, and misrepresentations of fact;

b. Engaging in a pattern of conduct designed to damage Mr. Mann's reputation and credibility in the business community, including the public filing of indictments and press releases that falsely accused Mr. Mann of criminal conduct – which exist on the internet to this day and continue to damage Mr. Mann's business relationships;

c. Contacting Mr. Mann's business partners, employees, and professional associates, including accountants and vendors, and making statements or inquiries that cast aspersions on Mr. Mann's integrity and the legitimacy of his business operations;

d. Issuing subpoenas and otherwise harassing Mr. Mann's business associates, including his sister and employee, Mrs. Peterman, and his accountants, in a manner calculated to disrupt ongoing business operations and relationships;

e.  Attempting to coerce and intimidate witnesses, including Mr. Mann's business associates, to provide false or misleading testimony against Mr. Mann, thereby undermining confidence in his leadership and business dealings;

f.  Imposing an overly expansive no-contact list as a condition of Mr. Mann's pretrial release in Case No. 20-20599, which identified approximately 256 individuals by name, including Mr. Mann's business partners, employees, accountants, vendors, and professional associates, with whom Mr. Mann was prohibited from communicating. The Government knew, through its review of Mr. Mann's business records and its direct communications with Mr. Mann's associates, that many of these individuals were integral to the day-to-day operations and management of Mr. Mann's healthcare-related businesses and other ventures. By casting the no-contact list so broadly, the Government ensured that Mr. Mann could not communicate with the very individuals upon whom his businesses depended, effectively severing him from his own companies and commercial relationships. The foreseeable and intended consequence of this restriction was that Mr. Mann's businesses were deprived of his leadership and involvement, causing many of those enterprises to deteriorate and ultimately fail, and

contributing to the nearly 93% reduction in income Mr. Mann experienced during the years he was under indictment. The Government imposed these restrictions not as a legitimate measure to protect the integrity of its investigation, but rather as yet another tool in its broader campaign to dismantle Mr. Mann's business relationships and inflict maximum economic harm upon him and his family; and

g. Defendant McDonald directly contacting third parties, such as Synergy Health Partners Holdings, LLC and Synergy Health Partners MSO, LLC (collectively "Synergy"), and soliciting negative information or "dirt" on Mr. Mann and concurrently warning Synergy of the allegations against Mr. Mann in an effort to induce those parties to sever or alter their business relationships with him.

319. Undeniably, the Government directly targeted Mr. Mann's business interests, which is evidenced by nearly a 93% reduction in income during the years where he was under indictment.

320. Furthermore, when Mr. Mann was indicted by the Government, his partners at Synergy immediately terminated his employment and forced him out of the company, which led to multi-year civil arbitration proceedings. In these closed-door proceedings Mr. Mann's business partners admitted that his termination was based on the Government's indictment, and furthermore, that Defendant McDonald

had been in contact with Mann's Synergy partners and had made allegations of improper dealings, which further tainted the business relationship.

321. Upon the conclusion of Case Nos. 20-20599 and 22-20188, and findings of Government malfeasance from Judge Leitman, Mr. Mann was issued a formal apology from his partners at Synergy acknowledging that "they at all times" lacked evidence of Mr. Mann's criminal wrongdoing. *See* **Exhibit 15**, *Confirmation of Voluntary Withdrawal of Certain Allegations by Synergy Health Against Cory Mann dated June 20, 2025*. This is undeniable proof that the Government's interference had a direct and tangible impact on Mr. Mann's business relationships.

322. The tortious conduct underlying this Count, including but not limited to, the initiation and maintenance of baseless criminal prosecutions premised on fabricated evidence, the direct and improper contact with Mr. Mann's business partners to solicit damaging information and impugn his integrity, and the harassment and intimidation of Mr. Mann's business associates, was non-discretionary in nature and falls outside the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a).

323. No federal employee possesses discretion to interfere with an individual's business relationships through the knowing use of fabricated evidence, suborned perjury, and witness intimidation. The Government's conduct in fabricating the evidentiary basis for Mr. Mann's indictments, and in leveraging those fabricated

104

charges to damage his business relationships, violated the Due Process Clause, 18 U.S.C. §§ 1512(b) and 1622, and the Justice Manual's binding directives prohibiting prosecutors from making public statements of opinion about the guilt of any individual. See JM § 1-7.400.

324. These mandatory legal obligations prescribed specific courses of action and left no room for the exercise of policy judgment. The Government's interference with Mr. Mann's business relationships was not a discretionary prosecutorial decision; it was the foreseeable consequence of deliberate violations of binding legal mandates. Accordingly, the discretionary function exception does not bar this claim.

325. As a direct and proximate result of the United States' intentional interference, Mr. Mann suffered the breach and/or termination of multiple business relationships and expectancies. The Government's actions caused Mr. Mann to lose income, lose business opportunities, suffer reputational harm, and experience the collapse or loss of value in his business ventures – all of which continue to this day.

326. Mr. Mann and his family have suffered actual damages as a direct and proximate result of the Government's tortious interference with his business relationships, including but not limited to: legal expenses, loss of reputation, loss of businesses and income, mental and emotional damages, as well as other quantifiable harm.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, for compensatory damages, exemplary damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

## COUNT VIII
*(Injunctive & Declaratory Relief – United States of America)*

327. The preceding allegations are fully incorporated herein by reference.

328. This Court possesses authority to enter prospective equitable relief under (i) 28 U.S.C. § 1331 (federal question), (ii) the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, (iii) 5 U.S.C. §§ 702, 706(2) (Administrative Procedure Act), and (iv) the Court's inherent equitable power to fashion remedies necessary to vindicate constitutional rights and deter future misconduct by federal officials.

329. The DOJ, through its Office of Public Affairs, and the FBI maintain official webpages, social-media feeds, and electronic repositories that host, archive, and amplify multiple press releases, blog posts, tweets, and related media (collectively, the "Press Materials") announcing and describing the criminal charges that were filed in Case Nos. 20-20599 and 22-20188.

330. Each such Press Material: (a) features Mr. Mann's name, photograph, or identifying information; (b) characterizes Mr. Mann as an individual who engaged in illicit conduct; or (c) remains publicly accessible through federal domains and third-party indexing services.

106

331. Notwithstanding the complete exoneration of Mr. Mann, the DOJ and FBI have refused requests – made through counsel pursuant to 5 U.S.C. § 552a(d)(2) and DOJ media-relations channels – to remove, edit, annotate, or otherwise correct the Press Materials. The Press Materials continue to appear near the top of internet-search results for Mr. Mann's name and are routinely accessed, downloaded, and republished by employers, lenders, business partners, licensing boards, and/or members of the general public.

332. The continued publication of these materially false Press Materials: (a) perpetuates the stigma that Mr. Mann is a fraudster and cheated the United States; (b) causes ongoing, concrete harm to Mr. Mann's professional reputation, business prospects, and personal relationships; and (c) subjects Mr. Mann to repeated inquiry, suspicion, and humiliation.

333. Because the underlying criminal matters terminated in Mann's favor, and because the Court found that the indictments were procured through governmental misconduct, the continued public dissemination of the Press Materials violates Mr. Mann's rights under the Fifth Amendment to be free from governmental action that imposes stigma or disability on baseless or fabricated grounds, as well as Mr. Mann's substantive and procedural due-process interests in his good name, reputation, and liberty to pursue the occupation of his choosing.

334. The DOJ's refusal to remove or meaningfully correct the Press Materials is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2). It also contravenes the Attorney General's own guidelines requiring that public statements "should be promptly updated when subsequent developments occur." Justice Manual § 1-7.400.

335. Plaintiff has no plain, adequate, or speedy remedy at law. Monetary damages cannot erase the widespread dissemination of the Press Materials or fully redress the ongoing reputational and business harms they inflict. Only injunctive and declaratory relief can compel the Government to correct the public record and halt the continued violation of Plaintiff's constitutional and statutory rights.

336. Absent injunctive relief, Plaintiff will suffer irreparable injury. Courts recognize that the loss of First-Amendment, due-process, or liberty-interest rights, as well as continuing reputational harm, constitutes irreparable harm that cannot be compensated by damages alone.

337. The balance of equities favors Mr. Mann. Requiring the DOJ and FBI to remove or prominently annotate demonstrably false Press Materials imposes minimal administrative burden on the Government, while leaving the materials intact inflicts daily, compounding harm on Mr. Mann and his family.

338. The public interest is likewise served by an injunction. Accurate public information about criminal proceedings promotes trust in the justice system; leaving

108

uncorrected, misleading narratives on official government websites undermines that trust.

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor and against the United States of America, Declare that the continued publication, maintenance, and dissemination of the Press Materials concerning Plaintiff in connection with Case Nos. 20-20599 and 22-20188 violates the Fifth Amendment, the Administrative Procedure Act, and the Department of Justice's own published policies, in addition to, issuing a permanent injunction directing the Attorney General, the Director of the FBI, and all persons acting in concert with them to: (1) Remove from all DOJ, FBI, and other federal websites, social-media platforms, and public-relations archives every press release, news update, tweet, blog post, photograph, or similar medium that references Plaintiff in relation to Case Nos. 20-20599 or 22-20188; (2) Transmit a written retraction to all media outlets and list-servs that originally received the Press Materials, stating that all charges against Plaintiff were dismissed with prejudice and that the indictments were obtained through governmental misconduct found by the Court; (3) Post for a period of not less than twelve (12) months, on the same webpages where the Press Materials formerly appeared, a corrective statement approved by this Court summarizing the dismissals and the Court's findings; and (4) Within thirty (30) days of the Court's order, file with the Court and serve on Plaintiff a sworn declaration describing in

109

detail all steps taken to comply with subparagraphs (1)-(3) above. Further, the Court shall Retain jurisdiction to enforce the injunction and to consider any application by Plaintiff for further relief should Defendants fail to comply, and award Plaintiff his reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412 and any other applicable authority.

339.   "Sadly, when law enforcement perverts its mission, the criminal justice system does not easily self-correct." *See Limone v. United States*, 497 F. Supp. 2d 143, 153 (D. Mass. 2007), *aff'd on other grounds*, 579 F.3d 79 (1st Cir. 2009). Defendant McDonald is still acting as a prosecutor for the DOJ, albeit not in Michigan. Likewise, Agent Doe-1 is still acting as an FBI special agent in the Eastern District of Michigan and elsewhere.

340.   While numerous individuals' lives and reputations were ruined by the Government in what can only be described as a 'sham prosecution,' the individuals responsible have not been held accountable. A significant monetary judgment against the Defendants in this matter is the only way justice will be served.

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment against the Defendants in this matter, jointly and severally, in an amount no less than $81,901,544.76, together with Plaintiffs' reasonable attorneys' fees and costs, award the relief as requested under each of the Counts, and award such additional relief as the Court deems appropriate.

Respectfully submitted,

Date: March 20, 2026          By:  */s/ William L. Thompson*
                                  Eric M. Nemeth (P42925)
                                  William L. Thompson (P80123)
                                  *Attorneys for Cory J. Mann*
                                  Varnum LLP
                                  480 Pierce St., Ste. 300
                                  Birmingham, MI 48009
                                  Phone: (313) 481-7330
                                  Email: emnemeth@varnumlaw.com
                                       wlthompson@varnumlaw.com

U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| CORY J. MANN, in his individual capacity,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF JUSTICE TAX DIVISION ATTORNEY MARK MCDONALD, in his individual capacity, and JOHN DOE NOS. I-X,<br><br>     Defendants. | Hon. _____<br>Case No. _____ |

**JURY DEMAND**

Now comes Plaintiff Cory J. Mann, by and through his attorneys Varnum LLP, and requests a trial by jury for all matters related to his Complaint so triable.

Respectfully submitted,

Date: March 20, 2026

By: _/s/ William L. Thompson_
Eric M. Nemeth (P42925)
William L. Thompson (P80123)
*Attorneys for Cory J. Mann*
Varnum LLP
480 Pierce St., Ste. 300
Birmingham, MI 48009
Phone: (313) 481-7330

112

Email: emnemeth@varnumlaw.com
wlthompson@varnumlaw.com

27537182