# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

— — —

UNITED STATES OF AMERICA,

     Plaintiff,

                               Case No. 20-20599

  v.

                               Hon. Matthew F. Leitman

CORY JUSTIN MANN and RACHEL
DIANE LOCRICCHIO

     Defendants.

_____/

<u>MOTION HEARING</u>

BEFORE THE HONORABLE MATTHEW F. LEITMAN
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Monday, April 8, 2024

APPEARANCES:

For the Plaintiff:    MARK S. MCDONALD
                      CHRISTOPHER O'DONNELL
                      U.S. DEPARTMENT OF JUSTICE, TAX DIV.
                      P.O. Box 972, Ben Franklin Station
                      Washington, DC  20044
                      (202) 514-5150

*To obtain a copy of this official transcript, contact:*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • robert_smith@mied.uscourts.gov*

APPEARANCES:  (Continued)

For the Defendant
Cory Justin Mann:        ERIC NEMETH
                         WILLIAM L. THOMPSON
                         VARNUM, LLP
                         480 Pierce Street, Suite 300
                         Birmingham, MI 48009
                         (313) 481-7318


For the Defendant
Rachel Locricchio:       ALLISON L. KRIGER
                         LA RENE & KRIGER, P.L.C.
                         645 Griswold, Suite 171
                         Detroit, MI 48221
                         (313) 967-0100

TABLE OF CONTENTS

MATTER                                                                    PAGE

ECF No. 550  Motion in Limine Seeking an Expedited
             Hearing to Admit Government Expert
             Witness Testimony
             Discussion with Ms. Kriger................... 10
             Discussion with Mr. McDonald................ 11
             Ruling of the Court......................... 13

ECF NO. 560  Sealed Motion to Produce
             Grand Jury Materials
             Discussion with Mr. McDonald................ 17
             Discussion with Mr. Nemeth.................. 44
             Discussion with Mr. McDonald................ 52
             Discussion with Mr. Nemeth.................. 54
             Discussion with Mr. McDonald................ 55
             Discussion with Mr. Nemeth.................. 58
             Discussion with Ms. Kriger................. 60
             Ruling by the Court......................... 61

EXHIBITS:_____Offered_____Received

(No exhibits offered.)

Detroit, Michigan

Monday, April 8, 2024

at about 9:28 a.m.

— — —

(Court, Counsel and Defendants present.)

THE CASE MANAGER:  All rise.

The United States District Court for the Eastern District of Michigan is now in session, the Honorable Matthew F. Leitman, United States District Judge, presiding.

You may be seated.

The Court calls Case No. 20-20599, United States of America v. Cory Justin Mann and Rachel Locricchio.

Counsel, please state your appearances for the record.

MR. O'DONNELL:  Good morning, Your Honor. Christopher O'Donnell on behalf of the government.

MR. McDONALD:  Good morning, Your Honor. Mark McDonald on behalf of the government.

THE COURT:  Good morning.  Welcome to both of you.

MR. NEMETH:  Good morning, Your Honor.  Eric Nemeth on behalf of Defendant Cory Mann, who's seated in the gallery.

MR. THOMPSON:  Good morning, Your Honor. William Thompson, also on behalf of Defendant Cory Mann.

THE COURT:  Good morning.

MS. KRIGER:  Good morning, Your Honor. Allison Kriger for Ms. Locricchio, who is also in the audience.

I also want to introduce the Court to Hanna Barron (phonetic).  She's a new associate.  She does not have an appearance and she's not yet sworn in, but I wanted to have her sit here for moral support and note passing.

THE COURT:  Okay.  You can answer all the tough questions.

MS. KRIGER:  That's right, and I would hope that the Court will direct all the tough questions to Ms. Barron.

THE COURT:  If Ms. Kriger needs to phone a friend. So there's benefits of sitting up there, you feel fancy like you're a real lawyer, but there's risks.

Okay.  Welcome to all of you.

All right.  We're here this morning for a hearing on a couple of matters.  I want to start with Docket No. 550, which is the government's motion in limine and brief in support seeking an expedited hearing to admit government expert witness testimony.

And essentially, this motion is a dispute over whether the government's expert disclosures satisfy Rule 16. And the government has made the point in one of its filings that the defendants' expert disclosures should be held to the

same standard.  So before we get into the argument, what I want to do is layout how I view the governing law here, to kind of set forth the discussion.

So in my first year of law school, I had a professor for civil procedures, and every time there was a question that one of the students had, he would always answer the question with a question, which is, "Have you read the rule?"  And that was such a famous response by him that we put it on our class t-shirt.

So I think that the obvious place to start here when thinking about the sufficiency of these expert disclosures, is with the language of Rule 16(g)(3), which is of the Federal Rules of Criminal Procedure, which is the rule that talks about the contents of an expert disclosure.  And that rule provides that the disclosure for each expert witness must contain -- as relevant here there are two things, a complete statement of all opinions that the government will elicit from the witness in its case in chief, or during its rebuttal to counter testimony that the defendant has timely disclosed, and the second thing is the bases and reasons for them.

So in terms of trying to understand what that means, there were a few decisions that I found helpful.  One of which was cited in the defendants' response to the motion, which is a Sixth Circuit decision in a case called *U.S. v.*

*Davis*, 514 F.3d 596, where the court, at page 16 -- excuse me, 613, found a disclosure not sufficient under the rule because it would not have permitted a defense expert to analyze the steps that led the government's expert to the expert's conclusions. So that gives us a sense of the kind of thing that might be required.

There's another case that Ms. Kriger sent me this morning, that I found on my own, that I thought was helpful, is a case called *United States v. Marbet*, M-A-R-B-E-T. It is a published decision in the F.Supp.3rd, but I don't think the published citation is available yet. It is 2023 Westlaw 8179685. This is by Judge Rakoff, from the Southern District of New York, who's a very well respected judge. And he talks about an expert disclosure, when it talks about the basis and reasons for the expert's opinion, to require at least some explanation as to how the expert came to his conclusions and what methodologies or evidence substantiate that conclusion.

And Judge Rakoff talked about how the recent amendments to Federal Rule of Criminal Procedure 16 largely mirror what has been required in civil cases, under Federal Rule 26, for disclosure of experts. And Judge Rakoff made a point that I think is important, that the disclosure requirements are even more important in criminal cases, since while civil litigants may depose their opponent's experts,

criminal defendants have no such opportunity.

And the idea Judge Rakoff adds is that the purpose of these disclosures is intended to facilitate trial preparation, allowing the parties a fair opportunity to prepare to cross-examine expert witnesses and secure opposing expert testimony, if needed.

There's another somewhat helpful case, called *United States v. Bressie*, which is a Westlaw cite, 2023 Westlaw 7287214, from the Middle District of Pennsylvania, where Chief Judge Brann, there, talks about a disclosure of expert testimony must explain why an expert believes that certain opinions are appropriate.

An important point here is the similarity between the language in Criminal Rule 16 and Civil Rule 26(a)(2). Both of those rules require disclosure of the basis and reasons for the expert's opinion. And I'm not the only one to recognize the similarity in those rules. As I mentioned, Judge Rakoff mentioned it; Judge Calabrese, in the Northern District of Ohio, in a case called *United States v. Spivak*, 639 F.Supp.3d 773, at page 779, notice the similarities that criminal practice has followed the lead of civil discovery in the areas of expert disclosures, which he says the 16(a)(1)(G) is modelled after Civil Rule 26(a)(2).

And there's a treatise, Wharton's Criminal Procedure, Section 12:9, 14th edition, notes the

similarities, although not identical, nature of the federal civil rule on disclosures of expert testimony, and the criminal rule.

And why that's important to me is that the Sixth Circuit has offered some important analysis of what this term, "the reasons and basis for the opinions," means in the civil rule, and, again, that's the same phrase that's used in the criminal rule, in a case called *R.C. Olmstead v. CU Interface*, 606 F.3d 262, a published decision from 2010. And what the Sixth Circuit said there is that an expert opinion must set forth the facts -- and then here's the more important part -- and in doing so, outline a line of reasoning arising from a logical foundation. And they talk about an expert report must include the "how" and the "why" the expert reached a particular result, not merely the conclusory opinions. And, again, this is all in the context of a discussion of the particular rule requiring a complete statement of the basis and the reasons. So that's the factual background that I'm considering here.

And before I take up the government's motion, let me ask the defense, and particularly Mr. Mann's counsel here, about a very technical rule that I apply in this Court called the goose-gander rule; what is good for the goose is good for the gander. And when I compare your expert disclosures against the government's, and I have a lot of concerns about

the government's, I think yours are even less compliant with the rule.

The -- there's one statement in your expert disclosure about the basis of your expert's opinion, and it says the basis of his opinion is his experience. That is no reasoning at all. That's not a chain of -- that's not answering the why. And so the government attached your disclosures, and I'm prepared to go through this exercise, and I have a proposed solution to this problem, but one solution is you back off your objection, they haven't moved to strike yours, they think yours are sufficient, which they're not; but one solution is everybody walks away from their objections and both experts can testify, or else I will take up the sufficiency of both.

So before I turn to the government, does somebody from the defense want to respond to that?

MS. KRIGER: Yes, Your Honor. Would you like me at the lectern?

THE COURT: Please.

MS. KRIGER: Okay. The answer to that question, Your Honor, is that the rule contemplates that the defendants' disclosure -- that the rule for their disclosures is only triggered when the government complies with their obligations under Rule 16. And that makes sense when you -- for example, when you read Judge Rakoff's decision, and

Judge Rakoff says the government's disclosure should allow the defendants to then be able to find their own expert to rebut these decisions.

And part of the issue here and the -- as the Court mentioned earlier, one of the places that we start is the rule itself. And the rule says, you know, if the government asks and the government complies with the rule themselves, then the defense has to do the same thing.

I certainly have no objection to, and imagine that the Court would order it anyway, no objection to supplementing defendants' disclosures when the government provides sufficient bases and reasons. But Mr. Lipton cannot follow, quite frankly, the R.A. Williams's rationale in this case, and I -- you know, he has a lot more to say about the bases and reasons for his opinions and just that he's a world-renowned tax expert, or the six publications that he wrote about partnerships of taxation last year, and the 18 pages of publications that the Court could have read itself or, certainly, the government could have. But that's the answer to the question, is that once the government complies, the defendants then should have an opportunity to supplement their disclosures and meet the same obligation.

THE COURT: All right. Who's going to talk from the government about this?

MR. McDONALD: Yes, sir.

THE COURT: So here's my -- I'm going to start -- before I make it an order, I'm going to start by calling it a proposal and get your thoughts. So I've read the government's disclosures from beginning to end, and the government says, every time it files a supplemental one, it was confident that its earlier ones were enough. Respectfully, I don't share that view, but I think as you move through it, you certainly got closer to what I believe is required under the rule.

But I believe the rule requires a disclosure that is essentially in this form: Opinion number one, a single, self-contained opinion, not an amalgamation of opinions; and then a statement of it; and then the basis and reasons for that particular opinion, which include an explanation of the why, a showing the work, some reasoning that somebody could follow.

So, for instance, if I sat down with Agent Williams and she offered an opinion, and I said, can you explain to me why you believe that, that would be the basis and reasons.

So what I'm proposing here is a carefully-crafted disclosure from each side, where they -- it's opinion number one, it's a discrete opinion, it's not an amalgamation of stuff, and then a basis and reasons for each.

Do you have any problem with that?

MR. McDONALD: May I have 30 seconds, Your Honor?

THE COURT:  Sure.

(An off-the-record discussion was held at 9:43 a.m.)

MR. McDONALD:  The government agrees, Your Honor.

THE COURT:  Okay.  Anybody on the defense side have a problem with that?

MS. KRIGER:  The remedy is -- sorry, just for clarification.

THE COURT:  That the government will give a disclosure in the format that I just identified, with a discrete statement of each and every opinion, with a single opinion in one item, not an amalgamation, and underneath that opinion, the reasons and bases for the opinion.

MS. KRIGER:  Okay.  Yes.

MR. NEMETH:  We're agreeable the government do that, but are we saying, simultaneously, with a defense expert or --

THE COURT:  If your expert is going to be a rebuttal expert, then he could respond to what they did, he would need some time to respond.  I get that.

MS. KRIGER:  Okay.

MR. NEMETH:  That's --

MS. KRIGER:  Yeah, within some reasonable amount of time.

THE COURT:  We can talk about timing in a minute.

So that's the first idea.  But what I want to make clear is when I think, in my own mind, about reasons and explanation, it means more than just citing a statute or citing a regulation; it means explaining how the authority that the person is relying on logically leads to the opinion or conclusion that the person has drawn.  That's what I'm talking about.

MR. McDONALD:  Yes, sir.

THE COURT:  Okay.  And some of the stuff that was listed in here didn't strike me as being in the form of a -- of what I would call an opinion.

MR. McDONALD:  Are you looking at 550-4, the long letter?

THE COURT:  No.  I was just looking at -- well, you guys can identify what you think are opinions, and you can identify them, each separately, and provide the reasoning for each.

How long do you need to do that, Mr. McDonald?

MR. McDONALD:  We can have it ready in 14 days, Your Honor.

THE COURT:  How long do you guys need to respond?

MS. KRIGER:  Well, one of the issues, Your Honor, is -- I'm not -- I think, one week.  But the other issue with -- one week would be fine.  That puts us -- that would put us to the pretrial motion deadline, although not the

motion in limine deadline, as I mentioned in footnote 1 in our response.  They are -- we were reserving the right, after the government provides a disclosure that complies with the rule, to challenge the admissibility of her testimony under a number -- for a number of other reasons that just didn't seem to be at issue in this particular -- for this particular matter.

So could we then have until May 3rd to challenge the admissibility of her -- okay.  Well, until the end of that week to file a motion about the --

THE COURT:  When is this trial date?

MS. KRIGER:  It's June -- so the -- we pick a jury on the anniversary of the Allied Invasion of Normandy, June 6th, and then we start the jury trial on June 12th.

THE COURT:  Is there any -- any more final pretrial conferences or motion hearings set in this case?

MS. KRIGER:  Yes, Your Honor, May 15th.  That's the one issue.

THE COURT:  That doesn't give the government a lot of time to respond to your motion, if I'm going to hear it on the 15th.

MR. McDONALD:  We'll be fine with a response to their complaints about the expert, Your Honor.

THE COURT:  By the --

MR. McDONALD:  We understand what their complaints

are going to be.

THE COURT:  You could respond by the 10th of May, a week later?

MR. McDONALD:  We understand what they're -- yes, is the answer.

THE COURT:  Okay.  All right.  So the -- let me just jot this down.

MR. McDONALD:  We would ask -- can I just say, Your Honor, we would ask that you not give them extra pages to write their response.

THE COURT:  Let me just take one thing at a time here.

MR. McDONALD:  So we don't have a 100-page motion to respond to or a 50-page motion or a 40-page motion.

MS. KRIGER:  I would like the record to reflect that the response to 550 was within the appropriate page limit.

THE COURT:  All right.  So government's updated expert disclosures will be on May 22nd.

MR. McDONALD:  Umm, 14 days from today is April 22nd.

THE COURT:  April, right.  I'm not great with calendars.  Then the defense expert disclosures, updated, will be April 29th.  Defense motion aimed at the experts will be May 3rd.  Government's response will be May 10th.  And I

will have a hearing on whatever motion is filed, if any, on May 15th.  Okay?

MR. McDONALD:  Thank you, sir.

THE COURT:  And unless there's a dire emergency, I don't anticipate extending the pages for an expert motion. Okay?  All right.  Thank you.

MS. KRIGER:  It would be very surprising to me if I needed more.

THE COURT:  It would be even more surprising to me if I were to grant that.  Okay.

So the next motion up is a motion, Docket No. 560, a joint motion for production of Grand Jury materials.  And I'd actually like to start this with a couple of questions for the government.  So who'll be arguing this one for the government?

MR. McDONALD:  I will, Your Honor.

THE COURT:  Okay.  So, Mr. McDonald, my understanding -- and I just want to make sure I have the facts right, is that the first and second superseding indictment both specifically allege that Mr. Angelo and Mr. Sereno held an ownership interest in Gravity Imaging, just as a factual matter; is that correct?

MR. McDONALD:  Yes.

THE COURT:  Okay.  And so I understand the government's position to be that at one point, you guys

believe that in good faith.

MR. McDONALD: Yes.

THE COURT: Okay.

MR. McDONALD: Yes.

THE COURT: And then I understand your position to be something happened between the second superseding indictment and the third superseding indictment that made you believe that exactly the opposite was true. Fair?

MR. McDONALD: Right, yes, that's correct.

THE COURT: In bite-size chunks and as carefully as you can, can you help me explain what it was that happened between the second superseding indictment and the third, and exactly how the "what" led you to change your view as to who was the owner of Gravity Imaging, and can you go real slow?

MR. McDONALD: Can you give me one second. I think we wrote it down, and I will just read it.

THE COURT: No. I was having trouble following it exactly, and that's why I kind of wanted to hear it in your own words, but you can certainly take your time.

MR. McDONALD: Your question is, what changed?

THE COURT: Yes.

MR. McDONALD: We obtained copies of the handwritten notes of the lead accountant responsible for the 2017 and 2018 and 2016 Cory Mann 1040s and partnership returns, and those handwritten notes were inconsistent with

other evidence already in our possession.

THE COURT:  All right.  So, again, I want to go real slow.  In your response, I think you have a photo of those notes on -- this is Docket No. 568, pageID.12753.

MR. McDONALD:  Your Honor, I apologize.  No one, except for you, has that pageID.  Because it was filed under seal, so just in the future, that transcript, I can't find it.

THE COURT:  It's page 18 of your response.

MR. McDONALD:  Thank you, sir.

THE COURT:  Okay.  So you're telling me that between the second and third superseding indictments, one thing that happened is you got Ms. Locricchio's handwritten notes?

MR. McDONALD:  Yes, sir.

THE COURT:  Is there anything else that happened between those two, that led you to change your mind about who owned Gravity?

MR. McDONALD:  Okay.  And, first, I would like to just -- you said, changed my mind, and that's not how it worked at all, just so you're aware.  But the evidence that came into our possession, us being the Department of Justice, is the handwritten notes which we were then able to go back and compare to Rehmann records that we received in January of 2023.

THE COURT: What was the date of the second superseding indictment?

MS. KRIGER: May 16th, 2023.

MR. McDONALD: Your Honor, do you want defense counsel to come up here and answer questions, or should the government answer questions?

THE COURT: She was just trying to be as helpful as possible, but you can take the lead from now on.

MR. McDONALD: Okay. Just checking. I have answers here, also.

THE COURT: Again, I'm trying to very precise in terms of getting this timeline down. In May of 2023, a second superseding indictment is returned, and it alleges, specifically, that Angelo and Sereno were owners of Gravity Imaging. Is that just true as a factual matter?

MR. McDONALD: It is, and it's in our brief on page 6. It's ECF No. 340 is the second superseding indictment in this matter. ECF No. 340 has a date of May 17th, 2023.

THE COURT: And one of the reasons you -- you the government, I don't mean you personally. One of the reasons the government believed that to be true was because Mr. Sereno had testified to that specific fact under oath. Fair?

MR. McDONALD: Those two things are not connected.

THE COURT: Okay. Let me again just try to get a factual question.

MR. McDONALD: Yeah.

THE COURT: And then I'll hear from you.

Is it true that before the second superseding indictment, at some point the government called Mr. Sereno as a witness before the Grand Jury, sweared him in -- swore him in, you were eliciting his testimony, and you specifically asked, did he own an interest in Gravity Imaging. You elicited that, and he, under oath, said yes?

MR. McDONALD: That is correct, but your sentence was -- was not what you just said. You said, did we rely on anything from Sereno's mouth to have to do with our determination of whether or not there was an ownership interest, and the answer is, no, we were relying on the professionals -- the accountants, not -- I don't know what you want -- that witness you mentioned, Sereno.

THE COURT: So your idea, here, is you called Sereno before a Grand Jury that was going to make a decision about who was the actual owner of Gravity at the time Mr. Mann filed his tax returns, and you elicited from Mr. Sereno sworn testimony that he was the owner, but that testimony was totally irrelevant, because it didn't have anything to do with the finding the Grand Jury made on that exact point?

MR. McDONALD:  No.  It had something to do with it, but if I'm understanding your question, you're saying, what are you relying on?  You're saying, is there a big pot, and that's one of the things in the pot?

THE COURT:  Let me put as fine of a point on this as I can.

MR. McDONALD:  Okay.

THE COURT:  The defense has made the point that what happened here is troubling.  I agree.  And I'm trying to understand if there's an explanation for it.  The government says there is, and I want to try to make sure I'm following and keeping an open mind.

MR. McDONALD:  Okay.  Yes, sir.

THE COURT:  And what we have here is the government calling a witness, eliciting sworn testimony from the witness on the issue of who's an owner of Gravity Imaging, and he says he is.  This is -- this doesn't evolve into the nicety of the distinction of whether he understands a technical term "partner," he said he was an owner.  And after that testimony, the government seeks and obtains two indictments that allege he and Angelo were owners.  The third indictment alleges the exact opposite.

MR. McDONALD:  Correct.

THE COURT:  That they were not owners.

Okay.  So if that's the case, there better be a

pretty good explanation for the change, and I'm trying to make sure I understand it.

MR. McDONALD:  And it -- that is what I'm trying to answer for you, and I'm telling you that what we were relying on is Rehmann, they are the professional accountants, at the time that the first and the second -- the first superseding -- or the first superseding indictment and the first indictment were obtained, we were relying on an accountant from Rehmann, named Rachel Locricchio, and the tax returns that that accounting firm prepared, which we understood to be unimpeachable because of the high esteem that this jurisdiction holds Rehmann in.  And so that is what we were relying on, and we had no reason not to.  And then some additional evidence came into our possession in February, and we had questions, but we still had to rely on what we thought we could prove beyond a reasonable doubt at trial, and there was some e-mail information, but nothing to establish how exactly the mind -- the mens rea of the accountant who was responsible for this, was understanding things at the time of 2015/2016, until we got her handwritten notes.  And then her handwritten notes, when we went back and compared to other documents, were inconsistent with there being a partnership, Your Honor.

THE COURT:  Now, there are other documents that you mentioned in your response, this is Docket No. 568, beyond

the handwritten notes, there are e-mails and internal Rehmann documents.  For instance, you reference a bunch of them on page 20 of the response.  Do you have that part of --

MR. McDONALD:  I know exactly what you're referring to.

THE COURT:  Okay.  Did you have those documents before you returned the second superseding indictment?

MR. McDONALD:  We did, but none of those will get around the problem of being in front of a Judge Leitman, who is asking, how do you know what was in the mind of the person responsible at the time?  This is just an e-mail.  Maybe she didn't read it.  Maybe she didn't understand it.  You can't know what she was thinking.  Maybe she didn't read it.  She's cc'd on that one or she wrote it in error.  However, the handwritten notes are more persuasive, in the minds of the government, and then you can combine those e-mails with her handwritten notes.

The e-mails, by themselves, we didn't think were sufficient, and that's not my opinion as an individual, Your Honor, that's the government's position.  It's the handwritten notes which made the difference, because those were taken contemporaneously, in handwriting, by the person who's responsible for the returns and the person who, when -- the returns are compared by other people at Rehmann, who didn't have any personal involvement, pointed out issues

with the paperwork and the background and the returns themselves. That, we found to be persuasive enough to prove beyond a reasonable doubt, willfulness to prepare false returns.

And again, Your Honor, this is a case about a false return and unreported income, not whether or not a partnership existed. The defense attorneys are focusing on whether or not a partnership existed. The government's perspective is whether or not income was not reported and the returns, themselves, are false. Those two things are not necessarily the same.

THE COURT: So, again, just help me understand. You're going to the Grand Jury on indictment number two, and this is one that alleges that Gravity is owned by the three of them, right? Yes?

MR. McDONALD: Yes, sir.

THE COURT: Okay. And at the time that you seek that indictment, you are in possession of the e-mail that's referenced on page 20, the e-mail string between Mann and Locricchio, where Mann says that, among other things, on August 4, 2016, at 6:38 p.m., that Gravity Holdings are a single member LLC, me. So you have that document.

MR. McDONALD: We do.

THE COURT: And you still ask the Grand Jury to return an indictment that says it's owned by the three of

them, and you're thinking is that, at the time, what, Mann is lying to Locricchio?

MR. McDONALD:  Now, I got lost in your reasoning, Your Honor, but I can just tell you, at the time, we did not think electronic transmissions, alone, were going to be sufficient to prove beyond a reasonable doubt that the ownership part of those returns was false.  That we needed more than just the electronic information, we needed handwritten notes.

So we did have the e-mail; that e-mail wasn't presented to the Grand Jury.  What was our thinking as to whether or not he was lying?  I don't have an answer for you on that, Your Honor.  I understand your point.  Your point is, how come the e-mails weren't enough, why did you need the handwritten notes?

THE COURT:  My point is a little finer than that.

MR. McDONALD:  Okay.  I'm sorry.

THE COURT:  You asked a Grand Jury to return an indictment that specifically alleged, among other things, that this entity was owned by three people.

MR. McDONALD:  Yes, sir.

THE COURT:  At the time that you do that, you're telling me, you have in your possession an e-mail written by one of those three people where he says he's the only member.

MR. McDONALD:  And if you look at the date on

that -- are you looking at it, Your Honor?

THE COURT: August 4, 2016.

MR. McDONALD: That's right, and they prepared a return, Rehmann did, that said that it was a shared ownership between January and December 2016. So we were not prepared to refute arguments that they had backdated it somehow or that he was lying, but -- is that what your question is? I'm sorry. Now I'm lost.

THE COURT: I -- you -- you have this e-mail where he says he's the only owner, and it's written contemporaneously, in realtime, and notwithstanding that e-mail, you, at that time, believe that you can prove beyond a reasonable doubt that there were actually three owners.

MR. McDONALD: At that point, we still did not feel we could refute the tax returns prepared by Rehmann Robinson, because we had no way of showing what was in the mind.

THE COURT: Who did those tax returns identify as the owner, again, the three of them?

MR. McDONALD: It identified entities as the owners; one of them owned by Cory Mann, one of them named Robin Street, Your Honor, so the owners were 50/50 Mann Global; and a company called Robin Street Consultants.

THE COURT: But what I'm saying is you took a position in the indictment that you could -- by getting the indictment, you were essentially concluding that you could

prove beyond a reasonable doubt that the entities --

MR. McDONALD:  Mann Global and Robin Street.

THE COURT:  Hold on.  I get lost in all of this stuff here.

So the first and second superseding indictments affirmatively allege that Angelo, Mann and Sereno held an ownership interest in Gravity Imaging.  You take that position.  So isn't that essentially saying that at the time that you filed that indictment, you believe you could prove that fact beyond a reasonable doubt?

MR. McDONALD:  Yes, Your Honor.

THE COURT:  All right.  How could you reach that conclusion when you were sitting on an e-mail by Mr. Mann, written contemporaneously, where he says he's the only owner?

MR. McDONALD:  Because there's other evidence that came from Rehmann that said something to the contrary, Your Honor.  There's evidence from different sources, and until we had a way to impeach --

THE COURT:  Wait.  So you believe that based on the Rehmann information alone, even in light of Mr. Mann's contemporaneous e-mail, you thought you could still prove, beyond a reasonable doubt, that it was owned by these three entities -- by those three people?

MR. McDONALD:  Yes.

THE COURT:  Let me ask --

MR. McDONALD:  Yes, yes, Your Honor.  I can't put it any other way.  The Rehmann Robinson accounting personnel, removing Rachel Locricchio, we anticipated were going to stand behind the accounting work that they prepared, unless something to the contrary was shown to them, because they do good work and they trusted their staff and they had no reason to doubt the work that they had done, and until we received evidence that refuted the work that they had done, we weren't comfortable taking a position to argue something contrary to what they had prepared.  However, the handwritten notes predate everything and allow us to argue something to the contrary.

THE COURT:  I want to make sure I follow this.  You're saying that when you got the first and second superseding indictment, where you alleged that Gravity was owned by Mann, Sereno and Angelo, you believe that -- you, the government, actually believe that.  Fair?

MR. McDONALD:  Yes, Your Honor.

THE COURT:  Okay.  And believe that it could prove that beyond a reasonable doubt.  Fair?

MR. McDONALD:  Yes.

THE COURT:  You put it in an indictment?

MR. McDONALD:  Yes, yes.

THE COURT:  And the reason you're saying you believe that is because Rehmann put it on some tax returns,

right?

MR. McDONALD:  And were standing behind their work.

THE COURT:  Okay.  And they were saying -- but at the same time --

MR. McDONALD:  Yes.

THE COURT:  -- you have that conclusion in your head, you are sitting on an e-mail exchange between Mann and Locricchio where Mann says the opposite, that he's the only owner.  So why aren't you saying to yourself, at that time, exactly what you're saying now, which is, hold on, Mann and Locricchio pulled a fast one on Rehmann?  We don't have a basis to stand behind Rehmann, because if the good, solid citizens at Rehmann were aware of this e-mail, they would have known what we know, which is it's not owned by all three.

MR. McDONALD:  Now I understand your question.  That I can just tell you candidly, we have to say that all the e-mails were provided on the date they were provided on January 2023, but the government, as a whole, we can honestly tell you that on May 17th, 2023, that e-mail wasn't highlighted as something that should be an exhibit, because we weren't in a position to be disputing the tax returns, on an ownership basis, for the entire year.  Does that make sense?

It was in our possession, and there's no way around

it.  Was it a flagged e-mail that we -- there's hundreds of thousands of e-mails.  We used search terms to look for it, and that one wasn't top of mind, Your Honor, at the time, candidly.  It wasn't an exhibit that was shown to the Grand Jury.  I don't have it in front of me, but I don't believe it was a trial exhibit in May of 2023 either, Your Honor.  Does that make sense?  But once we received her handwritten notes, that is when we were able to go backwards in time and do keyword searches and find additional items.  Does that make sense?

THE COURT:  I understand the point.

MR. McDONALD:  Okay.

THE COURT:  So her handwritten notes are pasted in on page 18 of in your response, Docket No. 568.

MR. McDONALD:  And they are also presented as an excerpt, as Attachment U, as in uniform.  It's in the last couple pages, Your Honor.

THE COURT:  Can you help me understand what it is about those notes that was kind of an ah-ha moment for the government?

MR. McDONALD:  Our understanding of her notes is that they indicate that the entity was created and it was solely owned by the defendant in 2015, and that her handwritten notes indicate it was a -- our understanding, owned by a company called Mann Global, and it should have

been reported as a Schedule C in 2015, which means that it was created as 100-percent-owned company by Mann Global, which makes it a Schedule C business, and that is what she is writing down at the time.

THE COURT: As of 2015, right?

MR. McDONALD: Correct, which is when it was created, so it started that way.

THE COURT: But isn't the version of events, here, that Angelo and Sereno become owners later, not at the time of formation, but later; isn't that the version of events that happens?

MR. McDONALD: That's correct, but then it started as a Schedule C business, and something has to happen to change it from being a Schedule C business.

THE COURT: Some filing has to be made or something?

MR. McDONALD: That is for the accountants to determine. That's not a matter for me to talk about. But our understanding is that -- and we can ask the Rehmann personnel, okay, why did it change? Because now we can look at Rehmann e-mails, which again, we don't have 100 percent knowledge of every e-mail that Rehmann Robinson sent, we have to do keyword searches and look back for them, and then when we go back and look, we can see e-mails from people, internally, that say, hey, this is a Schedule C business,

should we treat it as something else? And they're trying to figure out how to treat it.

And they don't -- and then we can see e-mail where they ask for documentation showing how has it been changed, and no one has it. And the person who's supposed to figure out how it's been changed is Rachel Locricchio. Does that make sense?

So it starts one way, 100 percent owned by the defendant, Mann, according to her individual notes. And then something -- then the Rehmann people say something has to happen to change it. Not the government, the Rehmann people say that. So those are witnesses that we can call, who will say it was a Schedule C business in 2015, and then something had to happen to change it. And then we will say, did you ever see evidence of how it changed? And they say, no, we asked for it over and over again, and there's e-mails of that, and we never received it. And so, why did you file it anyway?

THE COURT: Was there a Schedule C filed for 2015 tax year?

MR. McDONALD: Not with the name Mann Global or Gravity.

THE COURT: Could that mean that it changed before the final decision on what to file was made?

MR. McDONALD: You can say -- I mean, I can

speculate, but there's no filing. And I can tell you even -- and the defense attorneys will talk to this, I'm sure, even in their world, where everything is on the up and up, the documents they submitted said that Robin Street was an owner as of January 1, 2016. So that business -- it did business. I read the defense brief that said they saw no evidence that it ever functioned as a sole proprietorship in 2015. It paid wages to employees in 2015. It had deposits. It wrote, you know, checks. So it did business in 2015, when it was only owned by Mann Global.

And you say, what's the ah-ha moment for the government? Well, that means that we can prove that it started as a Schedule C business, beyond a reasonable doubt, 'cause we have her handwritten notes that say it. As you pointed out, there is no tax return.

THE COURT: You say, started as a Schedule C. There's a lot of times I might make a note about something and then change my mind. Why isn't that note one way she was thinking about it at one point in time? You're treating it as if some sort of formal determination was made that for tax purposes, written in stone, is X. I mean, this is just a note.

MR. McDONALD: It registers as a limited liability company with Michigan. It opens a bank account where the only member is the defendant, Cory Mann.

THE COURT: You mean, the only person with signing authority?

MR. McDONALD: The only member listed on the signature card, yes. Rehmann, who, as the professionals, say it was a 2015 Schedule C business. A single member LLC, if it doesn't -- my understanding -- I am not a tax lawyer. My understanding is that accountants will say, if a -- I mean, I'm not a tax lawyer at all.

THE COURT: That's fine. Okay. Go ahead. Neither am I.

MR. McDONALD: That a limited liability company that only has one owner is a single member LLC, and unless it elects in some way to be something different, it's treated as a sole proprietorship, or a Schedule C. It did not elect to be anything different in 2015. It didn't elect to be anything different all the way through August 4th, or whatever that e-mail is where they're still trying to figure out what it is, of 2016, it still hasn't elected. Now, they backdated the ownership which --

THE COURT: All right. Next topic, if you don't mind.

MR. McDONALD: Okay.

THE COURT: At the third Grand Jury -- the Grand Jury that returned the third superseding indictment, you were questioning Special Agent Marabella, and this is one

of the exhibits to the joint motion.  It's Docket No. 560-11, it's pages 20 and 21, I think, of Agent Marabella's testimony before the Grand Jury that returned the third superseding indictment.  Do you have that in front of you?

MR. McDONALD:  Pages 20 and 21.

THE COURT:  Yeah, I'm looking at 21.

MR. McDONALD:  Yes, sir.

THE COURT:  Okay.  Do you see line 16 on page 21?

MR. McDONALD:  Question:  And, again, Anthony Sereno has told you --

THE COURT:  Yeah, that's the one.  Okay.  So this is, in case the Sixth Circuit is ever reading this, Docket ID -- pageID.12522.  And the question -- I understand this is you questioning Special Agent Marabella.

MR. McDONALD:  Sir --

THE COURT:  And line 16 reads, "Question:  And, again, Anthony Sereno has told you and others he knows he never owned Gravity Imaging, that that's not true?"

And the answer is, "Correct."

Do you see that?

MR. McDONALD:  Yes, sir.

THE COURT:  Now, the defendants say that creates a false impression; that what should have been said there was Anthony Sereno's current position is that he doesn't own something, but, of course, he's testified under oath he was

an owner.  He appeared at several proffer sessions and said he was an owner.

Why isn't it fair that, at best, that creates a misleading impression for the Grand Jury?

MR. McDONALD:  Because they were also told that he agreed to participate in a pretext of ownership, Your Honor.

THE COURT:  This is the point that you make at the very end of your brief.

MR. McDONALD:  I don't know where it's made, Your Honor, but the indictment, itself -- the third superseding indictment, itself, reads in the allegations that he agreed to participate in a pretext of receiving money as a partnership, when he knew that wasn't the case.  And in this transcript it cites -- in the parts that we cited, I don't know if you've turned to it or not, we also ask questions about that.  So they -- and --

THE COURT:  Let me try to put a finer point on this question.  Was the Grand Jury that returned the third superseding indictment told that Anthony Sereno had previously testified, under oath, that he was an owner of Gravity Imaging?

MR. McDONALD:  No, Your Honor.

THE COURT:  Was the Grand Jury that returned the third superseding indictment told that Anthony Sereno, in more than one proffer session, had previously told the

government that he was an owner of Gravity Imaging?

MR. McDONALD: They were not told that he made conflicting statements, no, no, Your Honor.

THE COURT: I mean, what they were told is that, on page 21 of Marabella's testimony, the statement that I just read. They were told that he knows he never owned Gravity Imaging. That's what --

MR. McDONALD: Is that a question? Is that a question? Yes, that is what it says, yes, Your Honor.

THE COURT: So here's what I'm struggling with; you elicited from Special Agent Marabella to this Grand Jury -- this Grand Jury was told that Sereno had said he never owned Gravity Imaging. Why isn't it fair that that creates a misleading impression?

MR. McDONALD: That is a true -- it is not misleading. That is a true statement, he did say that. He also said things to the contrary. And I --

THE COURT: Look, this is -- this is your position, that as -- you say as a technical matter, the government is not required to present exculpatory evidence to the Grand Jury and the defense can bring this out at trial. Set that aside for a second. I don't want to quibble about that.

Why wasn't this just grossly misleading? This created the impression at the Grand Jury that Sereno agrees, and has all along agreed, with your story that Mann's the

only owner of Gravity and he's only been the owner of Gravity from the beginning.

MR. McDONALD:  Yes.  Can I answer your question, sir?

THE COURT:  That's why I'm asking, yeah.

MR. McDONALD:  Okay.  It is not misleading because Anthony Sereno -- you've had a chance to observe him when he testified in July, if you recall -- is not a sophisticated witness and when he is pressed on what he means when he says ownership -- you don't want to -- okay.  I don't have anything else.

THE COURT:  If you can see the blood boiling, you are reading me correctly.

MR. McDONALD:  Okay.  Then I have nothing else to say.  Yes, sir.

THE COURT:  No, don't sit down.  The history of this case is you called Sereno before a federal Grand Jury and you elicit, under oath -- you asked the question, who owned this damn company, and he said he did.

MR. McDONALD:  Yes, sir.

THE COURT:  And now you are creating the opposite impression in front of the final Grand Jury, and your answer for why that's not grossly misleading is because this guy doesn't understand ownership and partnership.  You presented him to the Grand Jury with that concept.  You had met with

him before you had presented him to the Grand Jury. Anthony Sereno is Anthony Sereno.  If you're with him for five minutes, you know this guy is not a CPA, he's not sophisticated.  Owner is not a sophisticated term.  I mean --

MR. McDONALD:  I can just tell you, sir, he believes that he was an owner on paper and not in reality.

THE COURT:  That is -- that is not what he said.

MR. McDONALD:  I understand.  Yes, Your Honor.

THE COURT:  I mean --

MR. McDONALD:  Yes, Your Honor.

THE COURT:  One of the conversations that you and I have had at various points in the iterations of this case is how is the government going to prove certain allegations beyond a reasonable doubt, and can the government believe, in good faith, that it can prove a case beyond a reasonable doubt?  And the allegations in these tax counts hinge on the allegation that -- these tax counts hinge on who was the owner of this entity, right?

MR. McDONALD:  At certain points, yes, Your Honor.

THE COURT:  That's an essential part of the government's case here --

MR. McDONALD:  Can the --

THE COURT:  -- is that this thing was owned by Mann only for the whole time, right?

MR. McDONALD:  No, no, no, it is not, Your Honor

and that's what I was trying to say. No, it's not, Your Honor. The defense attorneys can put on a case that says that it was a legit partnership all the way through the time when Defendant Mann creates a document that says it was sold on December 21. That document is not written by a lawyer, and it gets some of the parties' names wrong, but they appear to treat it like it was sold on December 21. And then $960,000 comes in on December 22nd, and that money was treated as if it was partnership money.

And then, so for 2017, time period of 12/21 to the end of the year, even in a world where Anthony Sereno doesn't exist, this document created by the Defendant Cory Mann exists. This defendant created documents that says, I am now becoming 100 percent owner, he gets the names of the entities wrong completely, and this is the government's -- this is the focus of the government's presentation of evidence at trial, is the documents that the defendant created in December, which is backdated, so on December -- I think it's 22nd and the 29th, there's a $500,000 deposit and a $400,000 deposit, it adds up to $960,000 (sic). He meets with Anthony Sereno. They backdate a document saying, okay, I will become 100 percent owner the day before the money comes in. And then they still file a tax return than says Anthony Sereno was the owner all the way to the end of year. That's 2017. And then January, in January, our evidence will

be that the Defendant Mann sends e-mails indicating the new owner is going to be a company, J&A Consultants, which is held in the name of John Angelo.  They issue approximately $220,000 of money to John Angelo in January of 2018.  The checks say, "membership distribution." Rachel Locricchio sends e-mails saying they are an owner in January 2018.

THE COURT:  Then the timeline will be, then there's a meeting with the government and Rachel Locricchio --

THE COURT:  Can I ask just a question?

MR. McDONALD:  Oh, I'm sorry.  The whole year is not -- the whole year is not the --

THE COURT:  Did Marabella testify before the Grand Jury that returned the second indictment?

MR. McDONALD:  Yes.

THE COURT:  All right.  And did you do the similar type of question where you went through paragraph by paragraph and said, does the evidence show A, B, C?

MR. McDONALD:  Yes.

THE COURT:  Okay.  And so at some point, under oath, he testifies that the evidence shows that these three guys owned Gravity, right, because that's one of the things?

MR. McDONALD:  Yes.

THE COURT:  And at that time, sitting in the evidence is the e-mails that I quoted, the ones

contemporaneously from 2016, where Mann says he's the only owner?

MR. McDONALD:  Yes.

THE COURT:  Do you have any concern that given the history of this case and the different competing positions and the testimony that you've elicited and the evidence that you've had, that there's not that good-faith basis to say that these allegations can be proved beyond a reasonable doubt?

MR. McDONALD:  No, Your Honor.  We would be relying on the Rehmann Robinson personnel for ownership of Gravity Imaging at all times.

THE COURT:  The Rehmann Robinson people, their views -- and I'm asking this, do their views, change based on the Locricchio handwritten notes?

MR. McDONALD:  I don't know the answer to that question, specifically.  I know that they looked at the -- what I started telling you about December of 2017 and January 2018, before you stopped me, they -- that is an exhibit and their views do change, based on those documents.

THE COURT:  What I'm saying is, pretend there's Rehmann Robinson witnesses up here, and you -- the government -- you've elicited all their testimony about what they believe and what the facts are.  And a defense lawyer stands up and has the second superseding indictment, the

second, not the third, and the date of it, and says, as of the date of this second superseding indictment, did you have all the information you need to support the opinion that you just offered? What's the answer to that question?

MR. McDONALD: What is the opinion, sir.

THE COURT: Whatever testimony you want to --

MR. McDONALD: Yes, yes, yes.

THE COURT: You are going to elicit testimony from Rehmann --

MR. McDONALD: Yes, it will be, 'cause the only question we are going to ask the Rehmann personnel is this is a sales document on December 21, 2017 that ends any partnership that you thought existed, and they will say yes. And then we'll say, did money that came in after December 2021, should that be treated as part of a partnership that no longer exists? And they'll say no. And then the same thing with January 2018 --

THE COURT: But, look, whatever they say, had this trial occurred the day before you get Ms. Locricchio's handwritten notes, their testimony would be exactly the same; is that true?

MR. McDONALD: Yes. The only position is the government's position on whether the entity was ever a partnership. That's the only thing that's different, is whether or not we can argue that.

THE COURT: Is there anything else that you want to tell me on this motion?

MR. McDONALD: No, sir.

THE COURT: Okay. Who's going to talk about this from the defense side?

MR. NEMETH: Yes, Your Honor.

THE COURT: Let me start with one of Mr. McDonald's last points, which is -- I'm going to re-characterize it here, that even if I was troubled by the who owned Gravity issue, that he gave me an explanation that, at some point in 2017, there's some backdated document, there's something, something, and that, alone, is enough to substantiate the charges, so all of this stuff that I was raising a concern about really is no harm, no foul.

MR. NEMETH: It's difficult to know exactly where to begin, because this has been like whack-a-mole with the government, and I'm just going to say for the record, I am a tax attorney standing here.

THE COURT: Most people won't admit that.

MR. NEMETH: I know, but it's hard to deny when you read my bio.

So the government's theories have continually evolved to the point now, where we're saying, now, well, the easiest way to deal with it is Anthony Sereno was never an owner, notwithstanding the fact, Your Honor, he stood right

in this courtroom, in that chair right there, and sworn under oath, under questioning by the government, that he was an owner.

THE COURT:  Look, that wasn't your best point.

MR. NEMETH:  No.

THE COURT:  He didn't do that.  He did not do that in this courtroom.  And, look, let's at least make sure we're being accurate.  In this courtroom, he used the term, "partnership," and you kinda make a hand gesture that maybe that doesn't matter.  That does matter, 'cause I can at least understand the idea that a layperson might not understand partnership connoting ownership.

Where you have a very strong position is that the guy used the term, "owner," under oath separately.  So ultimately, that doesn't matter substantively to me, but I want to be very accurate, he did not testify in trial that he was an owner.

MR. NEMETH:  Fair enough, Your Honor.  I guess I'm looking at the Grand Jury transcripts, and he uses the terms interchangeably, and frankly, the government has used the terms interchangeably.

The government has staked out a position now, in the third superseding indictment and for all the reasons in our brief and the Court has talked about its 180-degree reversal, and they did not tell the Grand Jury that they were

reversing position. Even this document that government counsel says is a backdated sales document drafted without a lawyer, that says we operated this business together and we're splitting it up. They operated this business together, and the record shows, for a relatively short period of time, and it seemed pretty clear, when you look at other evidence that the government has provided, where John Angelo is talking to Cory Mann in a wiretap that the government has, where they're talking about the monthly accounting and how things are being split 50/50. They're operating it in a partnership of sorts, where you're splitting the profits based upon the revenue that comes in.

What the government fails to take into account is that Gravity Imaging had an existence before Robin Street, and they had an existence after Robin Street. Cory Mann always kept the receivables.

And, Your Honor, if I may remind you, it wasn't that many -- well, I guess it was more than a year ago, the government sought to jail Cory Mann when they brought the indictment in the 2022 case, under a theory of secret partnership, secret ownership, and they pointed to a Gravity Imaging bank account in the name of -- wait for it -- Cory Mann. And Your Honor made a comment that was basically a strange way to hide an account. And it was the same bank account for Gravity Imaging all along. Cory Mann

didn't sell his receivables, so that money belonged to him.

Yes, he drafted a document with Anthony Sereno, and said, yes, we are selling, and the receivables -- basically the receivables that were owed Robin Street settled for $200,000 to get those receivables -- their share of the receivables, 'cause you don't know what you're going to get. This is a business that did MRIs. Some of the MRIs were auto related; many, if not most, were not. When a person comes in to get an MRI, there was a delay from the time that the services provided --

THE COURT: I get it, we had a whole trial on this point.

MR. NEMETH: Pardon?

THE COURT: We had a whole trial; I understand how this works.

MR. NEMETH: Exactly.

THE COURT: There's some risk of non-collection.

MR. NEMETH: There's some risk of non-collection, there's certainly a delay. You see in the wiretaps that John Angelo is the one talking to Cory Mann, saying, basically, where's our money? And Cory Mann talks to him, well, this is how much came in for the month, and that could be for services provided months earlier. These are the current bills that must be paid. This is how we split it up. In fact, he uses -- Cory uses the term, at some point, what

do you want me to do, peel it off, it's 50/50?  So there's this lag.  Well, part of what happens when you have a lag is when the business sells, there's still going to be a trail of receivables that come in.  That's basic business.  I'm done providing new services, but I need to get paid on my old A/R, that's why it's called A/R or accounts receivable.

Anthony Sereno wanted money.  Cory Mann and he reached a deal and self drafted a document, it is dated 12/21, it could have easily been effective 12/31, a typo.  I'll point out, the government has lots of typos in their documents, it happens.  The lawyers drafted it.

It's as simple as that, Your Honor.  This was not a complicated business.  What is clear is the mindset between the parties, was that they're operating Gravity Imaging together, during that period of time.

Cory Mann basically had the license and the sticks and the bricks, if you will, and the knowledge, and the other folks were providing outside sales, staff it, fill the place with customers.  In fact, it appears that -- well, it has to do with the other case, but it was really as simple as that.  So they were working together for the business, they were splitting the money 50/50.

Anthony Sereno has also testified, Your Honor, before the Grand Jury -- or in the 302 reports that he didn't talk to Cory Mann very often, because he didn't like

Cory Mann; John Angelo spoke to Cory Mann about the operation of the business.  So while I appreciate the government looks to Anthony Sereno sort of as a Swiss Army knife, we will use him in any way we want, he has repeatedly said, I'm an owner or a partner of Gravity Imaging, under questioning by these prosecutors, and he was specifically asked, if I ask you a question that's confusing or anything, you should just let me know, all right, in the Grand Jury.  Yes.  So there's no ambiguity there.  He testified that he had an ownership interest or was a partner in Gravity Imaging.  He uses the terms intermittently.  Frankly, people do that a lot.  If you're a lawyer and a C corporation, you'll usually refer to yourself as a partner, because it's sort of the vernacular of how law firms work.

That's what happened here, and, frankly, if anyone could testify to the details, that would have to be John Angelo.  Anthony Sereno has said, I left it to John Angelo, I let him talk to Cory about it.  But to come in now, though, and say, oh, I never did, and I agreed to a flaw partnership, and it was a fraud; this is the same person the government is saying is not sophisticated, is not reliable.

But perhaps most telling, defense files this motion calling out these irregularities, merely asking for the rest of the Grand Jury material, because perhaps there's something more there that provides a clearer picture.  As

Justice Brandeis said, sunlight is the best disinfectant. And instead of saying that there's more, what does the government do? On March 21, 2024, there he is, Agent Marabella, of the FBI, again, not of the IRS, is in a meeting and a memo is written up where Anthony Sereno, magically now, says all of these allegations, after the indictment -- third superseding indictment, after defense motion is filed.

It becomes only more troubling -- in fact, this, would be a case that we would want the jurors to see these indictments, to see that the government can't stick to a story. In fact, not even stick to it, completely reverse it and then say, our witness who is our star witness here, isn't really reliable anyway, but we're not going to tell the Grand Jury that. We will have our FBI agent come in, we will feed him 222 questions, he will answer yes to 219 of them, or some form of yes, including ones that were factually inaccurate and had to be corrected. That's the irrefutable record here. And if a Grand Jury system is to mean anything for people's Constitutional protection, this is it. I have never seen anything like this in 35 years of practice. To hang on and say, well, now we have some notes that we had, and they might or might not mean something, and that's what we're basing this all on now, and somehow Anthony Sereno will now come in and say it was all a fraud. I've said a lot.

THE COURT:  Did any of Sereno's prior sworn testimony suggest that this operation with Robin Street -- with Gravity was a fraud?

MR. NEMETH:  No, Your Honor, and I don't believe -- and I do believe if the government thought that they would have elicited that testimony and not brought him in to testify in other matters before the Grand Jury, to talk about that he's an owner and say, let's flush that out a little bit when you say you were an owner.  That would be very easy to do for sophisticated counsel as we've got here. It was let stand.  It was left to hang.

THE COURT:  Where's the most recent Sereno 302, is it in your reply brief?

MR. THOMPSON:  It's Exhibit D to the government's response, Your Honor.

THE COURT:  Mr. Nemeth, is there a -- a document that ever listed Robin Street as an owner of Gravity?  Am I missing that?

MR. NEMETH:  Tax returns.  Again, Your Honor, the government says, oh, well, where's the operating agreement between the parties?  Certainly, as a lawyer -- any lawyer would advise clients to have a written operating agreement. It didn't appear to be one here.  It's not required.

THE COURT:  Let me just ask Mr. McDonald a question.

Mr. McDonald, in this 302 that's attached to your response, it's Docket No. 568-4, pageID.12863, I guess it's Exhibit D to your response, there's a line in here that says, "Sereno never believed he was actually the owner of Gravity." And then there's an explanation for why he previously said, under oath, that he was.

Prior to March 21st, 2024, had Sereno ever expressed that view or anything like it before?

MR. McDONALD:  He said, on paper, several times, but he had never said in a complete sentence that could be attached to a memo.

THE COURT:  Where did he say it on paper?

MR. McDONALD:  In a jumble of words that do not make any sense in 302s.  If I could have quoted it and put it in a memo, I would have.  It does not exist in a way that you will understand, or I would have cited it, obviously.  That is why there's a 302, because it was made -- it was not intelligible.

THE COURT:  Do you recall our good friend -- let me just make sure I've got this right before I say this.

Mr. McDonald, this is a question for you.  Do you recall our good friend, Mr. Hammoud, who has joined us here today, one of his common refrains during the prior trial that we had in this courtroom, was that when the defense was uncovering things that were problematic for the government's

case, there was a pattern of the witness who had the problem being called in for a new interview, and the new interview somehow solving the problem?  I may not have Mr. Hammoud's exact words right, but Mr. Hammoud was clearly pointing out what he characterized as an evolution in 302s.  Do you recall, at least, him doing that?

MR. McDONALD:  Yes, Your Honor.

THE COURT:  My recollection is that, at least as a factual matter -- at least sometimes, and it may be more than I'm just saying there, it might have been a lot of times, he had a point, and this arguably looks like what he was accusing you of -- and I'm using a lot of hesitation here -- arguably and accusing.  But what do you say to the notion that if some sort of independent inspector general did a deep dive into what happened here, I'm talking about a DOJ inspector general, independent of you guys, independent of this prosecution team, that there's cause to be extremely troubled about what's going on here.  What would you say to that?

MR. McDONALD:  I would deny it, Your Honor.  I can tell you that what you're pointing out is that when there are inconsistencies, we ask the witness to resolve the inconsistencies and why they exist, and what is the truth, and we write down what they say.

THE COURT:  Okay.  All right.  Mr. Nemeth, I think

I interrupted you.

MR. NEMETH:  I'm sorry, Your Honor.

THE COURT:  I think I interrupted you.  Is there anything else that you want to say?

MR. NEMETH:  I think the last exchange here, Your Honor, sums it up.  The indictment's in August of 2023, Agent Marabella is testifying, if you can call it that, answering leading questions, very fact specific about this issue we're talking about of ownership, it's let stand, it's just left to hang out there in the air.  The defense files a motion challenging it, calling it out.  The response from government counsel now is, it's really nothing, it was a jumbled mess, nothing that I can articulate to.

But lo and behold, after the motion is filed, there's Agent Marabella and some others, and government counsel sitting there with Mr. Sereno, and he's spot on, all of a sudden.  I agree with Your Honor's comments and reflections on the appearance of it.  Calling it troubling, I think is generous, and I leave it at that.  Thank you, Your Honor.

THE COURT:  All right.  Mr. McDonald, do you mind coming back up?  I just have a couple other questions.

Would you see a Fifth Amendment Grand Jury problem if a defendant was charged with a crime -- and for purposes of my question, it doesn't matter what crime -- and the

*Motion Hearing • April 8, 2024*

government called an FBI special agent and the question was, Agent Smith, Defendant Jones is charged with this crime. You've seen the evidence.  You've looked at the evidence really carefully.  Are you satisfied, beyond any shadow of a doubt, this defendant is guilty of this crime?  Answer, yes. At that point, would it be appropriate for the government to ask the Grand Jury to return an indictment, and could an indictment returned under those circumstances stand?

MR. McDONALD:  A one sentence question, is the evidence sufficient?  No.

THE COURT:  No.  The question is -- I gave a long question.

MR. McDONALD:  Are you satisfied --

THE COURT:  You've read a lot of evidence in this case, Mr. Smith.  You've read it.  And what you've read are -- I'll make it a little more gray area.

You've read a lot of bank records.  You've talked to a lot of witnesses.  You've spent a lot of time on this. Are you satisfied, based on your review of these ten categories of evidence, beyond any shadow of a doubt, that this defendant is guilty?  Is that a permissible indictment?

MR. McDONALD:  No, sir.

THE COURT:  Okay.  How is what happened here different from that?  In other words, let me put a little meat on this question.  I'm very familiar with the rule that

*Motion Hearing • April 8, 2024*

agents can talk about hearsay, but my sense is, while they can talk about it, they've at least got to identify it.

So in my hypothetical, the agent would say, well, I spoke to these witnesses, and they said A, B and C.  And I assume, at some level, an agent can summarize some evidence in some ways, I get that.  Your parentheticals, though, don't really support that, the ones that you cited in your papers.

But here, why isn't it a fair point that the defense says that essentially this was an abdication?  This Grand Jury wasn't -- I'm making their argument and I want your response.  Their argument is this Grand Jury wasn't asked to understand any particular evidence, really all that happened here is they were asked to decide whether they thought Marabella was a qualified person who was accusing these people of a crime based on what he saw, but without knowing what exactly he saw and why he thinks what he thinks, they really weren't able to exercise any judgment.  Why aren't the defendants right about that?

MR. McDONALD:  Marabella was asked if he interviewed witnesses, if he talked to people at Rehmann, who worked at Rehmann and who spoke to him, and he wrote the 302s.  He was asked if he talked and spoke to Locricchio, and he wrote the 302s and what she said.

THE COURT:  Let me give you my new hypothetical.  It's a shooting crime.  It's a simple crime.  The agent is

called before the Grand Jury and the agent says, I interviewed a lot of witnesses at the scene. I watched a lot of video. I listened to an audio. I'm positive this person's guilty. Is that a basis to return an indictment?

MR. McDONALD: No, Your Honor.

THE COURT: Okay. What's different here? Was the evidence described --

MR. McDONALD: It was.

THE COURT: -- that Marabella looked at, and did he give reasons for why that evidence supported his conclusion?

MR. McDONALD: And we note in some of our -- you have the transcript. He's asked what the Rehmann personnel said. He's specifically asked what Bryan Kearis said about -- which I tried to explain to you, the December 2017 and January 2018 discrepancies, you stopped me before I could finish, but we specifically asked him, did you sit there and listen to Bryan Kearis explain inconsistencies and that they could not be resolved, and they should have resulted in different returns? That is what they were voting on. He was specifically asked about phone calls that he had listened to -- that he had listened to with the witnesses present, where they identified voices. He was specifically asked about sitting in rooms with a revenue agent explaining her math and the charts we've looked at. He was specifically asked about cooperating witnesses, who explained how money

moved through different places, and if they said all the transactions were honest and accurate or if they were for paying for police reports. He was specifically asked -- so, no, he didn't just say I talked to some people, generally. He went over allegations that he was personally involved in gathering evidence to support, Your Honor.

THE COURT: Okay. Thank you.

Mr. Nemeth, would you come back up for a second?

Mr. Nemeth, sometimes I ask strategy questions, and one of the questions that I sometimes ask defense lawyers is, do you really want to win a particular motion? So let me think out loud with you.

If you made a motion to dismiss the indictment based on the Fifth Amendment problem that you believe exists, and I deny it, now you've got an appeal issue, and then you can go to trial. And your opening statement can be, here's the first indictment, with highlighting of the yellow, where they charged that the three guys owned it. Here's the second indictment. Ladies and gentlemen, here's how an indictment is returned, it's serious business. People come in under oath, they swear, the government attorneys have to ask for it. Here's Sereno saying this. You've got your yellow. Here's all of this crap that you believe -- you could use that term in your opening, if you believe that's appropriate. And at the end of your opening, if you're the defense lawyer,

and you present a very simple narrative of how what they're saying now cannot possibly be squared with what they said then, you've got a decent chance, maybe, of winning the trial. And if you win there, it's over.

If I were to look at a motion to dismiss and grant it, there would likely be an appeal, and maybe my bosses in Cincinnati don't see it the way I do. Aren't you -- do you really want to win a dismissal now?

MR. NEMETH: Yes, Your Honor. I want to win a dismissal now. I think it will have the proper effect. I have discussed this with Mr. Mann. Your Honor raised this question earlier on, when we had a larger group. I think sunlight is the best disinfectant here.

THE COURT: I don't mean to suggest that I'm going to dismiss it, I was just asking.

MR. NEMETH: But I also had to game this out in my mind and discuss this with Mr. Mann, and we think, ultimately, if not today, a dismissal is appropriate of these charges.

THE COURT: Okay. All right. Do you want to say anything else?

MR. NEMETH: No, Your Honor.

THE COURT: I'm ready to rule on this motion.

Does the government want to say -- sorry, Ms. Kriger. Go ahead. I'm sorry that I forgot that there

was more than one defendant.

MS. KRIGER:  I just have one quick thing.

THE COURT:  Go ahead.  Do you mind coming to the podium?

MS. KRIGER:  Sure, I will come to the podium.

So the answer to the Court's strategic question is that, unfortunately, the case law in many cases says that a conviction will cure an indictment that never should have been returned.  So I'm not sure that we do get the appellate issue if the Court doesn't dismiss the case, and then the petit jury convicts our clients.

THE COURT:  But according to you guys, there's no way they are going to convict.

MS. KRIGER:  I have never ever said to a client that they're absolutely going to win any case, because, as we all know, you never know what a jury is going to do.

THE COURT: Okay.  Thank you.  All right.

Look, we talked about a lot of issues, but really the only one before me is a request in this joint motion, which is Docket No. 560, for production of the Grand Jury materials.  That's a far cry from dismissing the indictment or doing anything else.

But I'm going to grant this motion.  I think there has been a sufficient showing to be concerned, both about the manner in which Special Agent Marabella was questioned.  I

understand Mr. McDonald points to parts of the testimony that he believes actually presented evidence for the Grand Jury to consider.  I think the defense has pointed to others that could be viewed differently, as asking the Grand Jury not to play any sort of independent role in evaluating evidence, but to rely entirely on his opinion.  And so I think, looking at the entire transcript and then possibly seeing that argument developed again, would be helpful and is warranted.

And then I think there's also the concern that I have raised about these inconsistencies and whether there was a fair and accurate picture presented to the Grand Jury, and whether this goes beyond just a mere failure to present exculpatory evidence and, instead, crosses some line that the defense will argue has been crossed, in terms of some sort of prosecutorial misconduct.

I'm not reaching any conclusions on any of those issues, not even tentative ones.  What I'm saying is that, in my mind, there's been a sufficient showing, for the reasons set forth in the defendants' motion papers and in my questioning today, to warrant, at a minimum, the disclosure of the materials that are sought in the motion.

How long will it take the government to provide those to the defense?

MR. McDONALD:  We will hand it over before we leave the courtroom and follow up with a transmittal letter

cataloging what we just handed over.

THE COURT:  Okay.

MR. McDONALD:  We will do it today, before we leave the courtroom.

THE COURT:  Okay.  If there's going to be some sort of a motion to dismiss, when can that be filed?

MR. THOMPSON:  Your Honor, I think we were anticipating filing it by the April 29th motion filing deadline.

THE COURT:  All right.  You've got to do it sooner than that.  So if he gives you the materials today, I will give you two weeks, because this one's going to take longer for me to review.

MR. THOMPSON:  Understood, Your Honor.

THE COURT:  So that will be April 22nd, if you file one.

And, Mr. McDonald, how long do you need to respond to a motion to dismiss, if one is filed?

MR. McDONALD:  Two weeks, Your Honor.

THE COURT:  Okay.  Anything else on the government's agenda for today?

MR. McDONALD:  We have one more, the 404(b) motion.  Are we doing that at a different time?

THE COURT:  That, I did not notice that up today, and I'm not ready to talk about that.  We will talk about

that one at the motion hearing on May 15th.  Anything else on your agenda, Mr. McDonald?

MR. McDONALD:  No, sir.

THE COURT:  Mr. Nemeth?

MR. NEMETH:  No, Your Honor.

THE COURT:  Ms. Kriger?

MS. KRIGER:  Nothing, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.  I appreciate your arguments today.

(Proceedings concluded at 10:59 a.m.)

_    _    _

C E R T I F I C A T I O N

I, Robert L. Smith, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages comprise a full, true and correct transcript taken in the matter of UNITED STATES OF AMERICA vs. MANN and LOCRICCHIO, Case No. 20-20599, on Monday, April 8, 2024.

s/Robert L. Smith
Robert L. Smith, RPR, CSR 5098
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  04/09/2024
Detroit, Michigan