# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

— — —

UNITED STATES OF AMERICA,

        Plaintiff,

                              Case No. 20-20599

  v.

                              Hon. Matthew F. Leitman

CORY JUSTIN MANN and RACHEL
LOCRICCHIO,

        Defendants.

_____/

<u>MOTION HEARING</u>

BEFORE THE HONORABLE MATTHEW F. LEITMAN
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Wednesday, May 15, 2024

APPEARANCES:

For the Plaintiff:    MARK S. MCDONALD
                       CHRISTOPHER O'DONNELL
                       U.S. DEPARTMENT OF JUSTICE, TAX DIV.
                       P.O. Box 972, Ben Franklin Station
                       Washington, DC  20044
                       (202) 514-5150

*<u>To obtain a copy of this official transcript, contact:</u>*
*Robert L. Smith, Official Court Reporter*
*(313) 234-2612 • robert_smith@mied.uscourts.gov*

APPEARANCES:   (Continued)

For the Defendant          ERIC NEMETH
Cory Justin Mann:          WILLIAM L. THOMPSON
                           VARNUM, LLP
                           480 Pierce Street, Suite 300
                           Birmingham, MI 48009
                           (313) 481-7318


For the Defendant
Rachel Locricchio:         ALLISON L. KRIGER
                           HANNAH ROSE BARON
                           LA RENE & KRIGER, P.L.C.
                           645 Griswold, Suite 171
                           Detroit, MI 48221
                           (313) 967-0100

TABLE OF CONTENTS

MATTER_____ PAGE

ECF No. 578 DEFENDANTS' MOTION TO DISMISS

Discussion with Mr. McDonald................. 5
Discussion with Mr. Nemeth...................67
Discussion with Ms. Kriger..................85
Discussion with Mr. McDonald................88
Ruling by the Court.........................93

EXHIBITS:_____ Offered_____ Received

(No exhibits offered)

Detroit, Michigan

Wednesday, May 15, 2024

at about 9:29 a.m.

— — —

(Court, Counsel and Defendants present.)

THE CASE MANAGER: All rise.

The United States District Court for the Eastern District of Michigan is now in session, the Honorable Matthew F. Leitman, United States District Judge, presiding.

You may be seated.

The Court calls Case No. 20-2 0599, United States of America v. Cory Mann and Rachel Locricchio.

Counsel, please state your appearances for the record.

MR. McDONALD: Good morning, Your Honor. Mark McDonald here on behalf of the government.

MR. O'DONNELL: Good morning, Your Honor. Christopher O'Donnell on behalf of the government.

THE COURT: Good morning. Welcome to you two.

MR. NEMETH: Good morning, Your Honor. Eric Nemeth on behalf of the defendant, Cory Mann, who is seated right behind me.

MR. THOMPSON: Good morning, Your Honor. William Thompson also on behalf of Defendant Cory Mann.

THE COURT: Good morning.

MR. THOMPSON: Good morning.

MS. BARON: Good morning, Judge. Hanna Baron representing Ms. Locricchio.

MS. KRIGER: Good morning, Your Honor. Allison Kriger on behalf of Ms. Locricchio, who's beside me.

THE COURT: Okay. Welcome to you all. Please be seated.

Okay. We are here this morning for a hearing on motions; there's a number that are up today. I'd like to start with the motion that the defendants filed to dismiss the indictment, it's Docket No. 578. The defendants had the last word on that with a reply brief that was filed yesterday, and I had a chance to read that.

So what I'd like to do is begin with some questions for the government, if I could. Who will be arguing this motion for the government?

MR. McDONALD: I will, Your Honor.

THE COURT: All right. Do you mind coming to the podium?

All right. Mr. McDonald, you and I have had cases -- these cases together for a long time, so you know I kind of like to start with my questions, and then I'd be pleased to hear any additional argument that the parties have, after I ask my questions.

So my questions are going to kind of bounce around.

I wish I could tell you that I organized them in some sort of a brilliant fashion, but unfortunately, I haven't, so if the organization or something confuses, you just let me know.

MR. McDONALD: Yes, sir.

THE COURT: All right. So let me start with just some basic questions to help me get my head around the procedure for an investigation.

So some of the documents that are attached to the motion are forms that I think are called FBI 302 forms, and a form that is -- that goes by the letters MOI, memorandum of investigation.

Are those documents that agents prepare when they have contact with a witness in a case, is that what those are?

MR. McDONALD: Yes, sir.

THE COURT: All right. And is the idea here, that when an agent has contact with a witness in a case, for instance, the agents working on this case in connection with you guys, the idea is they're supposed to generate either a 302 or an MOI; is that the idea?

MR. McDONALD: Generally, yes, sir.

THE COURT: Is there some exception to that?

MR. McDONALD: Yes, sir.

THE COURT: What's the exception?

MR. McDONALD: For doing trial prep and there's

nothing new, then there's not one.

THE COURT: But apart from trial prep with reviewing old materials, it's fair to operate on the premise that if an agent working on your team has contact with a witness and there's communication about the case, the agent will generate either a 302 or an MOI?

MR. McDONALD: Yes, sir.

THE COURT: And is the idea here that the 302 or the MOI is supposed to memorialize the statements made by the witness to the agent working on your team?

MR. McDONALD: It is a summary or a memorialization of the statements, yes.

THE COURT: All right. And is it fair to say the 302 or the MOI is supposed to capture the material or important statements that the witness makes?

MR. McDONALD: Yes, Your Honor.

THE COURT: And is it fair to say that the 302 or the MOI is supposed to capture the statements accurately?

MR. McDONALD: It's supposed to capture what the witness says, Your Honor, accurately.

THE COURT: Okay. I mean, I didn't think that was that hard of a question, of course it's supposed to be accurate. But I just want to make sure we're on the same page, right?

MR. McDONALD: Yes, sir.

THE COURT: Okay. And when I'm reading the record in this case, including the MOIs and the 302s, is it fair for me to treat those, at least from your perspective, as an accurate memorialization of what the witness had said in the conversation that is memorialized in the 302 or MOI?

MR. McDONALD: It is accurate to the best of our ability, yes, sir.

THE COURT: Okay.

MR. McDONALD: It is -- and I will just clarify, it's a summary, it's not a transcript.

THE COURT: I get that.

MR. McDONALD: Okay.

THE COURT: Now, the agents that worked with you on this case include Agent Mirabella and others, and you've had opportunities to review the 302s and MOIs they have created in this case, fair?

MR. McDONALD: Yes, sir.

THE COURT: And has it been your impression that the agents working for you on this case, including Mirabella and others, have prepared accurate 302s and MOIs?

MR. McDONALD: Yes, sir.

THE COURT: All right. And that they have been careful in their preparation of those documents; is that your impression?

MR. McDONALD: Yes, sir.

THE COURT: Okay. Is it fair for me to conclude that whenever the agents working in connection with you on this case communicated with Mr. Sereno, they created a 302 or an MOI, unless the communication was trial prep with nothing new added by Mr. Sereno; is that fair?

MR. McDONALD: Yes, sir.

THE COURT: Okay. Let me then change gears here. Again, I'm kind of giving you this direction to help organize our conversation. Those were background questions. I want to start asking some factual questions about the investigation here, to get our head around that.

So can you tell me whether in response to subpoenas issued by the Grand Jury the Rehmann Robson accounting firm produced e-mails before the January/February 2023 timeframe?

MR. McDONALD: Yeah. I think -- can you give me a minute?

THE COURT: Sure.

MR. McDONALD: I think there are docket entries regarding that, because there was litigation in this courtroom with respect to e-mails, there's privilege claims, so there's a hard date where you had a hearing about privilege claims by Cory Mann, and you ruled, and then we received a big chunk of e-mails after that.

THE COURT: Can you help me understand the time frame for that?

MR. McDONALD:  Yeah.  Let me pull up the docket here, sir.

THE COURT:  I have to say your answer terrifies me, because I don't even have a vague recollection of that issue. I have trouble remembering what I had for breakfast, so I'm not doubting that we had this issue, but it would be helpful to refresh myself.

By the way, if anybody on Mr. Mann's defense team knows the date here, I'm just trying to ground us with a date.  So do you guys know the date that Mr. McDonald is thinking of here?

MR. THOMPSON:  Not off the top of our heads, Your Honor.

MS. KRIGER:  Your Honor, I know you addressed the question to Mr. Mann's team.  Upon information and belief, the only e-mails that were ever of issue that were in Rehmann's possession were e-mails between Cory Mann and Ken Boyer, but as I understand it, Mr. Mann's counsel did not contest those.

MR. McDONALD:  If you give me a minute, Your Honor, I'm looking through the docket.  I know we filed motions with respect to --

THE COURT:  Sure.

MR. McDONALD:  It is in the February, March 2023 timeframe.  So I'm looking at I'm trying to find the ECF No.

THE COURT: Here's why I ask this, I don't want to hide the ball here, Mr. McDonald.

So do you have the defendants' reply brief?

MR. McDONALD: Yes.

THE COURT: Okay.

MR. McDONALD: Do you -- it -- Counsel told me he thinks it is February 2023. I think it is February 2023. I see motions in limine to compel. I know we briefed privilege issue and it was resolved, there they are on the docket. So January 2023, February 2023 time period, there was litigation with respect to exhibits, and we received e-mail from Rehmann after that time period.

THE COURT: All right. On page 17 of the defendants' reply brief -- I don't know if that you have in front of you.

MR. McDONALD: Sure.

THE COURT: But I can read you what I want to ask you about. The defendants are pointing to a portion of Special Agent Mirabella's testimony that e-mails from Rehmann Robinson were not provided until January or February of 2023, and the defendants say in the next sentence, this is Docket No. 602, pageID.15981, that the government had thousands of pages of relevant material from Rehmann including e-mails as early as 2018, and no later than 2022. Can you share your thoughts with me on that.

*Motion Hearing • May 15, 2024*

MR. McDONALD: I don't believe that's accurate. If you want us to submit something with times on it, I can. I don't believe that to be accurate.

THE COURT: Okay. That's why I'm asking the questions.

MR. McDONALD: I can -- if you want to hear more, we --

THE COURT: You know what, they didn't cite anything in their papers, they didn't have a record cite for that, so I will ask them when they come up.

MR. McDONALD: Can I -- we -- we were under the impression we were working cooperatively with Rehmann and we were receiving information from Locricchio. We did subpoena e-mails, they are correct, as early as 2018. They asked us if we could delay providing the e-mails because it would be expensive for them to provide them, and we had access to Locricchio at any time we asked, and we agreed we would delay it until it got closer to the trial date, to ask for those e-mails. And then when we did ask for them, that's when there was litigation about privilege in January and February of 2023. That's my memory. Is that -- we didn't have litigation about privileges, there was -- it's -- maybe this Court will remember, there was a briefing on the *Kovel* privilege and whether or not the accountants were part of an attorney team in January/February 2023. That is when we

first asked for e-mails. Not that we didn't subpoena them before then, but we didn't ask for them to be compelled and be produced, because we believed they would be available when we needed them, and that we had access to Locricchio to answer questions.

So I would say that's not accurate to say that we had thousands of Rehmann e-mails before that. Someone might have, but I don't believe that the government had them, but.

THE COURT: Okay. Next question, different topic. Do you have the transcript of Special Agent Mirabella's testimony from August 16th, 2023 available to you?

MR. McDONALD: Yes, sir.

THE COURT: Can you go to page 17 of that transcript? It is in the docket in a couple places, but I'm looking at Docket No. 578-10, pageID.13920.

MR. McDONALD: If you give me just a moment. What page, sir?

THE COURT: The transcript page is 17.

MR. McDONALD: Okay. I'm there.

THE COURT: Okay. At the very bottom of that page, line 24, you ask Special Agent Mirabella, "And did Rachel Locricchio, nevertheless, tell the government that Gravity Imaging was set up as a partnership?" And he answered, "Yes." Do you see that?

MR. McDONALD: Yes, sir.

THE COURT: And then the next question is, Okay. Fair to say, fair, too, you took notes on that interview and recorded it in a 302?" And he answers, "Yes." Do you see that?

MR. McDONALD: Yes, sir.

THE COURT: Now you've looked for the 302 for that interview, I trust? Look, I'm not pulling this out of thin air. The defendants point out in their brief that that's not what Ms. Locricchio said, as memorialized in the 302. That in the 302, which is part of our record, Mirabella records her as saying that it was set up as an LLC and taxed as a partnership. Are you familiar with that part of his 302?

MR. McDONALD: Yeah, yes, I understand that to be the same thing, Your Honor. Setup as a partnership entity. An -- yes, I understand that, and I don't believe that's inconsistent.

THE COURT: That's your answer to the question, that you don't believe an LLC and a partnership are different under the corporate law?

MR. McDONALD: I believe that setting up as -- to be taxed as a partnership is setting it up as a partnership. I don't believe that's inconsistent, no, Your Honor.

THE COURT: Okay. Next topic, still talking about Ms. Locricchio. In Special Agent Mirabella's August 16th, 2023 testimony, you elicit that prior to

Ms. Locricchio's indictment, she was the main point of contact for Rehmann, correct?

MR. McDONALD:  Yes, Your Honor.

THE COURT:  And you elicited that she took handwritten notes while performing accounting services for Mr. Mann and his entities?

MR. McDONALD:  I apologize.  Can I have just a moment to look at the 302 'cause what you've just quoted to me is not -- I thought it said filed a form 1065, not a partnership, and I got distracted trying to find that language.

THE COURT:  Yeah.  I was quoting you the exact language from the 302, which is set up as an LLC and taxed as a partnership.

MR. McDONALD:  Can you point me to it?  I'm sorry.

THE COURT:  Yeah, hold on.  It is Exhibit 15 to defendants' motion to dismiss.

MR. McDONALD:  ECF No. 602 or ECF 578.

THE COURT:  It is ECF 578.

MR. McDONALD:  Thank you.

THE COURT:  Exhibit 16, page 2 of 4.

MR. McDONALD:  Got it.

THE COURT:  The sentence that I was asking you about --

MR. McDONALD:  Excellent.

THE COURT: -- is "Gravity was set up as an LLC, taxed as a partnership under IRS form 1065."

MR. McDONALD: Thank you. I remember the form 1065, and then you didn't say it, and then I was worried I read something different, so now I understand. My answer is the same. So, yes, that reads to me -- I read the whole sentence as Gravity was set up as an LLC, taxed as a partnership under IRS form 1065, which is set up as partnership. I don't believe that's inconsistent. The whole sentence -- I'm sorry. I just was double checking, because I thought maybe you were reading something different. I apologize sir. Thank you.

THE COURT: I'm now on a different topic, just for clarity -- or my effort at clarity.

And I asked you if you elicited, during his testimony in August of 2023 -- by "his," I mean Mirabella's, that Ms. Locricchio was the main point of contact for Rehmann, and you agreed that you did that.

I asked if you elicited that she took handwritten notes. You agree with me that came out in his testimony?

MR. McDONALD: Yes, Your Honor.

THE COURT: All right. You asked him before the Grand Jury, did the government subpoena those notes before 2023, right?

MR. McDONALD: Yes, sir.

THE COURT:  Okay.  And then you asked him that those notes were not produced until 2023, after Ms. Locricchio was indicted.  Do you recall that line of questioning with him?

MR. McDONALD:  I do, and --

THE COURT:  I haven't even asked my question yet. It is just a yes or no.  Okay.

So the defense argues that that line of questioning was misleading because it left an impression that Ms. Locricchio withheld her handwritten notes from production, and the defense has presented evidence that her notes were provided to Brian Lennon, and that it was a dropped ball at Warner Norcross that led to the delay in the production of at least a portion of her notes to the government.

What is your response to the defense's argument that that is a misleading portrayal of Ms. Locricchio?

MR. McDONALD:  It is not misleading.  Locricchio did not provide her notes from 2018, when we first subpoenaed it, to --

THE COURT:  Let me -- let me break my question down into chunks.  I understand the government's position that she has not provided notes post 2018.  I understand that position.

With respect to pre-2018 notes, isn't it -- doesn't

it appear from the record that she provided at least those to Mr. Lennon, to provide to you guys?

MR. McDONALD:  If your question is, did she make copies of her notes in January 2018 and scan them and give them to the Rehmann lawyers, the answer is yes.

THE COURT:  Okay.

MR. McDONALD:  I don't think -- I can just tell you, Your Honor, I don't believe that the Grand Jury was misled.  I know that it is true that we did not receive her handwritten notes for the time period of the returns that were charged.

THE COURT:  The -- the way this lays out, though, and I'll give you a chance to respond, is the way you establish her state of mind and the way you're building your proofs for the returns that were charged, your -- your evidence starts with a handwritten note by her, in 2015, where you believe she acknowledges that Gravity was set up as single member LLC.  That's the -- that's one -- if it's not the first, it's an early step in your chain.  It's a piece of evidence that you believe is inculpatory, fair?

MR. McDONALD:  Yes.

THE COURT:  Okay.  So when you told the Grand Jury, when you elicited that she didn't provide notes, period, without any distinction in time, why didn't that leave the Grand Jury with the impression that what she didn't provide

was this -- among other things, this key handwritten note that you highlighted for them?  Why wouldn't that have been a natural conclusion for them?

MR. McDONALD:  Because that wasn't the question, Your Honor.  The question was, we subpoenaed notes from 2018 until 2023 and --

THE COURT:  Hold on one sec.

MR. McDONALD:  Okay.

THE COURT:  The questions, when you read them in context, don't limit the date range of your request to 2018 to 2023, instead that is identified as the time frame during which you were issuing subpoenas for e-mails.

MR. McDONALD:  May I have a moment, Your Honor?

THE COURT:  At best, it's ambiguous on pages 15 and 16 of his questions -- of his transcript.

MR. McDONALD:  May I have a moment, Your Honor?

THE COURT:  Sure.  And when you get to 15 and 16, I can read you the questions that I'm looking at.

MR. McDONALD:  What pages are you on, sir?

THE COURT:  So go to page 15 of Mirabella's testimony.  Again, I'm just looking at ECF No. 578-10, pageID.13918, line 6.  Tell me when you're there.

MR. McDONALD:  Yes, sir.

THE COURT:  And the question is, "And those subpoenas were issued from approximately, say, 2018 to at

least 2023?" Answer, "Yes."

When I read that, I was looking at -- I was understanding that as the timeframe during which you were issuing subpoenas, not the date range for documents that you were seeking.

MR. McDONALD: I understand what you're saying. I don't read it as ambiguous. I don't agree, but I -- I don't agree. And I can tell you that the only handwritten notes we received were handwritten notes created before the Grand Jury investigation began. We received no hand -- does that make sense? There are no handwritten notes created after the first subpoena was issued.

THE COURT: Look, you -- the question here is on page 16, "And those subpoenas were issued from -- " the word is "from."

MR. McDONALD: Exactly, yes.

THE COURT: "-- from approximately 2018 to 2023?"

MR. McDONALD: And we received no handwritten notes covering the time period of 2018 to 2023.

THE COURT: The way I read that question is that you were issuing various subpoenas during that time, for e-mails and for handwritten notes.

MR. McDONALD: Yes, sir, I understand. Just give me a moment. I'm sorry.

THE COURT: And then you say a few lines down on

*Motion Hearing • May 15, 2024*

the same page, "Later did you learn that she had scanned notes in 2018, and these are the scanned notes."  These being the notes that you find highly inculpatory.  And then you say, "They were not provided until after the Grand Jury indicted her."

So isn't the impression that is created here that what happened was Locricchio created notes, scanned them, she's the point person, she didn't provide them, and the note that wasn't provided is this inculpatory note.  Isn't that the impression?

MR. McDONALD:  That is not the impression.  That is what happened.  And they are free to question Mr. Carvo and we are free to question Mr. Carvo, and he can give us whatever answer he would like to give us.  There are instances where Rachel Locricchio was spoken to between 2018 and 2023, and we asked where the handwritten notes were, well into February of 2023, and they -- they didn't appear until after.

So I disagree that any of this is misleading.  And I understand that we have an e-mail from Mr. Carvo, and we are free to ask him questions about what happened.  I don't believe that there is a misimpression.  It is true that she was the point person.  It is true that we subpoenaed them over and over again, and asked for them.  It is true that they did not show up until after she was indicted.  And it is

true that there is an e-mail that says she was contacted by defense counsel, and she is the attorney that currently represents Rehmann, Madalaine Lane was contacted by defense counsel and then did an inquiry, and then the result was that they found they had been scanned and never turned over, because of a -- some sort of oversight or logistical error that remains unexplained.

THE COURT: Isn't that a problem on the Warner Norcross end of things?

MR. McDONALD: I believe it's a problem on the Rachel Locricchio end of things, who is our point of contact to provide documentation that we requested over and over again, between 2018 and 2023.

THE COURT: Didn't all documentation exchange go through the lawyers? In other words, was she ever hand-delivering stuff, or wouldn't she give it to the Rehmann lawyers and then they would give it to you?

MR. McDONALD: I think that it had to have come though the lawyer, because that's how they would have operated. I don't know that we ever spoke to her where there wasn't a lawyer sitting next to her. I do know that we asked for them over and over, with a lawyer sitting next to her, and I do know what never happened is that she said she already scanned those, I can scan them again, or here are the more recent version, or today's February 2019, and there's

another year's worth of notes, I just met with him a year ago. That is not a misimpression, that's exactly what happened. And what you are -- I hear -- I don't believe that there was a misimpression. I believe that this was a defense argument that, hey, it's Scott Carvo's fault. But Scott Carvo, the tech guy, or the lawyer who's responsible for discovery production, was not the person that we were meeting with and asking for additional documents. Rachel Locricchio was. And she had a lawyer sitting next to her, who has also been subpoenaed, who I --

THE COURT: Doesn't the evidence before me indicate she gave the handwritten, scanned-in notes to her lawyers way before she was indicted?

MR. McDONALD: She gave notes up to January 2018, to the lawyer before she was indicted.

THE COURT: All right.

MR. McDONALD: She did not give notes from 2018 to 2023.

THE COURT: I get that. But the questioning, it seems to me, on pages 15 and 16, especially when you are talking about these are the scanned notes, on page 15 of the transcript, the notes you're referring to are this highly inculpatory note that you believe to be highly inculpatory, and I think this creates the impression that she was trying to hide that, and to me, that's misleading. So. Okay.

Brand new topic, and I want to be very candid that these next topics I view as just a distinct topic. Okay.

So looking at Agent Mirabella's testimony -- I think you have the transcript in front of you. Would you turn to page 20, please.

MR. McDONALD: Sir.

THE COURT: Okay. Do you see on line 15, there's a question, do you see that? So I'm looking at my Docket No. 578-10, pageID.13923. Do you see that?

MR. McDONALD: Yes, sir.

THE COURT: The question there, and it's asked in August of 2023, is, "And have you heard Anthony Sereno tell you and others that he understood he was not an owner of Gravity Imaging ever?" Do you see that question?

MR. McDONALD: Yes, sir.

THE COURT: Can you identify for me, with precision -- the answer is, "Yes." You see that? That's on the next line.

MR. McDONALD: Yes, sir.

THE COURT: Okay. What specific statements of Mr. Sereno is Agent Mirabella referring to there?

MR. McDONALD: He's referring to Sereno's description of the buyout -- excuse me, of the bonused-out arrangements with Cory Mann.

THE COURT: Okay. So what I'm looking for is

specific citation in the record. Is he referring to a statement that was memorialized in a 302? Is he referring to trial testimony? With great specificity, identify for me every statement in this record that Mirabella is referring to when he gives that answer, please.

MR. McDONALD: So I would refer to you ECF No. 594.

THE COURT: Okay. Can you just tell me what it is, so I can try to find it?

MR. McDONALD: Government's response to the motion to dismiss.

THE COURT: Page what?

MR. McDONALD: I'm trying to see where it starts. Starting on page 16.

THE COURT: Okay. So when I look at page 16, I see potentially three citations to the record.

MR. McDONALD: Correct.

THE COURT: Three statements that Mirabella could have been referring to here.

MR. McDONALD: That's correct.

THE COURT: Let take the easy one first. The one that you block quote from Attachment C to your motion, is made in March 21, 2024, right?

MR. McDONALD: And that's afterwards, yes, sir.

THE COURT: So we're certain --

MR. McDONALD: Yes, sir.

THE COURT: We're positive that's not what Mirabella was referring to.

MR. McDONALD: Agreed.

THE COURT: So that leaves two citations --

MR. McDONALD: Agreed.

THE COURT: -- that Mirabella could have been referring to when he said Anthony Sereno told him --

MR. McDONALD: Agreed.

THE COURT: -- and others. Okay. So let's look at those citations.

The first one is an interview summary of September 1, 2022. That's a -- that summary is attached to the defendants' motion to dismiss, as Exhibit 7. Do you have that?

MR. McDONALD: Yes, sir.

THE COURT: Okay. Where in this document does Mr. -- is it memorialized that Mr. Sereno said he, quote, "Understood he was not an owner of Gravity Imaging ever."

MR. McDONALD: It's -- in the 302. It is labelled at the bottom of page 203 -- or 2 of 3 and going into 3 of 3. I think it's probably highlighted on your copy.

THE COURT: Right.

MR. McDONALD: It's when he gives a description of the bonused-out.

THE COURT: Do you see the word, "understood," "not

an owner," anything like that in here?

MR. McDONALD: No, I don't.

THE COURT: No, it's not in there.

MR. McDONALD: But it does have in quotes, "bonused-out," and this is not a transcript, so it doesn't have every word that he said.

THE COURT: It has "bonused-out" and it refers to Sereno becoming a partner at Gravity, right?

MR. McDONALD: Yes.

THE COURT: Those are Mirabella's words. Those are Mirabella's words describing what he believes Sereno said?

MR. McDONALD: Correct.

THE COURT: Okay.

MR. McDONALD: Are you -- so, I'm sorry. Are you asking me to show you a quote where the quote --

THE COURT: Here's the point that I'm going to drive at with every one of these questions.

MR. McDONALD: Okay.

THE COURT: You asked Mirabella about what Sereno said --

MR. McDONALD: Yes.

THE COURT: -- and told.

MR. McDONALD: Yes.

THE COURT: And absolutely, you are not going to be able to point me to a damn thing in this record that supports

that, it's not even close.  And what we're going to do is we're going to go through it together, and we're going to bring that out.

MR. McDONALD:  Okay.  That's fine.

THE COURT:  This 302 --

MR. McDONALD:  Yes.

THE COURT:  -- isn't even close to what you asked and he verified during this Grand Jury testimony.

MR. McDONALD:  When Sereno explains on September 22nd -- September 1st, 2022, an explanation of the bonused-out arrangement, he did say that he wasn't really an owner.

THE COURT:  You know what, that's exactly why I started this hearing with my questions.

MR. McDONALD:  I understand.

THE COURT:  It's my old days as a lawyer to lock the person in.  It's entirely incredible -- it's wholly unbelievable for you to come here and tell me that during this September 1, 2022 session, Sereno actually said that he wasn't an owner, that this was fake, he understood that.

Is there an audio recording of that interview.

MR. McDONALD:  No.

THE COURT:  Okay.  How can you possibly take that position, given the way you and I started this dialogue, the whole purpose of the 302, that this is a critical comment, if

he made it, and it's not even remotely in here.  How can you take that position?

MR. McDONALD:  Because it has, right here in this 302, the -- a summary, and the quote of bonused-out, and if you asked him what bonused-out means, you get a long explanation of how he describes what bonused-out means.

THE COURT:  And it -- that explanation is summarized in here, and the wording that is in here is much more consistent with him being an owner than not being an owner.  To say, I'm a partner at Gravity, you want -- when I look at his trial testimony, you want me to look at these propositions and say, when he used the term, "with Gravity," that's important.  If I'm going to do that there, then I'm going to do that here.  And when he says he's a partner at Gravity, that's much more consistent with being an owner of Gravity.  And then he says after joining Gravity, that's another way to say I'm part of Gravity.  There's nothing in this 302 that suggests to me -- there's nothing in this 302 that, to me, is consistent with this question and answer that you gave here, nothing.

Okay.  The next citation that you give is to Sereno's trial testimony in one of our more recent trials.  And I've got to say this is closer.  I'm going to acknowledge that the testimony that you cite is closer, but let's look at it.  It is --

*Motion Hearing • May 15, 2024*

MR. McDONALD:  Is that Exhibit 8 on the defendants' motion to dismiss, ECF No. 578?

THE COURT:  I don't think so, but hold on.  No.  I think you guys attached it, didn't you?

MR. McDONALD:  We did.

THE COURT:  Do you know where it is on yours?

MR. McDONALD:  Yes, sir.

MS. KRIGER:  Your Honor, I believe the Court is looking for in and around what would be page 182, but it's ECF No. 411, pageID.8048.

MR. McDONALD:  It's Attachment H on the government's response, ECF No. 594, Attachment H, as in hotel.

THE COURT:  I still can't put my hands on this damn testimony.  Hold on one sec.

MS. KRIGER:  Also Exhibit 8 to the defendants' motion to dismiss, so just after the --

THE COURT:  Okay.  That's easier.  Thank you.  So I think the part of this that you want me to read is page 41 of his trial transcript; is that correct?

MR. McDONALD:  I don't know -- like 35, we highlighted to, we also highlighted to 41 and 42, yes, Your Honor.  It is highlighted in the version we submitted, Your Honor.

THE COURT:  So this is his trial testimony from

July 14, 2023. I'm looking at -- it appears in our record as ECF No. 414, that's where that transcript was filed originally, but it's also attached as Exhibit 8 to the defendants' motion to dismiss.

And can you point me where in here Sereno says, quote, "He understood he was not an owner of Gravity Imaging ever."

MR. McDONALD: There's not a quote in that language. Again he's described in the bonused-out. There is not a quote in the way that you are asking. It is not there, you are correct.

THE COURT: You say, the way I'm asking. Here's what you didn't say when you were questioning Special Agent Mirabella. You didn't say something like this: Special Agent Mirabella, has Mr. Sereno ever said anything that led you to conclude he believed he wasn't an owner?

Your question was quite specific. You said, "Did he ever tell you and others that he understood he was not an owner of Gravity Imaging ever?" The parts of the -- of the transcript that you cite me to, the closest that we come -- well, you tell me, what words in this transcript of his trial testimony of July of 2023 constitute him, quote, telling anybody that he understood he was not an owner of Gravity Imaging ever? And moreover, on line 19 of page 20 of Mirabella's testimony, it doesn't just stop there, that he

believed that he was a partner in the sense that he was a business partner who received money for each time he used stolen reports, but not a partner that he owned. Where is that distinction made anywhere in here?

MR. McDONALD: When he describes checks that are written as member distributions, on page 35, as a bonus given out to John and I.

THE COURT: All right. Mr. McDonald, before I had this job, I was an equity partner in a law firm and I got bonuses. Why does the term, "bonus" -- when my partners would cut me a bonus, I wouldn't say, oh, gees, I don't own part of this firm.

MR. McDONALD: May I answer your question?

THE COURT: That's why I asked it, yeah.

MR. McDONALD: Okay. So when you asked Sereno to explain what bonused-out means, he would explain that is how he understood the scheme where he was going to be made a partner on tax returns and be written checks that say member distribution, but he didn't, in reality, or -- own Gravity Imaging or have an interest in Gravity Imaging. That these were bonuses on top of the money that he was getting for his advertising-marketing work.

THE COURT: Here's my point, I hear you saying those words now.

MR. McDONALD: Yeah, can I --

THE COURT:  Go ahead, because I want to give you every possible opportunity, and I have to hold myself back, so I promise I won't interrupt you.  Go ahead.

MR. McDONALD:  That's how he describes what bonused-out means.  So when you ask me where it is, that's where it is, because that is how -- he is not an equity partner at a law firm, he understands bonuses being something on top of the money that he was already getting, and if -- but not a member distribution to someone who is, in reality, an owner, rather somebody who is pretend an owner, and that's what the bonused-out, in quotes, means in the September 2022.  But it's not a transcript, and those words that you are looking for as a transcript are not there, I agree.  But you asked me to point to where that happened, and I can tell you --

THE COURT:  But -- go ahead.

MR. McDONALD:  Thank you.  Before -- that Special Agent Mirabella heard those actual words come out of Sereno's mouth before he testified and during trial prep for this trial when we asked him to explain, what are you talking about when you mean bonused-out?  What are these checks?  When you say it is a bonus, can you tell us what you --

THE COURT:  Okay.  Remember -- remember going back to our earlier conversation -- our beginning conversation, I very intentionally locked you in.

MR. McDONALD:  I said --

THE COURT:  You're locked in.

MR. McDONALD:  I said it was a summary, not a transcript.

THE COURT:  I said to you, when does a new 302 get generated?  And you said, if there's anything new --

MR. McDONALD:  Agreed.

THE COURT:  -- and there's not a 302 prior to, quote, trial prep, for any case --

MR. McDONALD:  Correct.

THE COURT:  -- that mentions this whole fake owner. So if Sereno said that during trial prep, we would expect to see it in a 302 generated in connection with trial prep, because it would be new.

MR. McDONALD:  And we did not interpret it as new, because he had already said in September of 2022.

THE COURT:  Look, you can't -- you can't take the position here that he said it in 2022, because if he said it in 2022, it would be in a 302, by your own acknowledgment. It's not in there.

Here's the clearest indication it's not in there. Okay.  You have said to me at the last hearing, well, one of the reasons it's not in a 302 is because he speaks in jumbles and we don't know how to take it and put it into a neat 302. Do you remember saying that to me?  They quotes it back to

you in --

MR. McDONALD:  And I think every time I read it, I read it as you won't -- you will do what you're doing right now and ask me to point to the exact words, and I cannot do that.

THE COURT:  Look, in March of 2024, you guys generate a 302 that spells out in great detail, this -- these words that Sereno said; that he didn't understand himself to be an owner, that it was fake.  There is absolutely no reason to believe that if he had said the same thing in any prior meeting, it wouldn't be in a prior 302, just like it was in the March 2024 302.

MR. McDONALD:  But that's what happened, because when he explains bonused-out, he gives a long explanation and we've summarized it as bonused-out.

THE COURT:  Boy, then that's going to end up maybe being a huge problem for you.

MR. McDONALD:  I understand.

THE COURT:  Okay.

MR. McDONALD:  I understand.

THE COURT:  Let me switch to my next question here, which is, you meet with him in March 2024, and you show him his Grand Jury testimony from 2020, right?  And his Grand Jury testimony in 2020 was that he was an owner, right?  Unqualified, he says he's an owner, right?

Let's just pull it up, it'll be helpful.

I've got so many damn pieces of paper here.

Okay.  So in the Grand Jury testimony that Mr. Sereno gave on January 15th, 2020, it's attached as Exhibit 5 to the motion to dismiss.  Would you go to page 25 of that testimony, please.

MR. McDONALD:  Yes, I'm there.

THE COURT:  Okay.  So on page 25, line 19, you asked Mr. Sereno, "At some point did you get an ownership interest in Gravity?"  And he says, "Yes."  Do you see that?

MR. McDONALD:  Yes.

THE COURT:  He says nothing about a fake interest or anything, he just says "yes," right?

MR. McDONALD:  That's what it says, yes.

THE COURT:  Then you say, on the top of page 26, you say, "So whatever rate you were charging Gravity was too much to cover and that you negotiated to get an ownership interest instead; is that correct?"  He says, "Yes."  Right?

MR. McDONALD:  Yes.  You're on page 27 -- or 26 now?

THE COURT:  I'm on 26.

MR. McDONALD:  Yes.

THE COURT:  Do you see that?

MR. McDONALD:  Yes.

THE COURT:  And then you asked him, on line 13,

"Who did you negotiate with to be an ownership or a member?" And he says, "Cory Mann."  Do you see that?

MR. McDONALD:  I do.

THE COURT:  Okay.  This is -- I hope this is an easy question.

On its face, this testimony here is inconsistent with the version of events that he gives in the March 2024 302.  Can we agree with that, on its face?

MR. McDONALD:  Yes, sir.

THE COURT:  Okay.  So understandably, when you meet with him in March 2024, you show him this and you ask him, and you said, hey, how do you explain what you said in 2020, right?

MR. McDONALD:  Correct.

THE COURT:  And he says -- you correct me if I'm wrong, but I don't mean to be exact here, but --

MR. McDONALD:  He says whatever it says in the 302, correct.

THE COURT:  But it's something to the effect of -- you know what, I want to get the 302, because it's important.  This is Exhibit 18 to the defendants' motion to dismiss -- oh, hold on, that might be the wrong one.  Oh, yeah, no, this is the right one.  Okay.

Exhibit 18, do you have that, Mr. McDonald?

MR. McDONALD:  I don't.  Give me just a moment.

THE COURT: Take your time.

MR. McDONALD: Did you say it is Exhibit 18?

THE COURT: It is Exhibit 18 to the motion to dismiss. It is a 302 that was prepared on March 29th, but it was of the Sereno interview on March 21st.

MR. McDONALD: Okay. Yeah, I'm there.

THE COURT: All right. You're there? Okay. So will you go to page 2, please.

MR. McDONALD: Okay.

THE COURT: So there's a paragraph, three from the bottom, and I want to just read it so we are together. This is -- so we have his exact explanation for why his current version is different from his Grand Jury testimony. And he said -- or, this is your summary -- your agent's summary of what he said.

It says, "In his Grand Jury testimony in 2020, Sereno said "yes" to owning Gravity, but he thought he was answering "yes-or-no questions." Sereno reiterated that he felt the same way about his ownership of Gravity during his Grand Jury testimony as he did at the time of this interview: Sereno/Robin Street owned Gravity on paper and not in actuality. Sereno/Robin Street's ownership of Gravity was "fugazi," meaning "fake." Sereno only said "yes" in the Grand Jury in 2020, because he knew he was the owner on paper and if he knew he could elaborate on his answers, Sereno

would have said that his ownership of Gravity was only an agreement on paper."  Do you see that?

MR. McDONALD:  I do.

THE COURT:  All right.  So that's what Mr. Sereno told you was the explanation for the difference in his testimony, right?

MR. McDONALD:  Yes.

THE COURT:  All right.  Did you believe that?

MR. McDONALD:  Do I believe his explanation?

THE COURT:  Yes.

MR. McDONALD:  Yes, I believe his explanation.

THE COURT:  Okay.  Did you do anything to examine whether this explanation, in any way, holds up?

MR. McDONALD:  I don't understand your question.

THE COURT:  He tells you -- he gives you this explanation.  He says to you, as I'm sitting in the Grand Jury in January of 2020, I believed I could only answer yes or no.

MR. McDONALD:  Oh --

THE COURT:  And I believed I could not elaborate and that's why I didn't use this -- give this explanation back then.  He says that to you, fair?

MR. McDONALD:  Yes.

THE COURT:  Okay.

MR. McDONALD:  I'm sorry.  I don't understand what

you -- I don't understand your question.

THE COURT: You are meeting with him and he gives that explanation for why his Grand Jury testimony in 2020 doesn't match what he's telling you now. Fair?

MR. McDONALD: Yes -- yes, I'm following you. I don't understand the part -- I don't understand what you are asking.

THE COURT: That's why I'm going to go step by step.

MR. McDONALD: Okay.

THE COURT: You're meeting with him --

MR. McDONALD: Can I step away for just a minute, because maybe my partner understands and I'm being dense?

THE COURT: I'm going to try again, but, of course, you can step away.

MR. McDONALD: Okay.

(An off-the-record discussion was held at 10:26 a.m.)

THE COURT: Okay. Can we try again? All right. So you're with Mr. Sereno in 2024. You show him his Grand Jury testimony, and he says that I didn't say in 2020 what I said in 2024 because, in 2020, first, I only thought I was answering yes-or-no questions, and, second, I didn't believe I could elaborate. He gives that explanation, right?

MR. McDONALD: Correct?

THE COURT: Okay. At the time he gives it, do you believe that explanation?

MR. McDONALD: I did.

THE COURT: Okay. Did you do anything to assess -- to investigate whether that explanation makes sense or is reasonable?

MR. McDONALD: And you're asking me if I --

THE COURT: This is not a trick question. He gives this explanation. Witnesses appear before you all the time, they make statements, and you've got to -- sometimes you've got to do follow-up to see if the statement holds up.

Did you do any sort of analysis or evaluation to figure out if that explanation for the discrepancy makes sense?

MR. McDONALD: Like, look -- and I don't --

THE COURT: My question is not -- -

MR. McDONALD: I'm sorry. I don't understand.

THE COURT: This is not a hard question. He gives you an explanation.

MR. McDONALD: Correct.

THE COURT: You're sitting there, and after he gave that explanation, did you do anything?

MR. McDONALD: Yes, I did a number of things.

THE COURT: What did you do to determine whether that explanation is credible or sensible?

MR. McDONALD: We looked over the Grand Jury transcript and the exhibits that he was shown and the evidence available to us at the time that he was giving his answer.

THE COURT: Okay. So --

MR. McDONALD: Is that -- well, I didn't quite understand what you were asking.

THE COURT: Yes, yes. So he tells you, when I'm sitting there in front of the Grand Jury in 2020, I thought I could only answer yes or no, and I didn't understand I could elaborate. You say to yourself, okay, he says that, but I need to see if that makes sense, and one way to see if that makes sense is to look back at his Grand Jury appearance, which you did?

MR. McDONALD: Yes.

THE COURT: Okay. Let's go back and look at that together and see if you and I come to the same conclusion about the reasonableness of his explanation. Do you have -- can you go to page 4?

MR. McDONALD: Of the Grand Jury --

THE COURT: Of his Grand Jury testimony.

MR. McDONALD: Okay.

THE COURT: Okay. Do you see on page 4, line 14 you're advising him about his appearance, and you tell him that he just promised to tell the truth, so if he provides a

false answer to any question, he could be charged with an additional felony. You saw that when you went back and did your review, right?

MR. McDONALD: Yes.

THE COURT: Okay. And then you said to him, "If I ask you a question that's confusing or anything, you just let me know." You saw that, right?

MR. McDONALD: I did.

THE COURT: Okay. Will you flip to page 6?

MR. McDONALD: Yep.

THE COURT: Okay. Then on page 6, line 13, you remind him that he has an agreement with the government to cooperate, right?

MR. McDONALD: Correct.

THE COURT: All right. And what you tell him on line 13 of page 6 -- I want to make sure I quote it. You make sure that he understands, "That you are required by this agreement to provide truthful information and to not withhold the information. You have to -- not only do I have to ask you the right questions, you have to volunteer questions that -- volunteer answers if my questions are in the area of something that you understand." You told him that, right?

MR. McDONALD: Correct.

THE COURT: Okay. Let's flip to the end. Page 34.

MR. McDONALD: I'm there.

THE COURT: You see line 18?

MR. McDONALD: Uh-huh.

THE COURT: Here you say to him -- so this is at the end of his testimony. "So your testimony has been under oath, which means that it all needs to be truthful and honest. If I asked you a question and you believe you gave a false answer, you can change it now or after you speak to your lawyer, and you can go home and take a nap, or tomorrow morning you think, oh, I gave this answer wrong, if you let your lawyer know -- I'm saying you can come back and we can fix it. Do you understand that?" And he says he does.

MR. McDONALD: Correct.

THE COURT: Then, did you read this transcript to see if there were any yes-or-no questions where his answers were more than yes or no?

MR. McDONALD: I didn't, but --

THE COURT: That's just a yes or no. Did you do that?

MR. McDONALD: No. And may I please give a fuller answer?

THE COURT: Had you done that, would you have discovered that at least in one -- I believe more than one instance, he was asked a yes-or-no question, and at one point, gave a four-line answer and was able to qualify his answer to make sure it was truthful. You now know that you

would have found that had you looked for that, right?

MR. McDONALD: I understand.

THE COURT: So here's my question.

MR. McDONALD: Can -- can I give a fuller answer to your question of, did I look back?

THE COURT: Yes.

MR. McDONALD: I did look back. I also had discussions with his attorney --

THE COURT: Go ahead.

MR. McDONALD: Your Honor, I'm trying to answer your question, and I get the impression from you that I'm irritating you, and I'm just --

THE COURT: You're not.

MR. McDONALD: I'm just trying to answer your question.

THE COURT: You are not irritating me. Go ahead.

MR. McDONALD: I had discussions with his attorney about the same things that you are pointing out right now, so I understand what you're saying.

THE COURT: Okay.

MR. McDONALD: And I accepted the answers that I received from the attorney about why he answered in the way that he did. That is -- I follow what you're saying, is that he was told if I'm not asking yes-or-no questions, you can expand, or if there's confusion you can talk to your lawyer.

THE COURT: It's more than that. Okay. It is more -- it is much more than that. He told you in March of 2024, the reason I testified the way I did on this point in 2020 was because I thought they were only yes-or-no answers and I couldn't elaborate. And the facts are, you told him he was obligated to elaborate if that was necessary to make something true. You gave him an opportunity to come back. But it's not just that. He, in fact, answered yes-or-no questions -- not many, but some with, sometimes a couple sentences, that when you just look at the evidentiary record, it can't be reconciled with his explanation in 2024. And I'm troubled by the fact that that's not obvious to you.

MR. McDONALD: That's why I mentioned that I had discussion with his attorney about these things and so sort of resolved the inconsistencies. I understand -- I understand what you're saying.

THE COURT: We have a contemporaneous record in 2020, where he's given these warnings, and even more importantly, he actually answers a yes-or-no question with more information than with yes or no. What can he possibly say in 2024 that -- that somehow convinces you that he actually believed he could only answer yes or no in 2020, on the record we have from 2020?

MR. McDONALD: Are you -- did you want me to answer that?

THE COURT: Yes.

MR. McDONALD: I said I had discussions with his attorney about that inconsistency, and that resolved my sort of confusion about that.

THE COURT: If you want to share it with me, I would be pleased to hear it.

MR. McDONALD: He was under the impression, with respect to items on tax returns, the tax returns had what was true on it, and that he wasn't to, like, go into more detail unless I asked for more detail, to try to keep his questions -- I'm just -- I --

THE COURT: Look, I understand he's saying that now.

MR. McDONALD: Okay. You're saying I shouldn't believe him.

THE COURT: I'm saying, how could any reasonable person believe that explanation, given the contemporaneous record in 2020, is my question.

MR. McDONALD: Yes, sir. I understand what you're saying.

THE COURT: Here's -- let me be as blunt as I can. Okay. Here's what the defense says in this case, and I want to give you a full opportunity, and I'm gonna zip my mouth after I ask this question. What the defense says is -- and this is not me, Mr. McDonald, this is them. I want to try to

air out each side's argument as carefully as I can. And I'm paraphrasing the defense now.

The defense says, Mark McDonald and Chris O'Donnell are in way too deep. They have lost all objectivity and all ability to function fairly as prosecutors. And they point to certain examples where they say the conclusions drawn by McDonald and O'Donnell couldn't be drawn by any reasonable person looking at the same record, and this is an example they point to.

And -- again, this is them speaking, not me. They were very critical of you guys in the papers, you saw that. And I want to make sure I give you a full opportunity to explain to me how any reasonable person could look at Sereno's 2024 explanation and conclude that it's a plausible explanation for his testimony in 2020.

MR. McDONALD: I spoke to his attorney about why he would not expand on the answer in 2020. His attorney explained to me why the answers were this way. I also met with him in October of 2022, and we recorded it. I was present when he made statements from 2022, until his testimony in 2023, where he indicated, consistently, that it was a pretend partnership, it was not real. So that is why I believed that it was -- that the inconsistency and the way he explained it was accurate.

THE COURT: What did you just say?

MR. McDONALD: That is the reason why I believed his explanation regarding the inconsistency.

THE COURT: Did you refer to a time that Sereno talked about a pretend partnership just now?

MR. McDONALD: We've already talked about it. Nothing different than what we have already discussed. I'm referring to the same instances that we have already discussed. I'm just summarizing what we have already discussed. There is nothing different than what we have already written in our response.

THE COURT: When was the first time you learned that Anthony Sereno's position was that he was an owner of Gravity only on paper, in essence, a fake owner? When did you first learn that?

MR. McDONALD: When he began to talk about the bonused-out in October of -- or September of 2022, in the 302.

THE COURT: Okay. Hold on.

MR. McDONALD: That's my recollection. If I have something different in my notes later, I will let the Court now, but I think that's correct.

THE COURT: So you believe that in 2022, he told you that he was a fake owner of Gravity?

MR. McDONALD: Giving a long explanation about bonused-out, which includes membership distributions being

really getting a bonus, not as owner, but as extra money for being -- for doing advertising.

THE COURT:  And when he told you that in 2022, did you believe it?

MR. McDONALD:  I don't know, Your Honor.  I don't know.  We have inconsistent information between Anthony Sereno and the tax returns and Rachel Locricchio at that time.  And I believe -- quite frankly, Your Honor, I believed Rachel Locricchio, because she was an accountant who prepared the tax returns.

THE COURT:  New topic.  When you and I were together before, on the hearing on the motion to get some Grand Jury disclosure, I think that's the motion that came before this, I believe you told me, and please correct me if I'm wrong, that when you alleged, in the first three indictments that were filed in this case, that the owners of Gravity were Mann -- included Mann and Sereno, that you didn't rely on Sereno's testimony for that proposition.  Is that true?

MR. McDONALD:  I got lost there, but I recall the conversation and we were relying on the accountants and the folks at Rehmann, until the final third superseding indictment.

THE COURT:  Let me try to ask a better question.  Sometimes my questions aren't great.

In the original indictment in this case, there's an allegation in, like, paragraph 4 or something, about --

MR. McDONALD: In the introduction, yes.

THE COURT: Yeah, the ownership of Gravity. And it at least lists Mann and Sereno, and I can't remember if it lists anybody else. Are you with me?

MR. McDONALD: I recall, yes, I recall.

THE COURT: Was that allegation, in any way, in your view, based on the testimony that Sereno provided to the Grand Jury in January of that year, or were you relying on something else?

MR. McDONALD: And I think I -- are you looking at the transcript? I already answered the question, I think, and hopefully I said that we are relying on the folks at Rehmann and the tax returns that were prepared.

THE COURT: Yeah. Okay. So this is really what I want to zero in on. I think this is helpful. So you're telling me that at the time you prepared the original indictment, when you alleged the ownership of Gravity, that allegation was based on information or documents prepared by Rehmann?

MR. McDONALD: Yeah. I'm sorry. Are you asking me the same thing again, because I got confused there in the middle.

THE COURT: Yeah.

MR. McDONALD:  The paragraph 4 in the introduction of the second superseding indictment, is the one place where it says something about ownership, it is in the introduction.

THE COURT:  Right.

MR. McDONALD:  And we were relying on a tax return that says that.  Is that what you're asking me?

THE COURT:  Yes.

MR. McDONALD:  And I think that's what I said the last time you asked me this.

THE COURT:  Yeah.  I'm just trying to make sure I understand the full universe of information.

MR. McDONALD:  I understand.  I understand.

THE COURT:  The only thing that you were relying on, at that point, was a Rehmann-prepared tax return that listed owners?

MR. McDONALD:  Yes.  You asked me this before, and then you asked me, well, why are you alleging that, if Sereno had something different?  And I will say it again, we are required to allege what we think we can prove beyond a reasonable doubt.  At that point, Rehmann is standing behind their tax returns, even if -- when the second superseding indictment comes out, Rachel Locricchio maybe has made some inconsistent statements.  We still don't have evidence, beyond a reasonable doubt, to say that that's not what the tax returns say for some reason.  Until we get the

handwritten notes that have something different, that we think we can prove beyond a reasonable doubt, that allegation did not change. Does that -- is that the transcript that you are looking at?

THE COURT: These are my notes.

MR. McDONALD: Okay. So that, I hope, is what I said the last time you asked me, because that is what happened from the DOJ's perspective.

THE COURT: New topic, but kind of related.

One of the pieces of evidence that the defense highlights in their motion is testimony by Special Agent Mirabella, in March of 2022, that Gravity was at one time owned by, among others, Sereno. Do you remember that testimony that --

MR. McDONALD: A hundred percent, a hundred percent. I know exactly what you're referring to.

THE COURT: So Mirabella testified to that, and the defense highlights that and say that's misleading. And your response is, hey, that's a problem for the defense, because Mirabella was relying on Locricchio when he explained who he believe the owners were. Do you remember that?

MR. McDONALD: Can you show me exactly, because I think there's a timeframe issue, also?

THE COURT: Sure.

MR. McDONALD: So can you just point me to what you

are reading?

THE COURT:  Sure.  Give me a second.

MR. McDONALD:  Is that the response from the government?

THE COURT:  Yeah.  Hold on.

MR. McDONALD:  It has reference to Fayad?

THE COURT:  Would you go to page 28 of your response, please.

MR. McDONALD:  Did you say page 28?

THE COURT:  It is 27 and 28 of your response.

MR. McDONALD:  Yes.

THE COURT:  So on the bottom of 27, you're taking on the defense argument where they -- they point out that Mirabella testified that Sereno was, at one time, an owner. You see that you start taking that on PAGE 27?

MR. McDONALD:  Yes.

THE COURT:  And Sereno is listed with a bunch of others in his testimony.

And on page 28, you say this argument fails because it does not note that the testimony on March 2, 2022 -- that's Mirabella's testimony -- was based on false information being provided by Defendant Locricchio.  Do you see that?

MR. McDONALD:  I do.

THE COURT:  And then the citation for that, that

you give, is Attachment S, at 24, which is Mirabella's March 2, 2022 Grand Jury testimony. Do you see that?

MR. McDONALD: I do. That's the testimony that they referenced and we are just citing it again, if I'm following along. Is that correct?

THE COURT: A little bit. So --

MR. McDONALD: I got lost there. I'm sorry.

THE COURT: Do you have Mirabella's 2022 testimony in front of you?

MR. McDONALD: Is it Attachment S of this very motion we're looking at?

THE COURT: It might be. I'm looking at defendants' -- it's Exhibit 11 to theirs.

MR. McDONALD: Okay. I think I have his testimony from 2022, yes.

THE COURT: So the part that the defendants find significant is on page 12, where he testifies that he learned that Gravity Imaging was owned at different points of time --

MR. McDONALD: I'm following you.

THE COURT: -- by, among others, Anthony Sereno and John Angelo. Do you see that on page 12?

MR. McDONALD: I see the part. I missed the citation that you gave, because of the coughing.

THE COURT: It's on page 12. Do you see that?

MR. McDONALD: Yes.

THE COURT: And so the defendant says this is significant because Mirabella later testifies that Sereno was not really an owner. That's their argument. I'm not asking you to agree with it. I'm just giving context to this question. Okay.

MR. McDONALD: Okay.

THE COURT: And you say, hold on -- these are my words now -- it is unfair for the defense to be citing this testimony from Mirabella because this based on bad information he got from Locricchio, so they sure the hell better not be relying on this. Is that basically one of your responses?

MR. McDONALD: I mean, I think that's what it says. I'm sorry, I'm not tracking. I think we say --

THE COURT: I haven't yet gotten to the hard question. This is just, is that your position?

MR. McDONALD: I think so, yeah.

THE COURT: Okay. So as support for that position, you cite to page 24 of his testimony, which is 12 pages later.

MR. McDONALD: Yeah. Is that just going to be the wrong page?

THE COURT: No, it's not going to be the wrong page.

MR. McDONALD: Okay.

THE COURT: It's going to be a page where he refers to getting information from Locricchio as to the ownership change on December 21, 2017. And my point is that you suggest that Mirabella told the Grand Jury -- or was relying on Locricchio when he said, at some point, Sereno was an owner, and your record citation to me doesn't support that proposition. I want to give you a chance to respond.

MR. McDONALD: So it's a bad citation, is that -- you're saying, show me where Mirabella says he's relying on Locricchio, is that what you're saying?

THE COURT: For this point, yes.

MR. McDONALD: Okay. I'm just trying to follow along. Okay. And you're saying page 24, you don't think that's right, because -- and then I got lost. Why is that wrong?

THE COURT: Let start -- 24 is not a page I picked, it's your citation. And 24 says --

MR. McDONALD: Right. I understand.

THE COURT: I understand when I read 24, he was talking about information that he got from the return preparer, but he was talking about a particular piece of information.

MR. McDONALD: Okay. I'm following you.

THE COURT: And it was a particular piece of information that had to do with an alleged change of

ownership in December of 2017.  That piece of information doesn't speak to whether Locricchio is the one who told him that Sereno was, at one point, an owner.

MR. McDONALD:  The tax returns were prepared by Locricchio.  Each one of them says Sereno was an owner. The '16, '17 and '18 tax returns were prepared -- is that what you are saying?  You're saying, show me the evidence where --

THE COURT:  Is that your answer?  So is your point here -- instead of citing page 24, are you saying that when Mirabella testified that Sereno was an owner, Mirabella was relying on tax returns prepared by Locricchio.  Is that your answer?

MR. McDONALD:  Yeah.  So on page 20 -- if you look -- on page 20 -- sorry, Mr. Smith.  Give me just a brief indulgence here, Your Honor.

So if we're looking at ECF No. 594, Attachment S, this is Mirabella's March 2, 2022 Grand Jury transcript. Page 23 of the transcript -- page 23 of the transcript, at the bottom of the page -- so it says 23 at the top.  At the bottom, the question, line 20, "Did you review and interview the return preparer of the Cory Mann individual returns and the -- I'm showing you Grand -- I'm sorry, I'm showing you Grand Jury Exhibit C, as in Charlie, I'm sorry.  Did you see interviews with Cory Mann's return preparer -- Cory Mann's

return preparer is Rachel Locricchio -- who did the 2017, 2018 Gravity Imaging tax returns and Cory Mann's own tax returns that indicates she never saw a document indicating..."

So that is the reference to -- is that what you are asking me?  That is a reference to Locricchio, Cory Mann's tax returns.

THE COURT:  That's what you cited and that's a reference to Locricchio providing certain information.  The information that she provided, as described on pages 23 and 24, to me, has nothing to do with whether Sereno was an owner prior to this time.  But if you are telling me he reviewed tax returns that showed that and that's what misled him --

MR. McDONALD:  The tax returns, themself, show Robin Street to be an owner in '16, '17 and they get a K-1 distribution in '18.

THE COURT:  All right.  So that's what Mirabella was relying on.

MR. McDONALD:  And that's what it says, the return preparer for Cory Mann's tax returns in those years.

THE COURT:  At the risk of being technical, because this is a business where words matter, these pages don't say that.  Your question says, did you see interviews, but it doesn't talk about interviews writ large.  It's an interview

where she indicates she never saw a particular document. That question and the answer to it don't speak to whether Sereno was ever an owner of this, which is the testimony 12 pages earlier. But you've given me a different reason that he could plausibly say he was misled by Locricchio, but it's just not this testimony.

MR. McDONALD: But -- but -- but this transcript that you're -- unless -- I apologize. Unless I'm confused, this December 2022 transcript is not presented to show that somebody misled -- that Sereno misled Locricchio.

THE COURT: Here, this is --

MR. McDONALD: The only reason it is cited is to say that the testimony they are citing has to do with the preparation of tax returns and the preparation of tax returns information, at that time period, came from Locricchio. It's not to say that she was misled by Sereno. I think the record eventually will show she has never spoken to or met Sereno. It's to show that the tax returns, themselves, were being relied upon, and those were prepared by Locricchio.

THE COURT: Okay. New question. New topic.

One of the things that defendants are critical of is your statement to the Grand Jury in August of 2023. Do you have that transcript in front of you, Mr. McDonald?

MR. McDONALD: Brief -- yes.

THE COURT: Okay. So this is Docket 578-10. You

may have it at a different spot.  I'm looking at pageID.13929, the transcript is page 26 of the August 16, 2023 Grand Jury.

MR. McDONALD:  Yes, sir, I'm there.

THE COURT:  And the defendants are critical of you for saying on lines 21 through 25, the following:  "And there are no documents that it ever became a partnership and the person who's supposed to be the partner, Anthony Sereno, says he was never a partner."

You understand the defendants are critical of you for saying that?

MR. McDONALD:  Yes.

THE COURT:  I'm going go in my bite-size chunks.

MR. McDONALD:  Yes.

THE COURT:  Okay.  Your response to this, in your papers, was that the defendants have completely taken this statement out of context, because it relates to Count 10.  Do I understand your response?

MR. McDONALD:  Yes.

THE COURT:  Okay.  This is my question for that. It's not as if Count 10 is somehow conceptually distinct from the underlying counts.  You tell the Grand Jury this, this is in this same paragraph.  I think it's important to read the whole paragraph.

On line 16 of page 26 you say, "and then, there's

also a Count 10, which is making a false statement, is alleged by Rachel Locricchio --" and then here's the key -- "for telling the government that Gravity Imaging was always a partnership, whereas her notes and e-mails showed that it was originally owned only by Cory Mann.  And there are no documents that it ever became a partnership, and the person who's supposed to be the partner, Anthony Sereno, says he was never a partner."

So when I read this -- let me share my interpretation and I'd invite your response.

It look to me like you're telling the Grand Jury, in Count 10, we're saying she lied "for telling the government it was always a partnership."  And then it seems to me you have three pieces of evidence that you cite to the Grand Jury as supporting that conclusion that it wasn't always a partnership.  First, her notes and e-mails show it was different.  Second, there are no documents that show it ever became a partnership.  And, third, the person who is supposed to be the partner says he was never a partner.  Isn't that what you're telling the Grand Jury?

MR. McDONALD:  So -- I'm sorry.  I'm still -- you're asking me now is that the summary?  I'm sorry.  I got lost at the end.

THE COURT:  Let me just give you the floor and say this:  The defense says that the statement -- the partner,

Anthony Sereno, says he was never a partner.  The person who is supposed to be the partner says he was never a partner. The defense says that's false and misleading.  I know you disagree with that.  Okay.

MR. McDONALD:  Yes, sir.

THE COURT:  But explain to me why the defense is wrong to even be citing this, at all.

MR. McDONALD:  Okay.  And we -- I'm going to point you to the response, 'cause we spent a lot of time laying it out.  Give me a minute and I will just point you to it.

THE COURT:  I'd prefer it in your own words.  I wasn't able to digest it in the easiest way possible.

MR. McDONALD:  Okay.  Can I have a brief indulgence, sir?

THE COURT:  Sure.

MR. McDONALD:  Thank you.  Defendants cite portions of the transcript -- I'm reading from our filing, ECF No. 594.

THE COURT:  Hold on.  What page are you on?

MR. McDONALD:  Let's see.  Page 30 -- so it says number 30 on the bottom of the page.

THE COURT:  I have read this a couple times, but in your own words, tell me why is it unfair for the defense to be citing this part of the Grand Jury discussion?

MR. McDONALD:  Because page 22 -- I'm just going to

read back what it says, and you're not persuaded by it, but --

THE COURT: I didn't say -- I'm trying to understand it. I want to give you the best shot to explain it to me.

MR. McDONALD: On pages 22 through 26, we reference, did the people at -- and I have it -- I have it bolded here. Did people -- it is on page 31 of the government's ECF No. 594, that prior to the portion that they are citing, there's a long back-and-forth about Rehmann personnel asking for documentation and operating agreements and partner agreements. And then when you keep reading down the transcript, I'm summarizing what we have covered, to say that they didn't get documents referencing the documents that they requested on earlier pages in the transcript.

THE COURT: I'm with you a hundred percent up until the point that you add in this point about what you believe Sereno said. The testimony that you cite, in bold, on page 31 and 32 of your response, does talk about a lack of follow-up documentation. I agree with you. Okay. But when you took it upon yourself to speak to the Grand Jury, you didn't limit your comments to this lack of documentation when you were telling them why they could find that Rachel Locricchio made a false statement. You added that another reason they could find that Rachel Locricchio made a

false statement was, in your words, "The person who's supposed to be the partner, Anthony Sereno, says he was never a partner."

Didn't you offer that as a reason in the context of Count 10, to find that she made a false statement?

MR. McDONALD:  Yes, but I thought there are -- yes.

THE COURT:  Okay.

MR. McDONALD:  But I thought their argument that we were responding to is, the government misled the Grand Jury by saying there are no documents showing a partnership.

THE COURT:  You know what, they did make that argument, and I'm not focused on that argument.  I'm focused on the last part of the sentence here, which is your statement that the person who's supposed to be the partner says he was never a partner.

MR. McDONALD:  Okay.  But --

THE COURT:  They criticize you for that, too.  I'm only talking about this part of the criticism.  And what I'm getting at is, if I find that statement to be false, it seems to me that there's a serious position, if not the correct argument, that this false statement was one of the pieces of evidence that was used to secure an indictment on Count 10.

MR. McDONALD:  On Count 10?

THE COURT:  Yes.

MR. McDONALD:  The government has dismissed

Count 10.

THE COURT: I understand.

MR. McDONALD: Okay. That's the false statement charge; is that correct?

THE COURT: Yes.

MR. McDONALD: Okay.

THE COURT: Right?

MR. McDONALD: I understand what -- you are making a different argument than the argument that they make. Now I understand. You are not arguing.

THE COURT: The argument I'm making is this -- the argument -- let me play the role of the defense, so that I can give you a full opportunity to respond to what I understand to be their full-throated argument. Their argument is that it is the statement, the person who's supposed to be the partner says he was never a partner. They say that is false on this record, and at absolute best, they say it is grossly misleading, and they say it was misconduct for you to elicit that testimony from Mirabella, and compounded misconduct for you to personally highlight that to the Grand Jury.

Give me your best response to that, which is really their fundamental attack here.

MR. McDONALD: That the government was not committing misconduct because we had previously heard the

statements from Sereno, in September of 2022, and then he testified consistently, in July of 2023. And although it is not transcribed exactly as Mirabella said it, he said words to those effect, Mirabella did hear them, and he was honestly saying what he had honestly heard Sereno say. That's the same argument that you've heard from the government already, though.

THE COURT: Okay. Hold on. All right. Mr. McDonald, you have been very patient with me in answering my questions. I want to make sure that I give you an opportunity to highlight any other points you want to highlight on the motion to dismiss.

MR. McDONALD: Sir, we will rely on our submission.

THE COURT: Okay. Thank you. I appreciate your thoughts.

Mr. Nemeth, if you -- when you come up, I would like you to confine your comments to the topics that I addressed with Mr. McDonald.

MR. NEMETH: Yes, Your Honor. Where do I begin, Your Honor?

THE COURT: How about with this: Let's say I agree with you, with all of the factual points that you made. What case says that I have the authority to exercise supervisory powers to dismiss an indictment for what happened here?

MR. NEMETH:  We believe *Nova Scotia's* progeny gives the Court authority.  There is -- if not this situation, Your Honor, then the Grand Jury system, the Constitutional protections are nonexistent.  It's a completely abusive situation.  Knowingly false representations were made to the Grand Jury by the prosecution team.

THE COURT:  What -- what is your response to Mr. McDonald's argument that it wasn't knowingly false because Mirabella heard Sereno say -- prior to Mirabella's August 2023 testimony, Mirabella heard Sereno say what's documented in the March 2024 302?

MR. NEMETH:  There's no evidence to support that. First of all, Your Honor, and I've struggled with this.  To call Agent Mirabella's testimony testimony is generous.

THE COURT:  Look, you're not getting anywhere on that line of argument.  There's a million cases that say the form of the Grand Jury testimony doesn't matter, the hearsay doesn't matter.  That's why I'm asking you to confine your comments to what I'm talking about here.  You've got a potential ground to victory here, but I have hard questions, and I need answers to these questions.

The -- what case -- even if I'm horribly offended and even if I share your view, what case says I can dismiss on what we have here?  *Williams* says that there's no

obligation to present exculpatory evidence.  Does this go beyond a mere failure to present exculpatory evidence?

MR. NEMETH:  Yes, it does, Your Honor.  Exculpatory evidence would be -- you know, there's A and there's B, and another person said something.  Here there's actually fabricated testimony, and the logical chain of events here is that when the defense counsel raises this issue about, well, where is this coming from, that Anthony Sereno is now saying he was never a partner and/or owner of Gravity Imaging, the government runs out and now we have an interview unrecorded.

THE COURT:  In Sereno's trial testimony that Mr. McDonald pointed to, I think it was Mr. Hammoud said, is Gravity Imaging Cory Mann's company?  And he said yes.  So why can't Mirabella, thereafter, testify as he did?

MR. NEMETH:  It's not what he testified to, Your Honor.  First of all, Mr. Sereno -- and, Your Honor, you took basically my words out of my mouth, from my binder there.  When you go back to the 2022 Grand Jury testimony, and it's illuminative because that's one of the things the government relies upon in their 50-page response.  Look at the 2022 -- I'm sorry, the 2020 Grand Jury testimony when Mr. Sereno is laying this out right before his plea, and Mr. McDonald tells him, hey, you have to volunteer things

here, and if something's not clear to you, you have to let me know.

THE COURT: I'm talking about in 2022 or 2023, Sereno testifies at the trial, where Mr. Hammoud was the lawyer. Mr. Hammoud asks him a question about Gravity, and he says, that's Cory Mann's company, right? And Mr. Sereno says yes.

So my question to you is, that from that point forward, why is it false when Mirabella testifies that Sereno said he wasn't an owner and it was all fake?

MR. NEMETH: Because the question in cross-examination has no context to time, place, what have you. That is Cory Mann's company in 2023.

THE COURT: I think the question was in the past.

MR. NEMETH: And some part of it, because he's still collecting the receivables. This is where the government is dancing on this head of a pin. And, you know, Your Honor talked about that words have precision. What could be more imprecise than what's going on here, that Anthony Sereno allegedly changes his sworn testimony, that when I testified to these things at the Grand Jury and I've been the government's star witness and I've been relied upon, well, it's none of those things that I meant. And I never

went outside and talked to my lawyer of 35 years and said, you know, I was really confused by this, and '21 goes by, '22 goes by, and we get into 2023 and a new theory appears of, oh, it turns out that there's not a partnership here.  And I think what's illuminative of this, Your Honor -- and I don't know if the Court has had an opportunity to look at some of the government responses from the other motions in limine that have been filed, but the government says, well, Mr. Sereno now says, oh, I agreed to do that, and they call him Defendant Sereno, because it was part of Cory Mann's plan to defraud the IRS.  They just add these things in now.

Agent Mirabella, who I note is not here today, when we look at August of 2023, that moment in time, and he's answering the questions, sometimes inconsistently, because they're not factually accurate questions, but Mr. McDonald corrects it -- or tries to.  It is not just Agent Mirabella that says it, it's Mr. McDonald that says it.  Oh, he, Sereno says he was not an owner ever.  Meanwhile there are -- there is testimony to the contrary.  And the only document that supports it is a 302, seven months later, that bolsters it -- bolsters that argument.

THE COURT:  What about the other part of Sereno's trial testimony the government cites, where he says he's a partner with Gravity?

*Motion Hearing • May 15, 2024*

**72**

MR. NEMETH:  So Your Honor is talking about these prepositions.  At the same time the government says Mr. Sereno doesn't understand, he's not a sophisticated businessman, he doesn't understand these concepts.  But, Your Honor, I'd like to point to something, and I think this is -- this is on point.

So in the government's response at tab -- at Exhibit V, Attachment V, as in Victor, we have a Title III intercept, and the government attaches this.  And it says, IC, incoming call, from Anthony Sereno to JA, John Angelo.  The government's own agent -- before I quote the conversation -- summarizes it this way:  According to JA, Mann just provided the numbers he's looking at for receivables for Gravity Imaging.  JA, Mann and Sereno have been discussing the rabbi's proposal to buy them out and take over Gravity.  Buy them out.

And then the conversation -- John Angelo answers the phone:  Yeah.

Sereno:  All right.  Go slow and try to explain this to me.

John Angelo:  All right.  So we've got 3.7 million in receivables.

Sereno:  That's me, me, and you; or me, you and Cory?

John Angelo:  That's what the account receivable is

there.

Sereno:  That's our money?

It's yeah -- is this Angelo now:  It's -- yeah, the whole -- the business.

Sereno:  But most of it is ours, right?

JA:  What do you mean, most of it's ours?

Sereno:  Okay.  3.7 is --

JA:  That's the accounts receivable.

Sereno:  Well, we're the only ones sending there, right?

JA:  Yeah.

Sereno:  So we get 40 percent of that.

An then they go on -- this is what the government highlights.

John Angelo:  Right.

Sereno:  Okay.  All right.  Just so I understand. I'm not questioning you on anything.  I'm just --"

And then we go down.

"John Angelo:  So what Cory's saying?  Okay.  Let's factor -- let's just tell the rabbi that the whole caboodle for 1.5.  Give him the keys.  He could do whatever he wants with the receivables.  Keep them, factor them, you know what I mean?

Sereno:  Uh-huh.

JA:  And Cory will stay on and run it for 200 grand

a year, if he wants.

Sereno:  Uh-huh.

JA:  And we'll get a marketing agreement with him.

Sereno:  Okay.  Do you want me -- what do you want me to do?  Do you want me to call the rabbi and meet with him?

They are talking about dividing up the business. That is irreconcilable with this idea of a fake partnership. We're dividing up the receivables.  If anything, there's confusion on -- it was divided 50/50, not 60/40.  The government in their pleadings that have been filed in the motions in limine are now saying, well, the case isn't about partnership, but the indictment says the fraud is falsely claim that Gravity Imaging was a partnership.

The prepositions "in," "with," it's all dancing on the head of a pin here.  I think Your Honor summed it up best, the prosecution's in too deep here.

THE COURT:  No.  I was summing up your position.

MR. NEMETH:  I'm sorry.  I apologize.  You are summing up our position.  They are in too deep here.  It's 42 months since the indictment, 42 since the indictment.  I don't know how long prior to the investigation?  I think there might have been a target letter in 2018 or something. And this is where we are now, that, well, the latest

testimony is that there's a new theory here, and the case isn't about partnership but the fraudulent is partnership, and Anthony just says he never was a partner, it was a fake partnership. Yet here they are -- this isn't my attachment, Your Honor, this is the government's attachment from their wiretap where Anthony Sereno is discussing, in 2017, the sale of the business that he owns part of. And the government agent summarizes it that they are looking at buying them out.

THE COURT: All right. So you believe that if it's relevant to this motion, it is relevant because you believe it shows that at least, at some point, the government believed they were co-owners and the government, to get an indictment, presented testimony to the opposite?

MR. NEMETH: Absolutely. The government brought Anthony Sereno in to the Grand Jury just a few -- a week or two before his plea agreement, which I also note as a sidebar, when you read the plea hearing, Mr. McDonald did most of the talking there, too. Mr. Sereno says, didn't file my taxes. But the concept here that you are a partner, Mr. Sereno, couldn't have been clearer. What else can we rely on than clear language here? We are now in a Grand Jury setting and --

THE COURT: Look --

*Motion Hearing • May 15, 2024*

MR. NEMETH: -- for them to just say, well, forget all of that.

THE COURT: It is only relevant for today's purposes, that might be a great exhibit at trial, but it is only relevant today if it somehow suggests that the government proceeded in bad faith in front of the Grand Jury that issued the most recent indictment.

MR. NEMETH: Absolutely, Your Honor. And the fact of the matter is, when Your Honor was questioning Mr. McDonald at the beginning, about 302 reports or the MOIs and the importance of them, what could be more important than, oh, Mr. Sereno now, I guess, years after the fact has come in and said, you know what, it was all a fake partnership. Let, me tell you everything that's going on here, that we wouldn't write a 302 report on that.

We have been inundated with millions -- millions of documents and pieces of paper and memorandums of interview and so forth. And then to say, well, something like this doesn't fit in.

I think, Your Honor, and I think the record supports clearly, as we started to delve into this new iteration, we called this out. Where is this with Anthony Sereno and fake partnership and I was never a partner. That is contrary to what we have laid out in our

pleadings.

THE COURT: Look, the government's position is, yes, we believed this was a real partnership for a while, but we didn't have access to the key evidence. We got the key evidence and the key evidence persuades us that it was a fake partnership.

MR. NEMETH: It's absolutely not credible. That is not a credible argument, and frankly, it is beneath the Department of Justice Tax Division to be taking a position like that.

Let's juxtapose this for just a moment. We indict a CPA with 20-some years experience at a major firm because we look at a note and say, you didn't volunteer something to us, you didn't tell us something, and frankly, misled the Grand Jury as to why they don't have e-mails from Rehmann.

And to take the view that -- first of all, Rehmann hired Warner Norcross, a major competitor of Varnum, a very -- a highly reputable firm. There is nothing in the record to suggest that Rachel Locricchio did not cooperate with Rehmann. And, in fact, if these notes were what the government thought they were, the easiest thing for her to do was to get rid of them. She's perhaps the most honest person in the this whole case. She turned things over. She told her lawyer something in confidence. And the government plays

some sort of gotcha, changes theory, tries to salvage a case. I don't understand their obsession with Cory Mann, but it's there, but then Anthony Sereno gets a pass. Anthony Sereno is the one testifying at the Grand Jury and they are like, oh, well, he now believes that he said something wrong. But I looked to the timing of this and there is no 302 report, there is no corroboration of anything about all of these details of Mr. Sereno, until the government is notified by the defense counsel that we intend to file a motion looking for something.

And as the Court commented in the April 8th hearing, that Mr. Hammoud had noticed this trend before -- this is not just an isolated incident. There is a problem, lo and behold, we get a witness. Mr. Sereno has zero credibility. Now, that's a judgment call of the people, if they want to continue to go on with him.

But Your Honor asked Mr. McDonald about -- on page 53 of the hearing transcript, "Where did Mr. Sereno express this view about it being a fake partnership?"

Mr. McDonald says, "In a jumble of words that do not make any sense in 302s. If I could have quoted it and put it in a memo, I would have. It does not exist in a way that you will understand."

Apparently, we are now delved into -- I don't know if "inside baseball" is a fair term here.

THE COURT:  Maybe he just thinks I'm a dumb ass.

MR. NEMETH:  I doubt that, Your Honor.

THE COURT:  I wouldn't be so sure.

MR. NEMETH:  But we are now here, as a defense, and when you look at this and say, well, what's this case about? I'm -- I'm kind of out of words.  I don't know what the case is about anymore.  The indictment says one thing about fake partnerships and the pleadings that have come in, including the motions in limine, say the case isn't about partnership, it's not about it.  The Bill of Particulars, which is up for later, says we can't identify anything else on Mr. Mann's return.  Well, this is it, and it says, oh, they shouldn't have filed a partnership return.

I will submit to the Court, we are sort of in this trick box situation now, because if Mr. Mann would have filed a Schedule C, they would have indicted him.  They would say, well, you're talking about partnership here, you are splitting profits under Section 761 of the Internal Revenue Code, that's a partnership.  They are just trying to hold on to the case.  And frankly, the comments of Mr. McDonald to the Grand Jury were somewhat gratuitous at that point.  They weren't specifically -- he just adds them in; oh, by the way you should know.  There was no -- at least if there would

have been a 302 report, you could point to it and say, well, maybe they should have provided some exculpatory evidence, it's at least grossly misleading to the Grand Jury, and we could look at that standard about grave concern and so forth.

That's not what happened here. Three times -- two or three times, Mr. McDonald volunteers that, as to drive home the point. What Mr. Mirabella just says is yes, yes, yes, yes, yes, yes.

So when you look at the -- when you look at the record of this indictment, and I will point out that when we filed our motion and we had the hearing on April 8th, we thought we were most of the way home, but you don't know what you don't know, because Grand Juries operate in secrecy. And then when you shed light on it, it might have been, whoa, I didn't realize there was all of this other evidence, but what came out of it was a quarter-inch or half-inch of documents with mostly mugshots and back to talking about stolen police reports and basically just polluting the field for the Grand Jury.

There's absolutely no fairness to this process, but it goes beyond that, that the Grand Jurors are told things of fact that there really is no record of or evidence to support, certainly the extent or context that was presented to them as fact. Hey, you should know the partner says it wasn't a real partnership and I wasn't part of it. That's

not the same thing as saying that Gravity Imaging is Cory Mann's company. That is not even remotely the same thing, particularly for someone the government has labeled, on multiple occasions, as unsophisticated. And certainly Mr. Abed (sic) wasn't questioning him as to that point in his cross-examination in that case. But when we get to the crux of it, oh, we are going to indictment someone, paragraph 104, Defendant Cory Mann falsely claimed that Gravity Imaging was a partnership, that's the third superseding indictment. So that's the issue. He falsely claimed it was a partnership.

Well, what could be more compelling to a Grand Jury than to say, you should know that the other person who controlled the entity --

THE COURT: I get the point.

MR. NEMETH: -- says that he wasn't.

I really don't have much more to say on that point.

THE COURT: Before I hear from Ms. Locricchio's counsel, I forgot a couple questions for Mr. McDonald.

Do you mind coming back up, Mr. McDonald?

MR. NEMETH: Thank you, Your Honor.

THE COURT: Mr. McDonald, do you believe that Mr. Sereno's January 2020 testimony to the Grand Jury, where he said he was not an owner, and his statements in the

proffers that he was not an owner, do you agree that that's exculpatory evidence?

MR. McDONALD:  Say the date again?  I'm sorry.

THE COURT:  The Grand Jury testimony, where he says he is an owner, I think it was January 2020.

MR. McDONALD:  January 2020.

THE COURT:  And the 302s where he identifies himself as an owner.  Do you agree that those are exculpatory statements?

MR. McDONALD:  Yes, sir.

THE COURT:  Okay.  Do you agree that those statements are directly contrary to the repeated allegation in the third superseding indictment that Robin Street did not hold an interest in Gravity Imaging?

MR. McDONALD:  Say that sentence again, sir.

THE COURT:  Yeah.  So in the third superseding indictment, you guys allege several times that the falsity was "Defendant Cory Mann falsely claimed that Gravity Imaging was a partnership."  And do you agree that Mr. Sereno's sworn testimony and his statements during the interview directly contradicts that, at least on its face -- his statements on their face?

MR. McDONALD:  Can I have -- can I have a moment?

THE COURT:  Sure.

(An off-the-record discussion was held

at 11:24 a.m.)

MR. McDONALD: On their face with no explanation, we agree, yes, sir.

THE COURT: Okay. Can you just explain to me why you guys didn't go to the Grand Jury in August of 2023 and explain to them that here's what we understand Sereno's current position to be, that he was a fake partner? But, ladies and gentlemen, you should understand, we want you to know, we're not hiding the ball here, he has previously testified under oath that he was an owner, and he told us that in interviews, and, ladies and gentlemen, we even charged that in the three prior indictments, but we want you to understand, here's the explanation for why he said that and why we believed it and why we charged it, and it's inconsistent to what we're asking to you do today, we acknowledge it, but here's our very reasonable basis for believing what we do today. Can you share with me why that wasn't part of the discussion with the Grand Jury?

MR. McDONALD: Yes, sir. First, I would note the same Grand Jury heard the second and third superseding indictments, and you can tell from their questions that that's the case.

Second, I would note that rather than present the exculpatory information in the way that you just laid out, what we did was make sure the Grand Jury understood that

Sereno had entered a felony plea, that he had a cooperation agreement, that he had a vicarious cooperation agreement with a loved one, and that his cooperation was contingent or had an effect on whether she was charged with anything.  That he --

THE COURT:  I understand --

MR. McDONALD:  Can -- wait.  Can --

THE COURT:  -- you did disclose.  You put that in your papers.  I read that.

MR. McDONALD:  Can I --

THE COURT:  You have bullet points about everything you disclosed, I appreciate and respect that, but that's not the answer to my question.

My question is -- if the answer is because we made a bunch of other disclosures, that's fine.  Is that the answer?  I don't need to hear them again, I read them.

MR. McDONALD:  The answer is that we believe we provided proper context for the Grand Jury to view anything that had to deal with Sereno with caution, by providing the things that we outlined, showing his criminal culpability and his involvement in the scheme, and that we did not provide the exculpatory information because we thought we had provided enough context to protect the due process rights of the defendants, certainly to view his testimony or anything having to do with him with extreme caution.

THE COURT: Okay. That's all of my questions for you at this point.

Does anybody want to say anything on behalf of Ms. Locricchio at this point?

MS. KRIGER: Your Honor, just briefly.

THE COURT: Let me ask you, did the government mislead the Grand Jury about Ms. Locricchio's handling of her handwritten notes?

MS. KRIGER: Yes, and the Court's questions appeared to pick up on this. They left the Grand Jury with the false impression that Locricchio, herself, who was the point person, was responsible for providing these notes. The government relies upon a statement that says, oh, well, we never have received her notes, like the actual notes, we've never received them, but that's not what they said to the Grand Jury. They said we haven't -- we didn't receive them until after Rachel Locricchio was indicted. So they're not talking about the actual, physical notes themselves. They're not talking about any notes after January of 2018. They're talking very specifically, and this is what they say, the note -- the notes that were supposed to be produced in January of 2018. And that makes sense, because the only note that they say is significant is one that was taken or jotted down in 2016, that refers to Gravity Imaging as an LLC, taxed, then, as a Schedule C, in 2015. And they left the

Grand Jury with the false impression that Rachel Locricchio was responsible for giving over those notes, and they were not given over until May -- or after she was indicted, after May 17th of 2023, which is demonstratively false.

THE COURT: Okay. Anything else you want to say?

MS. KRIGER: Only in response to the Court's first question, which was, what gives me the right -- what authority provides the right to dismiss this case? And the *Bank of Nova Scotia* uses the harmless error standard, essentially, to put it in very simple terms, because the law here is very nuanced and complex, but the question is, were the improprieties -- was the misconduct --

THE COURT: *Bank of Nova Scotia* deals with the level of error. *Williams* comes after and deals with the type of error that allows dismissal. And in *Williams*, they said failing to present exculpatory information to a Grand Jury, that can't be the basis. The basis for -- before you even get to the question of prejudice under *Bank of Nova Scotia*, you have to have a permissible ground to dismiss the indictment, and it has to be a ground that's specified in some rule or law or somewhere. The Supreme Court said exculpatory evidence, that's not the kind of rule.

And so why isn't the error here, if there is one, exactly the error in *Williams*, that the court said I don't have the authority to dismiss?

MS. KRIGER:  There's a footnote in *Williams*, Your Honor, and I don't have it in front of me, but I remember it -- from memory, I can recall it, where it says but presenting perjured testimony is a basis for dismissal.

This was not just a failure to present exculpatory evidence, Your Honor.  This was a deliberate injection of perjury, of false statements into the record.  I agree with the Court that --

THE COURT:  What is the evidence that at the time McDonald elicited these answers from Mirabella and that Mirabella gave them, that they both had the state of mind for perjury?

MS. KRIGER:  Well, they knew that -- I -- they certainly -- well, we'll go back to, I guess, to the reply brief, which they now say they understood, although they couldn't -- they couldn't put it into a 302, they understood that what Sereno was saying was that there was a business relationship between Robin Street Consultants and Gravity Imaging, and that the business relationship between Robin Street Consultants and Gravity Imaging was such that Robin Street would provide marketing services and Gravity Imaging would do the MRIs and then, together, they would share the profits.  That is, as a matter of law, a partnership, and that is why we emphasized that that explanation actually makes the conduct more egregious,

because they essentially lied to the Grand Jury in yet another two ways.  One is that, based on Sereno's statements alone, that the Grand Jury should find -- or must find that no partnership existed or the business relationship that existed should not be taxed as a partnership, and we know that is just, as matter of law, not true.  And I just find it completely not credible, or incredible, that the Department of Justice, the Tax Division could say, well, shucks, we didn't know the law, so this wasn't deliberate perjured testimony.  We should have known the law, but we didn't.  I mean, it's essentially a concession that Gravity Imaging was in a partnership and the only conspiracy was to file a false -- or to file a correct return, Your Honor.  I don't see how they can possible defend this position.  And if nothing else, still, they've ultimately conceded they can't win this case, and they should have presented the correct testimony to the Grand Jury in the first place.

THE COURT:  Okay.  Thank you.

Mr. McDonald, I want to make sure that you have an opportunity to respond to any of these arguments.

MR. McDONALD:  Brief indulgence, Your Honor.

THE COURT:  Sure.

(An off-the-record discussion was held at 11:33 a.m.)

MR. McDONALD:  Nothing further, Your Honor.

THE COURT: Do you mind if I ask you another question?

Who among the chain of command at the Tax Division has seen the motion to dismiss?

MR. McDONALD: As far as I know, from my direct supervisor up to ethics personnel -- everybody, everybody.

THE COURT: Your supervisor's supervisor?

MR. McDONALD: The chief, my supervisor, my chief, up to the ethics person, and then I don't know what happens after that.

THE COURT: Okay. All right. I want to take ten-minute break.

(Court recessed at 11:34 a.m.)

- - -

(Court reconvened at 11:43 a.m.; Court, Counsel and all parties present.)

THE CASE MANAGER: All rise. Court is back in session.

THE COURT: All right. Mr. McDonald, I thought of one last question I wanted to ask and forgot to ask. Do you mind coming back up?

We talked about March of 2024, when Mr. Sereno explains the fake partnership issue, and that's documented in that 302 that we saw. And at least from reading the 302, it appears that when he mentioned the fake partnership point, it

occurred to you that there was some tension between that and his Grand Jury testimony, so you asked him about it. Is that what happened in 2024?

MR. McDONALD: I'm sorry. Say it again, sir?

THE COURT: We are in March of 2024. You have this meeting with Mr. Sereno, and this is the meeting that's memorialized in a more recent 302. This is the 302 where it references fake and fugazi, in quotes. You know the one I'm talking about?

MR. McDONALD: I do.

THE COURT: So in that 302, just reading chronologically, it starts off by reporting this fake and fugazi version of events from Mr. Sereno, and then it says he was shown his Grand Jury testimony from 2020. Do you recall this part of the 302?

MR. McDONALD: Yes.

THE COURT: Okay. So as I'm sitting there reading the 302, it occurs to me that what might have happened is in March of 2024, when Mr. Sereno relays this fake, fugazi account to you, it occurs to you that this account is not consistent with his Grand Jury testimony, so you guys ask him about the Grand Jury testimony. Is that what happened during that meeting?

MR. McDONALD: Did we show -- you are asking me if we showed him his prior transcript when we meet with him in

March of 2024?

THE COURT: I'm asking you an antecedent question to that, which is, when he shares with you the version of events that his -- this fake, fugazi version, at that point, does it occur to you guys that that version is in, at least some, if not obvious, tension with his prior Grand Jury testimony, so you ask him, how does he reconcile the two? Is that just, mechanically, what happened at that meeting?

MR. McDONALD: You're asking if all of this is in sequence, is that what you're saying? That he gave us the fugazi thing and then we showed him the transcript, or did it go the other way around?

THE COURT: I'm just trying to understand, at some point you show him the transcript. Was it after he shared with you the fugazi business, and you guys -- it occurs to you that there's some tension between that and the Grand Jury testimony. Did that occur to you during that meeting?

MR. McDONALD: I mean, I think -- can you give me a brief moment, because I think this is memorialized in order.

(Brief pause in the proceedings at 11:47 a.m.)

MR. McDONALD: So I'm looking at the 302 and --

THE COURT: Hold on one sec. Let me just join you. I just have to find it real quick.

Okay. So can you tell me how this occurred?

MR. McDONALD: We showed him the transcript and

*Motion Hearing • May 15, 2024*

asked for the -- for him to reconcile the inconsistency, and then he gave us all of that stuff that comes after that. The 302 is in order. So we showed him tax returns and then we showed him his transcript.

THE COURT: What led you to show him the transcript and ask about the alleged -- the possible inconsistencies?

MR. McDONALD: We went over everything that he would testify to in the Cory Mann/Locricchio trial.

THE COURT: So let me get to the question I was ultimately going to ask. You have reported to me that in this meeting of September 2022, that's the first time that he shares this fake partner idea. And my question to you is, at that meeting, did you say, hey, Mr. Sereno, this conflicts with what you previously testified under oath?

MR. McDONALD: I understand. No.

THE COURT: Why not?

MR. McDONALD: It didn't occur to me at that time. When he said it, I didn't immediately recall his prior testimony from 2020.

THE COURT: Okay. Thank you.

MR. McDONALD: May I go sit down?

THE COURT: Please. I'm all set with you.

All right. I'm going to give you an oral ruling on this motion right now. Just give me one second. All right.

Let me start by outlining the legal rules that

govern this motion, because it seems to me a logical starting point.

As the government points out in its papers, and as the Sixth Circuit has said and the Supreme Court has said, my two bosses, the dismissal of an indictment based on alleged prosecutorial misconduct is really an extraordinary remedy and it is reserved for only the most serious abuses of the Grand Jury process. So the standard is very high, and I'm familiar with it.

The second legal rule is that dismissal is not permitted, absent a showing of actual prejudice. This is the *Bank of Nova Scotia* holding. It can't just be that a court is offended by what happened, there has to be some showing of actual prejudice.

The third point that I think is important here is that the holding in *Williams*, that dismissal of the indictment is not permitted solely on the basis of a failure to present exculpatory evidence to the Grand Jury. There must be a violation of some established rule or statute, including rules against the presentation of false evidence to a Grand Jury.

And the fourth, the government has cited some Sixth Circuit case law from the '80s that suggest that in order to dismiss based on prosecutorial misconduct, there first has to be a showing of some sort of a pattern of

Grand Jury abuse in the district.

The defendants argue that that standard, this pattern requirement, doesn't survive the Supreme Court's more recent cases, and I agree with that.  In the *Bank of Nova Scotia* case, the Supreme Court focused on prejudice and that was the focus, rather than some sort of a pattern.  And even more to the point in the *Williams* case, the Supreme Court said that dismissal is not appropriate unless there's a violation of some established rule, but didn't suggest that there's -- that if there is a violation of some established rule, there has to be any sort of a pattern.

So in my view, those are the rules that govern here.  And when applying those rules, I think it's important to understand the factual background -- the part of the factual background that's important to me in connection with this motion, and I want to briefly review it.

The first point in time I want to start with is September 25, 2018, Anthony Sereno gives a proffer.  There's a 302 of the proffer in our record, at 578-3.  And in that proffer, Mr. Sereno says that he, Mr. Angelo and Mr. Mann are co-owners of Gravity, and he gives the percentages.

There's a proffer on April 29th of 2019, by Mr. Sereno -- and I'm using the word, "proffer," it may be interchangeable with "interview," but this is also memorialized in a 302 at 578-4.  There's a reference again in

this 302 to Mr. Sereno reporting that he was a part owner of Gravity with Mr. Mann.

Then Mr. Sereno appears before a Federal Grand Jury in January of 2020, and the transcript of that testimony is in our record at Docket No. 578-5. And at pages 25 to 26 of that transcript, Mr. McDonald asks Mr. Sereno if he got an ownership in Gravity. Mr. Sereno says yes. And Mr. McDonald goes so far as to reference negotiations for an ownership interest. And, again, Mr. Sereno confirms that he negotiated to get and got an ownership interest.

Other parts of this transcript that are significant to me are parts that I highlighted with Mr. McDonald in my discussions with him, which are at the beginning of the testimony, on pages 4 and 5, Mr. McDonald reminds Mr. Sereno of his obligation to tell the truth. He tells Mr. Sereno to speak up if he's confused. And at page 6 of the transcript, reminds Mr. Sereno that he's obligated to volunteer answers if my questions are in the area of something that you understand. At the end of the testimony, on page 34, Mr. McDonald again reminds Mr. Sereno that he can come back and fix any testimony at a later date, if he reflects and realizes that he gave a false or wrong answer.

Other parts of this testimony that are significant to me are where Mr. Sereno did offer some elaboration on a limited number of yes-or-no questions. At page 25 of the

testimony, he was asked a yes-or-no question and he gave a four-line answer, with a qualification. At page 31, he gave another full sentence answer, with an explanation to a yes-or-no answer, and he did the same thing at page 33, where he gave a clarification that he was uncertain about a date. And what that indicates to me is that all of this -- the instructions to Mr. Sereno and his conduct during the testimony, the record, objective evidence indicates to me that he understood he was not limited to yes-or-no answers and, in fact, was required to -- or at least was advised, on the record, that he was required to volunteer information, and I have no reason to believe that he couldn't or did not understand that simple direction.

Turning then to September 20th of 2020, Mr. Sereno gives another interview. This is in our record at Docket No. 578-6, and he reports that he and Mr. Angelo were bought out of Gravity, a statement that, to me, could at least be deemed consistent with the notion that he held an ownership interest.

The next important date for me is December 16th, 2020. A Grand Jury returns an indictment, and the indictment specifically alleges that, among other things, Mr. Sereno held an ownership interest in Gravity, and I believe that alleged ownership is among the factual bases for the two false return charges against Mr. Mann that he failed

to account for that ownership interest.

In December of 2021, we have a superseding indictment, and paragraph 20 repeats the allegation that, among other things, Mr. Sereno held an ownership in Gravity.

We then have a Grand Jury appearance by Special Agent Mirabella on March 2nd, 2022. This is in our record at Docket No. 578-11. And Special Agent Mirabella indicates that, at one time, Gravity was owned by, among others, Mr. Sereno. And during that testimony, Mr. McDonald elicited from Mirabella that his answers were based on documents he had reviewed; summaries of interviews, either FBI 302s or IRS MOIs; and deposition transcripts.

There is another interview with Mr. Sereno, on July 28th, 2022. This is in our docket at 594-2. In there Mr. Sereno indicates that he and Mr. Angelo were "made" and then "part owners" of Gravity.

And there is a September 1, 2022 interview that is in our record at Docket No. 578-7, where Mr. Sereno indicates that he became a partner "at Gravity," as a way to get bonused-out. And I regard "at Gravity" as consistent with having an ownership interest.

By the way, when I'm recounting these 302s and MOIs, I understand Mr. McDonald's point that they don't purport to be transcripts or direct quotes, but I also take his answer that they are the best effort of the authors to

accurately recount the substance of what was said.

The next date is the second superseding indictment that's returned in May of 2023. This contains the same allegation that, among other things, Mr. Sereno held an ownership interest in Gravity.

The next date for me is an e-mail dated May 26, 2023, where a representative of Warner Norcross reports to Mr. McDonald that the firm has found a scan of Ms. Locricchio's notes, certain of them, on the system, and that it appears to that person that the firm had neglected to send the notes earlier.

The next key date for me is a June 6, 2023 meeting involving Mr. Sereno, that is memorialized at Docket No. 578-9. During that meeting, Mr. Sereno reviewed all of his prior reports of interviews, including 302s and MOIs, if any. He was given an opportunity to correct any statements that were inaccurate. He does make corrections, but he does not make corrections to any of the points in his prior interview reports indicating that he was an owner of an interest in Gravity, at least at some time.

The next event that I want to focus on is Special Agent Mirabella appearing before the Grand Jury that returned the third superseding indictment on August 16th, 2023. And in that testimony, on page 20, which is, among other places, in my docket at 578-10, pageID.13923,

Mr. McDonald and Mr. Sereno have the following exchange that I want to make sure I quote into the record. This begins at line 15 on page 20 of the transcript.

Question: "And have you heard Anthony Sereno tell you and others that he understood he was not an owner of Gravity Imaging ever?"

The answer is: "Yes, yes."

Next question: "Okay. That he believed he was a partner in the sense that he was a business partner who received money for each time he solicited somebody using stolen reports and sent an MRI?"

Answer: "Correct."

Question: "But not a partner such that he owned half of an entity called Gravity Imaging?"

Answer: "Yes."

And then on line 16 of page 21, Mr. McDonald again asks question: "And, again, Anthony Sereno has told you and others he knows he never owned Gravity Imaging, that that's not true?"

Answer: "Correct."

On page 27 of the transcript, a Grand Juror raises a question that references, "On paper, Anthony Sereno was supposed to be part of a partner?"

And Mr. McDonald says, "Do you want me to ask the agent about that?"

The Grand Juror says, "Yes, please."

And on page 28 of the transcript, Mr. McDonald asks at line 5, "And do you understand that Anthony Sereno has indicated he never was an owner of that entity, that this is not a true document?"

Answer: "Correct."

On page 26 of the transcript, Mr. McDonald was talking to the Grand Jurors in the context of Count 10, and he told the Grand Jurors, among other things, that: "The person who's supposed to be the partner, Anthony Sereno, says he was never a partner."

The other parts of this transcript that are relevant, though not quite on the level of what I just talked about, are the references to Ms. Locricchio and her role in gathering notes and what happened with her scanned note of 2016, the note that the government regards as inculpatory, because supposedly it's her acknowledging that she understood Gravity was not a partnership. And the questioning begins on page 13, with Agent Mirabella identifying Ms. Locricchio as the primary point of account contact, for the Grand Jury. On page 15 there are questions about subpoenas being issued for handwritten notes.

As I indicated, I believe the reading of the questions that are asked here are not that the subpoenas were limited to documents created between 2018 and 2023, but that

the Grand Jury would have understood these questions to talk about the subpoenas that were issued during that time period.

And I believe that when the questions from pages 14 through at least 17, are read in context and fairly read, I believe that those questions reasonably left the Grand Jury with the impression that Ms. Locricchio was responsible for a failure to produce, in response to a subpoena, this note from 2016 that the government ultimately obtained and that it relies on now. There was no mention made to the Grand Jury that, as the government had been informed before this testimony, Ms. Locricchio had sent notes in a notebook to Mr. Lennon at the Warner Norcross firm.

The next date is the third superseding indictment -- and I guess, before I move to that -- that's returned by the Grand Jury, what's important to me is what is not communicated to the Grand Jury that returns the third superseding indictment. And what is not communicated to them is the sworn Grand Jury testimony that Mr. Sereno gave in January of 2020, nor any of his prior interview statements, where he indicated that he was an owner, nor his interview where he had an opportunity to review his prior statements and confirm their accuracy. None of that information that, to me, is not just garden variety exculpatory information. This is -- this evidence includes sworn testimony that goes to the core allegation and fundamentally contradicts the core

allegation underlying the charges against Mr. Mann and Ms. Locricchio, is that a false claim that Gravity was a partnership. All of the prior statements by Mr. Sereno that I identified and that were not shared with the Grand Jury directly undercut that, and so do the three prior Grand Jury indictments.

Now, Mr. McDonald points out that the same Grand Jury returned the third indictment and the third superseding indictment, so indictments three and four, but I don't see any effort to bring to their attention this contradiction. But the much more important point, rather than the change in the government's theory, is the failure, in my view, to highlight this absolutely critical exculpatory evidence.

The next date here is the March 21st, 2024 meeting, where Mr. Sereno explains that he was -- that he never believed he was an owner of Gravity. That the ownership agreement was fake or fugazi. And he offers an explanation for why his Grand Jury testimony was inconsistent with that. On the basis of the evidence before me in the record, I don't think that that explanation can reasonably be believed.

Mr. McDonald says that he had some conversation with Mr. Sereno's attorney, off the record, that is -- the contents of which is both unclear to me and unsatisfying, but the objective evidence on the record would, to me, compel the

conclusion that no reasonable person could believe the explanation that Mr. Sereno offered in 2024. Also -- so those are, to me, the key facts.

So when I apply the legal rules here, to me this isn't simply a case of a failure to present critical exculpatory evidence, because if it was just that, I think *Williams* would preclude me from granting the motion.

I regard this case as going a clear level further and one involving the presentation of false evidence, not just a lack of exculpatory evidence. And to me, the false evidence is the words and questions that were used in the colloquy between Agent Mirabella and Mr. McDonald in the Grand Jury in August. The questions were specifically worded about whether the agent had heard Mr. Sereno tell people that he understood he wasn't an owner of Gravity, and tell people that he believed he was a fake partner, and tell people that he never owned Gravity Imaging. And on the record before me, the reasonable conclusion is that that is false. That Mr. -- that Agent Mirabella, on the record before me, the most reasonable conclusion and most reasonable inference is that he did not hear Sereno say the words that were attributed to him in the Grand Jury testimony.

And the way that I get to that inference is I start with the questions that I began this hearing with, about how these procedures work and what goes into 302s. And in my

view, the answers from Mr. McDonald support the inference that if Mr. Sereno had ever said, prior to Special Agent Mirabella's testimony, that he was not an owner of Gravity Imaging, the record before me indicates that that would have been considered an important piece of information, and important pieces of information are included in reports of interviews. And so I think the evidence supports an inference that Mr. Sereno did not say these words.

I have offered the government an opportunity to identify, for me, evidence in the record before me that Mr. Sereno did say these words, and I went through that with Mr. McDonald in my colloquy with him, and I don't believe that any of the evidence cited by the government could support an inference that Mr. Sereno told anybody he was not an owner or a partner.

The government cited three pieces of evidence. One was a March 2024 302 report, but as Mr. McDonald candidly acknowledge, that came after Special Agent Mirabella's testimony, so that can't render the testimony true.

The other 302 that Mr. McDonald pointed to was a September 2022 interview with Mr. Sereno, but in my colloquy back and forth with Mr. McDonald, I explained why I don't believe there's anything in that that supports the words attributed to Mr. Sereno here, which are important and significant words about what he understood. That, to me,

appears nowhere in this September 2022 302.

The closest we get to this is the trial testimony of Mr. Sereno in the -- in one of the prior trials that I had, where Mr. Sereno refers to himself as a partner with Gravity, and at one point says that Gravity was Cory Mann's business. But, to me, those statements are a far cry from the specific words that Mirabella testified came out of Sereno's mouth about what he understood, in terms of being an owner and believing he was never a true owner. The testimony at the trial, that the government relied on, at best, would require a series of inferences about what Mr. Sereno may have believed, and the testimony about Gravity being Cory Mann's business is not tied down to a particular date and is not inconsistent with the notion that Mann ran it and was the majority owner, so that doesn't support an inference that this testimony by Special Agent Mirabella was truthful.

Indeed, as I indicated, I believe that, on the record before me, given the government's answers today, that the reasonable conclusion -- the most reasonable conclusion is that the testimony attributing these specific words to Mr. Sereno was false.

On top of that, aside from my view that this is false, in my view, the way this matter was presented to the Grand Jury was grossly misleading. The -- heading into this testimony in August of 2023, the government had sworn

testimony from Mr. Sereno that directly and unambiguously, on its face, contradicted what was reported to the Grand Jury. It had Sereno confirming, many times, that what was reported to the Grand Jury is the opposite of what he believed, and the government did not bring that to the Grand Jury's attention.

While there is no general obligation to share exculpatory information with the Grand Jury, the fact that this was so grossly misleading, the omission of this evidence, on top of the fact that the testimony was false, to me, is something that weighs in favor of a dismissal here.

Having reviewed the policy of the Department of Justice, which is included in the materials at 17 -- it's -- they have a policy on the presentation of exculpatory evidence. It is 9-11.233. It acknowledges that the government is not required to present exculpatory evidence, but says that when a prosecutor conducting a Grand Jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the Grand Jury before seeking an indictment.

In my view, that policy was not complied with here. On its face, Mr. Sereno's statements directly negate the guilt, because they undermine the core of the government's case. And the explanation that Mr. Sereno gave for why you

should understand those statements differently than their plain language is, to me, not one that could be reasonably accepted on this record, for the reason that I gave.

So in my view, a prosecutor looking at this evidence would have done exactly what I asked, or should have done, under the DOJ's own policy, exactly what I asked Mr. McDonald if he did, which was inform the Grand Jury about this. Mr. McDonald respectfully disagreed with my view and said that he thought that the government's disclosures to the Grand Jury were sufficient. I respectfully disagree with that.

It's one thing to tell a Grand Jury that they should take, with caution, evidence that is attributed to Mr. Sereno. It's an entirely different thing to tell the Grand Jury that Mr. Sereno has testified, under oath, contrary to what the Grand Jury is being told at the time and has confirmed in interviews, several times, a version of events that is contrary to what the Grand Jury is being told at that time. So I found that aspect of the government's presentation to be misleading and not consistent with DOJ policy.

I also think that the handling of the matter with respect to Ms. Locricchio and the notes and the scanning in, that testimony that I reviewed earlier, I thought that was presented in a materially misleading way, that was designed

to cast aspersions on Ms. Locricchio. There may be plenty of reasons to believe in the government's view that she is guilty of an offense, but the way that this was presented, to me, created an inaccurate view, and the view was specifically that she somehow withheld the note that the government finds inculpatory. That's the inference that I think was thrown out by the government and that the Grand Jury could well have made.

I want to make clear that while I reference the DOJ's policy, that's absolutely not the basis on which I'm dismissing this, so let's be clear about that. The law is clear that the DOJ's failure to comply with their own policies is not a basis for dismissal, and that's not the grounds for kicking it. It just adds additional context to what is going on here.

And the next question is, as I indicated, that I believe I have to answer, is the question of prejudice. Is there a strong reason to believe that the testimony that I found both to be false and grossly misleading led to this indictment. And I think the answer there is, to me, yes -- an unequivocal yes.

While the government certainly presented other evidence, for instance, Rehmann documents, that the government says supports its theory here, the whole point of bringing out this evidence and highlighting it for the jury

and coming back to it again and again, and addressing it in response to a question from the juror, tells me that the evidence I'm concerned about here unquestionably had a significant impact, at least in my view, on the jury's decision to return an indictment.

I want to indicate that not only do I believe that the testimony elicited from Special Agent Mirabella brought out what I believe to be a false point that Sereno told somebody, I think it's additionally significant that Mr. McDonald emphasized or highlighted that evidence again, on page 26 of the Grand Jury testimony, when he said that, among other things, the person who is supposed to be the partner, Anthony Sereno, says he was never a partner. I understand that was in the context of Count 10, but when you read the reason that Mr. McDonald was highlighting that, he was trying to underscore that there was no basis for a conclusion that Gravity was a partnership, and that, of course, bleeds into the other counts. So it is just more conduct before the Grand Jury that, to me, creates a false and misleading impression.

So for all of these reasons, I'm going to grant the defendants' motion and dismiss the indictment that is set to be tried, I guess, in a couple weeks.

The one issue that I have not -- I'm not prepared to rule on now, and I would invite supplemental briefing on

this, is whether the dismissal should be with or without prejudice.  There's a body of law on prosecutorial misconduct findings that lay out a series of factors to be considered when deciding whether a dismissal should be with or without prejudice.  That was not taken up in the briefing.  I know it's an issue, but I haven't looked at it myself.  So before I make a final decision on the form of the dismissal here, I would ask for some supplemental briefing.

Since it's the defendants' motion, how long do you want to file those briefs?

MR. THOMPSON:  Two weeks, Your Honor.

THE COURT:  All right.  How long does the government want to respond?

MR. McDONALD:  A month, Your Honor.

THE COURT:  That's fine.  So there will be no trial coming up.  The rest of the motions, I'm just going to terminate as moot.  I gave my ruling orally here, because we are on the eve of trial.  This is normally something that I would write on, but I don't have time to write, given that we are right up on it.  So I'm simply going to enter an order that says, for the reasons stated on the record, the motion to dismiss is granted, and that the indictment is dismissed, and that there will be further determination about whether the dismissal is with or without prejudice.

Anything else?

MR. McDONALD:  Not from the government, Your Honor.

THE COURT:  Mr. Nemeth?

MR. THOMPSON:  Yes, Your Honor.  We have one other item to take up with the Court.

THE COURT:  Okay.

MR. THOMPSON:  May I approach?

THE COURT:  Yep.

MR. THOMPSON:  Your Honor, we need to lay down a marker on this particular issue I'm going to bring up, because we have seen the government take corrective action after it knows there's a serious flaw in its indictment.

Your Honor, we have this other case hanging out there, it's the 2022 case.  If you look at the indictment specific to the tax charges, it raises the same allegation that Cory Mann was a sole proprietor.  We can only conclude that the government got there by producing the same witnesses, the same type of testimony.

I wanted to make an oral motion, now, for disclosure of those materials pursuant to criminal rule -- Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), for the production of those Grand Jury materials.

I also want to set down this marker because we could anticipate that the government will try to supersede that indictment in the 2022 case, based on the Court's ruling today.

THE COURT: Is there any reason you can't file this motion in writing?

MR. THOMPSON: We can file the motion, Your Honor, in writing, if that is what the Court prefers, but I wanted to put that on the record today, that we will be seeking that, in light of the shown pattern of corrective action.

THE COURT: Well, what's to stop the government from getting a superseding indictment in the other case if they do it some different way?

MR. THOMPSON: Your Honor, I just wanted to put it on the record. We will certainly file our briefings per the Court's directive.

THE COURT: Okay. You can file whatever you want. If you file a motion, I will decide it. To the extent that you're making an oral motion, I'm going to deny it without prejudice, because as I sit here right now -- first of all, I'm tired. We have been going for three hours. And second of all, you've quoted a rule with a lot of subparts. I have no idea what you're talking about, as you stand there. If you file a motion and a brief, I'll read it carefully.

MR. THOMPSON: Understood, Your Honor. Thank you.

THE COURT: Ms. Kriger, anything else from you?

MS. KRIGER: No. Thank you, Your Honor.

THE COURT: All right. Thank you. We are adjourned.

THE CASE MANAGER:  All rise.  Court is in recess.

(Proceedings concluded at 12:24 p.m.)

_    _    _

                    C E R T I F I C A T I O N

          I, Robert L. Smith, Official Court Reporter of the

United States District Court, Eastern District of Michigan,

appointed pursuant to the provisions of Title 28, United

States Code, Section 753, do hereby certify that the

foregoing pages comprise a full, true and correct transcript

taken in the matter of UNITED STATES OF AMERICA vs. CORY

JUSTIN MANN and RACHEL LOCRICCHIO, Case No. 20-20599, on

Wednesday, May 15, 2024.


                              s/Robert L. Smith
                              Robert L. Smith, RPR, CSR 5098
                              Federal Official Court Reporter
                              United States District Court
                              Eastern District of Michigan

Date:  05/17/2024
Detroit, Michigan